TIMOTHY A. LUKAS, ESQ.
Nevada Bar No. 4678
**HOLLAND & HART LLP**
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Tel: (775) 327-3000/Fax: (775) 786-7169
Email: ecflukast@hollandhart.com

JAMES S. LIVERMON, III (Pro Hac)
Bar Number:  NC #26492
**WOMBLE BOND DICKINSON (US) LLP**
555 Fayetteville Street, Suite 1100
Raleigh, NC  27601
Phone No.: (919) 755-2148
Fax No.: (919) 755-6048
Email:  Charlie.Livermon@wbd-us.com

*Attorney for Liquid Gold, LLC*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>MEDOLAC LABORATORIES, A PUBLIC BENEFIT CORPORATION<br><br>Debtor. | Case No. 21-11271-abl<br>Chapter 11<br><br>**LIQUID GOLD, LLC'S MOTION TO DISMISS**<br><br>Hearing Date: OST REQUESTED<br>Hearing Time: |

Now comes Liquid Gold, LLC ("Liquid Gold" or the "Creditor"), a secured creditor in this matter, by and through counsel, and, pursuant to 11 U.S.C. § 1112(b), hereby respectfully requests that the Court dismiss this chapter 11 case of the debtor, Medolac Laboratories, A Public Benefit Corporation (the "Debtor") for cause, or in the alternative, convert this case to one under chapter 7 of the Bankruptcy Code. In support of this Motion, Liquid Gold states as follows:

## I. JURISDICTION

1.  This matter is a core proceeding pursuant to 28 U.S.C. §157, and the court has jurisdiction pursuant to 28 U.S.C. §§151, 157, and 1334.

///

///

## II. FACTUAL BACKGROUND

2. Medolac Laboratories, A Public Benefit Corporation (the "Debtor") commenced this bankruptcy case by filing a Petition under Subchapter V of Chapter 11 of the United States Bankruptcy Code in this Court on March 17, 2021 (the "Petition Date").

3. Liquid Gold is a creditor by virtue of the filing of Proof of Claim No. 5 in the unsecured amount of $2,418,525.73 in this case (the "Claim"). The Debtor has not objected to Liquid Gold's claim.

4. The Claim is based on judgment entered in the Superior Court of the State of Delaware, Case No. n19C-08-115 MMJ-CCLD (the "Delaware Litigation") in the original amount of $2,399,909.51 and accrued post-judgment interest (the "Judgment"). In addition to the Judgment, discovery sanctions were imposed upon the Debtor in the Delaware Litigation in the amount of $4,616.75 which remained unpaid as of the Petition Date (the "Sanctions"). The Judgment and the Sanctions are included in the Claim.

5. The Delaware Litigation was commenced as a result of the Debtor's failure to make payment upon a convertible note held by Liquid Gold, executed by the Debtor in favor of Liquid Gold on July 12, 2017 in the original principal amount of $1,900,000 (the "Note"). Interest accrued on the Note at the fixed rate of five percent (5%) per annum. The Note matured by its own terms on July 12, 2019.

6. Following entry of the Judgment, the Debtor filed its petition for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code. According to the Debtor's Schedules (D.E. #50), on the Petition Date the Debtor asserted that it owed a total of $306,960.41 on secured claims, $992,429.45 to priority claims and $5,314,568.05 on undisputed, noncontingent and liquidated unsecured claims for a total of $6,613,957.97 in undisputed debt.

7. The Debtor filed its Subchapter V Plan on April 5, 2021, only nineteen (19) days from the Petition Date. The Debtor proposes to fund its plan with "cash generated from operations from its existing benefit product line, further potential investments from outside sources post-confirmation" and the pending approval by the United States FDA of its infant formula product. See Plan (D.E. #59).

8.  For the reasons stated herein, the Debtor's case should be dismissed or converted to chapter 7.

### III. ARGUMENT

9.  "[O]n request of a party in interest, and after notice and a hearing the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate . . . ." A court should convert a case or, alternatively, dismiss the case, so long as "cause" exists. 11 U.S.C. § 1112(b). "A bankruptcy court considering dismissal under § 1112(b) must engage in a case-specific factual inquiry which focuses on the circumstances of the debtor." *In re U.S. Tommy, Inc.*, 2019 Bankr. LEXIS 893, *12 (B.A.P. 6th Cir. March 22, 2019) (internal citations omitted). "[T]he initial burden lies with the Movant to establish "cause" for conversion [or dismissal]." *In re Prods., Int'l Co.*, 395 B.R. 101, 109 (Bankr. D. Ariz. 2008). "A list of what constitutes "cause" is found in § 1112(b)(4). Generally, such lists are viewed as illustrative rather than exhaustive" and courts should consider other facts "and use its equitable powers to reach the appropriate result in individual cases." *Id*. (citing *In re Consolidated Pioneer Mortg. Entities*, 248 B.R. 368 (9th Cir. BAP 2000). "[C]ourts have a wide discretion in determining what constitutes such cause." *Id*. "Although a debtor's bad faith in filing a petition is not an enumerated reason for dismissal under § 1112(b)" courts addressing the issue "have overwhelmingly held that a lack of good faith in filing a chapter 11 petition establishes cause for dismissal." *In re Detienne Assocs. L.P.*, 342 B.R. 318, 323 (Bankr. D. Mont. 2006); *see also Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994).

10.  "A determination as to whether a debtor has acted in bad faith is a "fact-specific and flexible determination" that must be made on a case-by-case basis looking to a totality of the circumstances." *Id*. (citing *In re Lee*, 467 B.R. 906, 917 (B.A.P. 6th Cir. 2012) (quoting *Alt v. United States (In re Alt)*, 305 F.3d 413, 419 (6th Cir. 2002)). Among the factors that courts have has set forth as probative to a determination of good faith, or the lack thereof, is whether the pre-petition conduct of the debtor has been improper. *See Trident Assocs. Ltd. P'ship v. Metropolitan*

3

*Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995)[1]. "If the motion [to dismiss] is predicated on bad faith, the moving party has the initial burden of making a prima facie case to support its allegations of bad faith." *In re Mense*.5-9 B.R. 269, 277 (Bankr. C.D. Cal. 2014). In this case, dismissal is warranted based on the following:

**A. Bad Faith [11 U.S.C. § 1112(b)(1)]**

   **i. The Debtor artificially manipulated its debts to qualify for Subchapter V.**

11. The Debtor's bad faith actions center on its manipulation of its balance sheet following the Debtor's decision to file bankruptcy and within the thirty (30) days of the Petition Date. But for this manipulation of its debt load, the Debtor would not meet the definition of a small business debtor under Section 1182. A small business debtor under Subchapter V as originally enacted was a person engaged in commercial or business activities that has noncontingent liquidated secured and unsecured debts as of the petition date of not more than $2,725,625, but within weeks after the effective date of Subchapter V, Congress passed the CARES Act[2], which increased the debt limit for eligible debtors under Subchapter V up to $7,500,000.

12. By all measures, without the adroit maneuvering and negotiating of its counsel, the Debtor would not and should not qualify as a small business debtor. On the Petition Date, the Debtor owed roughly $6.6 million. Yet when the Debtor hired Larson & Zirzow LLC, counsel for the Debtor in this case, on January 14, 2021 and until mid-February 2021, or approximately thirty days prior to the filing, the Debtor had noncontingent liquidated debts of approximately $14,000,000, some 120% greater than its debts on the Petition Date and nearly 100% greater than the debt limit under the CARES Act. The Debtor's sudden halving of its debt, ironically to a level just under the Subchapter V debt ceiling, constitutes bad faith when viewed for what it is: abuse of the bankruptcy process and unfair treatment of its creditors.

---

[2] Coronavirus Aid, Relief, and Economic Security Act, H.R. 748, 116th Cong.

HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Tel: (775) 327-3000/Fax: (775) 786-6179

13. Successfully shedding over $8 million in debt in less than thirty (30) days (or three times faster than by a chapter 7 bankruptcy) is an extraordinary feat. However, the Debtor accomplished this quite simply: according to Ms. Medo's testimony at the Debtor's Section 341 Meeting of Creditors, she contacted a select, hand-picked group of creditors, told them about the imminent bankruptcy filing, and then offered to convert their debts to equity so they had the opportunity to get their investment back (or more) after the Debtor discharged the debts of those who were not provided this opportunity.[3]

14. Ms. Medo identified those whose debts were converted to equity on the eve of bankruptcy as follows: Doug Hughes, Keen Growth Capital, Sue Hall, Frank and Rebecca Donatelli, Mark and Laura Diamond, and Dr. Berolone.[4] See Liquid Gold's Designation Statement Pursuant to LR 7032, Section 341 Meeting of Creditors Transcript, p. 44, line 11 – p. 45, line 6. At the time of conversion of Mr. Hughes' and Keen Growth Capital's debts to equity, the Debtor owed $3.3 million and $3.8 million, respectively.[5] Ms. Medo also acknowledged that she approached Mother's Milk Corporation, Inc., an affiliate of the Debtor <u>that the Debtor manages</u>, and converted its debt to equity in early March 2021, only days before the petition date.[6] These creditors received one (1) share of stock for each $1.62 of debt.[7] Multiplying this conversion factor to number of

---

[3] See Liquid Gold's Designation Statement Pursuant to LR 7032, Section 341 Meeting of Creditors Transcript, p. 40, line 17 – p. 44, line 4.

[4] See Liquid Gold's Designation Statement Pursuant to LR 7032, Section 341 Meeting of Creditors Transcript, p. 40, line 17 – p. 43, line 5. Ms. Medo did not provide Dr. Bertolone's first name during her examination. However, (Dr.) Salvatore J. Bertolone, a physician in Louisville, Kentucky, is the only person named "Bertolone" who is listed as a Series B Preferred equity security holder in the Debtor's List of Equity Security Holders.

[5] See Liquid Gold's Designation Statement Pursuant to LR 7032, Section 341 Meeting of Creditors Transcript, p. 54, line 23 – p. 55, line 6.

[6] See Liquid Gold's Designation Statement Pursuant to LR 7032, Section 341 Meeting of Creditors Transcript, p. 40, line 18 – p. 41, line 16.

[7] See Liquid Gold's Designation Statement Pursuant to LR 7032, Section 341 Meeting of Creditors Transcript, p. 41, line 17 – p. 42, line 10.

HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Tel: (775) 327-3000/Fax: (775) 786-6179

Series B shares disclosed in the List of Equity Security Holders filed on March 30, 2021, the chart below shows the Debtor converted $8,378,359.77 of debt to equity from those transactions:

| Creditor | Series B Shares[8] | Value[9] |
|---|---|---|
| Doug Hughes | 2,108,361 | $3,415,544.82 |
| Keen Growth Capital | 2,361,597 | $3,825,787.17 |
| Mother Milk Cooperative, Inc. | 543,187 | $879,962.94 |
| Sue Hall | 24,262 | $39,304.44 |
| Frank Donatelli | 12,410 | $20,104.20 |
| Rebecca Donatelli | 9,987 | $16,178.94 |
| Mark and Laura Diamond | 28,912 | $46,837.44 |
| Dr. Bertolone | 83,111 | $134,639.82 |
| **Total** | **5,171,827** | **$8,378,359.77** |

15. *Schedules and Statement of Financial Affairs*, List of Equity Security Holders [D.E. #50]. According to the Schedules filed by the Debtor, at the time of the filing of the petition the Debtor owed $6,613,957.97. *Schedules and Statement of Financial Affairs* [D.E. #50]. Combine that with the amount of debt that was converted, and the debt on the Petition Date should have been $14,992,317.70 or **double** the maximum Subchapter V debt limit.

        **ii.**        **The Debtor preferred certain unsecured creditors over others when converting debt to equity.**

16. Perhaps to Ms. Medo, converting the debts of certain preferred creditors to equity seemed like the "right thing to do,"[10] but to the twelve (12) other convertible noteholders with claims exceeding $3.25 million[11] who did not have this opportunity and who now may receive pennies on their claims, it is fundamentally unfair and inequitable. Throughout the Bankruptcy Code, there are specific provisions that ensure fairness and equality to creditors. A prime example

---

[8] According to the Debtor's List of Equity Security Holders attached to the Debtor's Schedules and Statement of Financial Affairs [D.E. #50].

[9] Calculated based on the number of securities listed in the Debtor's List of Equity Security Holders multiplied by the conversion factor of $1.62 per share.

[10] Section 341 Meeting of Creditors Transcript, p. 44, lines 5 - 12.

[11] Paul Feldstein is listed in Schedule F as having a claim based on a promissory note, but the amount of Mr. Feldstein's claim is listed as "unknown."

is Section 547, authorizing a trustee to avoid pre-bankruptcy preferential transfers that gave creditors more than their equal share under a hypothetical chapter 7 liquidation. While frustrating to those on the receiving end of a preference demand or lawsuit, these provisions not only promote and ensure equality and fairness between creditors, they also guard against a debtor's favoritism to certain selected creditors. 5 *Collier on Bankruptcy* ¶ 547.01 (16th ed. 2011) ("[M]ost importantly, the preference provisions facilitate the prime bankruptcy policy of equality purposes of Section 547 of distribution among creditors of the debtor.").[12]

17. Here, the Debtor has "preferred" or chosen a select group of creditors to benefit from the bankruptcy by converting their debts to equity, providing them benefit from the Debtor's bankruptcy filing by wiping out huge swaths of similarly situated debts and positioning them to benefit from the Debtor's discharge. Without this preference, these chosen creditors, along with the rest of the general unsecured creditors, would receive mere pennies on the dollar. Instead, these preferred creditors get the upside appreciation in the value of their equity interest from the reorganization and the Debtor gets to avoid the absolute priority rule by skating just under the Subchapter V debt limit.

18. Should the Debtor's pre-bankruptcy preferential transfers to a small group of hand-picked creditors be sanctioned and a bright line, "snapshot in time" petition date test for eligibility under Subchapter V be established, the door will be opened for abuse, manipulation and gamesmanship of a debtor's balance sheet that could potentially destroy the bankruptcy's foundation of equality and fairness and severely impair the court's ability to consider the "totality of the circumstances." Once word of this sanctioned manipulation of a debtor's balance sheet ripples throughout the bankruptcy community, it is easy to envision situations where this process

---

[12] See also *Yellowhouse Mach. Co. v. Mack (In re Hughes)*, 704 F.2d 820, 822 (5th Cir. 1983) ("The nature of the preference avoidance powers granted by Section 547 is intended to promote the common good of *all* of an estate's creditors…."); Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand. L. Rev. 713, 748 (1985) ("Statements in the legislative history also mention preserving the bankruptcy policy of 'equality' of distribution. But, with creditors classified for distribution purposes on the basis of lien and priorities, no bankruptcy policy of 'equality' exists. A policy of preserving classes and of preserving equality within classes does exist, however, and the preference concept is designed to preserve this policy." (footnotes omitted)).

7

can and will be abused by debtors, insiders and even creditors alike. Giving equity instead of cash payment to a creditor could now be a way to effectively dodge Section 547, since Subchapter V allows equity holders to retain their stake in the reorganized debtor. This hardly promotes equality and fairness. To the contrary, it promotes and highlights the lack of good faith in the Debtor's plan process.

19. What promotes equity and fairness among creditors is for all convertible noteholders to have been provided the opportunity to choose equity or retain its unsecured claim. Given that choice, Liquid Gold and at least two other convertible noteholders would have opted for the conversion of their debt to equity and it is likely that others would have as well.[13] Creditors who then rejected that opportunity would have done so knowingly and at their own risk. However, because the Debtor only offered the conversion option to certain of its creditors and alerted only those same creditors to an impending bankruptcy filing, it acted with fundamental unfairness with respect to the its convertible noteholders.

### iii. Proceeding under Subchapter V avoids the absolute priority rule and other chapter 11 confirmation requirements.

20. Offering the conversion deal to select creditors allowed the Debtor a significant and material advantage under Subchapter V by avoiding some significant obstacles to confirming a plan under chapter 11. Proceeding as a small business debtor will avoid necessary compliance with the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii), thereby allowing equity security holders, including Ms. Medo and the other select, hand-picked former creditors who had their debts converted to equity on the eve of bankruptcy, to retain their equity without paying the general unsecured claims in full. In addition, by virtue of its qualification as a Subchapter V debtor, the Debtor avoids the requirements of § 1129(a)(10) that the debtor receive the acceptance of at least one impaired class of creditors, removing another key creditor protection normally afforded by chapter 11.

---

[13] *See* Motion to Dismiss filed by creditor Prolacta Bioscience, Inc. and the Declarations of Pamela Moffat and Slater Lawrence attached thereto.

20. By manufacturing its eligibility for Subchapter V, the Debtor removed key creditor protections built into the Bankruptcy Code from its plan confirmation equation. The Debtor is now free to propose a plan that would not have been confirmable under the normal confirmation procedures in a standard chapter 11 case. The engineering of that circumstance amounts to fundamental unfairness and bad faith on a scale sufficient to warrant the dismissal of the Debtor's chapter 11 case.

**B.  Substantial or continuing loss to or diminution of the estate and the there is no reasonable likelihood of rehabilitation [11 U.S.C. § 1112(b)(4)(A)]**

21. Among the listed examples of cause for dismissal or conversion under § 1112(b) is that there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). "With respect to the first element, there need not be a significant diminution in the estate" to satisfy the loss or diminution prong of section 1112(b)(4)(A). *Mense*, 509 B.R. at 284. With respect to the second part of § 1112(b)(4)(A), "[r]ehabilitation contemplates the successful maintenance of the debtor's business operations." *Id*. "A reasonable likelihood of rehabilitation is absent when the debtor's business operations do not justify continuance of the reorganization effort." *Id*. "For a Chapter 11 case to be dismissed or converted, predicated on this item, there must be both (1) continuing loss or diminution, and (2) the absence of reasonable likelihood of rehabilitation." *Prods*, 395 B.R. at 110.

**i.  There is substantial or continuing loss to or diminution of the estate**

22. It is clear from the Debtor's projections attached to the Plan and other financial information provided that the Debtor has been and anticipates continuing to experience loss in value to the company and to the estate. The Debtor projects losses for the next four months from operations according to the Debtor's emergency motion for post-petition financing. (D.E. 19; the "Post-Petition Financing Motion"). The budget attached to the Post-Petition Financing Motion shows that from March through June, there will be a net operating loss and that the total net operating losses of approximately $700,000. In addition, the projections attached to the Plan anticipate two months of negative cash flow and negative cash available for plan distributions. Coupled with the expenses associated with potential ongoing litigation, it is incontrovertible that

9

the Debtor's bankruptcy estate is experiencing a continuing loss to or diminution in value.

### ii. There is no reasonable likelihood of rehabilitation

23. While "rehabilitation contemplates the successful maintenance of the debtor's business operations," it is equally clear in this case that a "reasonable likelihood of rehabilitation is absent" because the Debtor's "business operations do not justify continuance of the reorganization effort." *Mense*, 509 B.R. at 284. The Debtor in this case has never had a profitable year of operations, having been established in 2009. In fact, the Debtor acknowledged in its motion to estimate Prolacta's claim that the Debtor has generated "only $2,942,662 in net sales revenue (after costs of goods sold) in its *entire history*" and has incurred net operating losses of approximately $16.6 million.[14] The Debtor's struggles with profitability are highlighted in the budget presented to support its emergency motion for post-petition financing and use of cash collateral filed as part of the first day motions in this case. (D.E. # 19). Noticeably, even without the astronomical litigation expenses associated the various pre-petition litigation, the financial picture is the same. The budget shows that each month from March through June, there will be a net operating loss and that the total net operating losses over this period will be approximately $700,000.

When comparing the budget to the 4-year plan projections, the numbers are irreconcilable. Revenues for May and June 2021 were projected to grow between 5% and 10 %.[15] Yet, in the 4-year plan projections, the Debtor projects that sales would grow by 50% in July, by 27% in August and by 14% and 17% in September and October, respectively. In November, sales would hold steady at $486,798, which is a 252% increase in sales compared to five months earlier in June or a 290% increase compared to April, just six months earlier. There is no mention in the Plan as to how this significant increase in revenue will be attained. The Debtor mentions the pending infant formula submission of its new Fortifier product with the Food & Drug Administration, but the Debtor acknowledges that there is no known timetable of when (or even if) approval will be

---

[14] Debtor's Motion to Estimate Claim of Prolacta Bioscience, Inc. Pursuant to 11 U.S.C. § 502(c), Docket No. 108, p. 59, lines 9-10, and 16-17.

[15] April revenue growth is not ascertainable because the gross revenue amount for March is for only a portion of the month, which eschews the percentage of revenue growth for April.

received.

Contrary to what one might have expected, expenses do not track the Debtor's optimistic sales grown.  Instead, the Debtor has unstated expenses to show profitability.  Notice that in July when sales are projected to increase by 50%, expenses are only increasing by 7.5%.  In August when sales are to increase by 27%, expenses will increase by only 11%.  In September and October, sales increase by 14% and 17% with expenses increasing by 2% and 9%, respectively.  The Debtor offers no explanation for why expenses do not increase in lock step with such rapid growth.

Under the Debtor's current leadership, it is unlikely that the Debtor will be able to turn itself into a profitable company able to fund all payments under the Plan. The Debtor has inflated its revenue projections and understated its expenses throughout its four year projections.  There is no reasonable likelihood of reorganization in this case, and the case should be dismissed.

**C.    The court should convert this case to one under Chapter 7 of the Bankruptcy Code**

26.    As stated above, 11 U.S.C. § 1112(b)(1) states that "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss [the] case . . . whichever is in the best interest of creditors and the estate . . . ." While Liquid Gold asserts there is sufficient cause to dismiss this case, in the alternative Liquid Gold requests that the court convert this case to one under chapter 7 so that a trustee may be appointed to liquidate the assets of the Debtor.

**IV. OBJECTION TO DEBTOR'S SMALL BUSINESS DEISGNATION**

27.    By this Motion, Liquid Gold hereby objects to the Debtor's designation as a small business debtor under Subchapter V of Chapter 11 pursuant to Fed. R. Bankr. P. 1020(b).

**V. CONCLUSION**

28.    Based on the Debtor's bad faith actions, the continuing loss to and diminution in value to the estate, the lack of a reasonable likelihood of successful reorganization, and for the other grounds stated herein, cause exists to dismiss, or in the alternative convert, this case pursuant to 11 U.S.C. §§ 1112(b)(1) and 1112(b)(4).

WHEREFORE, Liquid Gold respectfully requests that the Court dismiss the chapter 11 case

11

of the debtor, Medolac Laboratories, A Public Benefit Corporation, and further respectfully requests that this Court grant such other relief as is appropriate under the circumstances.

Respectfully submitted this 14th day of May, 2021.

HOLLAND & HART LLP

By: */s/ James S. Livermon, III*

Timothy A. Lukas, Esq.
5441 Kietzke Lane, 2nd Floor
Reno, NV 89511
Telephone: (775)327-3023
Facsimile: (775)786-6179
ecflukast@hollandhart.com
    -and-

James S. Livermon, III (Pro Hac)
Bar Number: NC #26492
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Phone No.: (919) 755-2148
Fax No.: (919) 755-6048
Email: Charlie.Livermon@wbd-us.com

*Counsel for Liquid Gold, LLC*

HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Tel: (775) 327-3000/Fax: (775) 786-6179

# CERTIFICATE OF SERVICE

I am, and was when the herein described mailing took place, a citizen of the United States, over 18 years of age, and not a party to, nor interested in, the within action; that on May 14, 2021, I served a true and correct copy of the foregoing **MOTION** in the following manner:

☒ (BY NOTICE OF ELECTRONIC FILING) Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Electronic Case Filing System of the United States Bankruptcy Court to the parties in the case.

☐ (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Reno, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐ (OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐ (FACSIMILE) That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

DATED: May 14, 2021.

                                                            Cyndy Arnold

16730185_v1