**BRIAN D. SHAPIRO, ESQ.**
**Law Office of Brian D. Shapiro, LLC**
510 S. 8th Street
Las Vegas, NV 89101
(702) 386-8600 Fax (702) 383-0994
brian@brianshapirolaw.com
Proposed Attorney for Trustee

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>MEDOLAC LABORATORIES, A<br>PUBLIC BENEFIT CORPORATION,<br><br><br><br><br>Debtor(s). | Case No. 21-11271-abl<br>Chapter 7 |

## MOTION TO APPROVE SETTLEMENT[1]

Brian D. Shapiro, ("**Trustee**") submits his motion to approve settlement with Doug Hughes ("**Motion**").  This Motion is based upon all pleadings on file in this case and any oral argument that this Court may permit.  The Trustee respectfully requests this Court take judicial notice of the official court Docket in Debtor's case to the extent appropriate under and permitted by FRE 201(b) and (c).

---

[1] All references to "ECF No." are to the numbers assigned to the documents filed in this bankruptcy case as they appear on the case docket maintained by the Clerk of the Court. All references to "Section" are to provisions of the Bankruptcy Code, 11 U.S.C. § 101, et seq. All textual references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure. All textual references to "Civil Rule" are to the Federal Rules of Civil Procedure. All references to "FRE" are to the Federal Rules of Evidence

## BACKGROUND

1. On March 17, 2021, Medolac Laboratories, a Public Benefit Corporation ("**Medolac**") filed a Chapter 11 Bankruptcy Petition and chose to proceed under Subchapter V of Chapter 11 ("**Petition**").  See, ECF No. 1.

2. Om March 18, 2021, the United States Trustee appointed Brian D. Shapiro as the Subchapter V Trustee.  See, ECF No. 7.

3. On March 19, 2021, Medolac filed an emergency motion for (a) the entry of interim and final orders authorizing the debtor to obtain senior secured, super priority post-petition financing; (b) granting liens and super priority claims; (c) approving loan documents relating to the foregoing; (d) modifying the automatic stay; (e) scheduling final hearing; (ii) authorizing the use of cash collateral or alleged cash collateral; and (iii) granting related relief.  See, ECF No. 19 (referred to herein as "**DIP Financing Motion**").

4. The DIP Financing Motion requested approval of Debtor in Possession Financing with Doug Hughes ("**Hughes**") in an amount not to exceed $500,000.00.  Id.

5. On March 30, 2021, Medolac filed its Bankruptcy Schedules (the "**Schedules**").  See, ECF No. 50.

6.  The Schedules at ECF No. 50 p. 3-10, listed a value of Medolac's assets in the amount of $2,151,701.38 which consisted of the following:

| **Description** | **Amount** |
| --- | --- |
| Cash in Hand | $416.00 |
| Cash In Bank Accounts | $211,718.37 |
| Deposits | $26,936.76 |
| Retainers for Professionals | $30,560.50 |
| Prepaid Health Insurance | $6584.31 |
| Prepaid Insurance | $30,168.58 |
| Property Taxes | $8,824.29 |
| Account Receivables | $209,621.31 |
| Donor Milk (cost basis) | $469,487.67 |
| Finished Product (cost basis) | $63,627.62 |
| Furniture and Fixtures (net book value) | $12,62.00 |
| Computer Equipment | $5,979.94 |
| 1989 Dodge Ram 1500 Truck | $500.00 |
| 2005 Ford F-150 | $5,000.00 |
| Machinery and Equipment (net book value) | $968,740.74 |
| Shop Tools (net book value) | $1,811.17 |
| Laboratory Equipment (net book value) | $93,748.12 |

| Lease for 1031 Boulder City Pkwy. | Unknown |
| --- | --- |
| Claims Against Prolacta | Unknown |
| Claims for Collection of Receivables | Unknown |
| Claims arising out of intellectual property | Unknown |
| Potential Tax Claims and Refunds | Unknown |

7. On March 30, 2021, this Court entered an interim order approving the DIP Financing Motion. <u>See</u>, ECF No. 52

8. On April 26, 2021, this Court entered a final order approving the DIP Financing Motion. <u>See</u>, ECF No. 90.

9. On May 13, 2021, Prolacta Bioscience, Inc. ("**<u>Prolacta</u>**"), with a request for shorten time, filed a motion to dismiss Medolac's bankruptcy case ("**<u>Prolacta's Motion to Dismiss</u>**"). <u>See,</u> ECF No. 124.

10. On May 14, 2021, Liquid Gold, LLC ("**<u>Liquid Gold</u>**"), with a request for shorten time, filed a motion to dismiss Medolac's bankruptcy case ("**<u>Liquid Gold's Motion to Dismiss</u>**"). <u>See</u> ECF  No. 136.

11. On July 2, 2021, this Court stated its oral ruling granting both Prolacta's Motion to Dismiss and Liquid Gold's Motion to Dismiss for cause and converting Medolac's bankruptcy case to one under chapter 7 of the Bankruptcy Code. <u>See</u>, ECF No. 234.

12. On July 6, 2021, Hughes, by and through counsel, advised the Debtor that it was now in default under the terms of the financing approved by this Court.  A copy of the July 6, 2021, notice of default is attached hereto as **Exhibit 1**.

13. On July 7, 2021, this Court entered an order granting Prolacta's Motion to Dismiss but converted the case to a Chapter 7.  <u>See</u>, ECF No. 234.

14. On July 7, 2021, this Court entered an order granting Liquid Gold's Motion to Dismiss but converted the case to a Chapter 7.  <u>See</u>, ECF No. 236.

15. On July 8, 2021, the United States Trustee appointed Brian D. Shapiro as the Chapter 7 Trustee ("**<u>Trustee</u>**") of Medolac's bankruptcy case ("**<u>Bankruptcy Estate</u>**" or "**<u>Estate</u>**").  <u>See</u>, ECF No. 241.

16. On July 14, 2021, the Bankruptcy Estate received a notice of proposal to accept collateral in full satisfaction of secured obligations.  A copy of such notice is attached hereto as **Exhibit 2**.

17. Upon being appointed as the Trustee, the Trustee immediately contacted Liquid Gold and Prolacta along with other entities who have previously expressed an interest in the assets of Medolac or purchasing the ongoing business of Medolac. Also, the Trustee spoke with three parties who have not appeared in the Bankruptcy Case but were inquiring into the assets of the Bankruptcy Estate.  <u>See generally</u>, Declaration of Brian D. Shapiro.

18.  As of the date of the filing of this Motion, neither Liquid Gold, Prolacta nor any other third party have made any offers to purchase assets of the Bankruptcy Estate. Prolacta initially advised the Trustee that it was not interested in purchasing such assets.  However, after the Trustee inquired about a consent to an order shortening time to the approval of this Motion, Prolacta expressed a renewed interest in purchasing the Estate's assets.  Email communications from Prolacta's counsel and

the Trustee are collectively attached hereto as **Exhibit 3.**    <u>See generally</u>, Declaration of Brian D. Shapiro.

19. The main equipment that was being utilized by Medolac to produce its product are leased.  Some of the leases appear to be actual purchase agreements.  The Trustee has attempted to gather information as to the buyout of such leases but not all figures have been obtained.  A copy of the Trustee's report is attached hereto as **Exhibit 4**.  <u>See generally</u>, Declaration of Brian D. Shapiro.

20. The Trustee has recovered $184,770.79 in cash and has determined that there are account receivables in the amount of $131,737.20.  At this time, it is unknown as to the potential of collecting such receivables.  The Trustee is aware that in his past experiences, collection of receivables of a chapter 7 debtor is extremely difficult.  Further, the longer the receivables age, the more difficult they become to collect.  Whether the receivables are collectable based upon the type of product sold by Medolac and that its customers are medical facilities is unknown at this time.  <u>See generally</u>, Declaration of Brian D. Shapiro.

21. The Trustee is confident that the equipment owned by the Bankruptcy Estate has some type of liquidation value to the Estate, but it does not appear that the value of the equipment would result in net funds to the Estate.  Attached hereto as **Exhibit 5,** is a list of assets that is owned by the Estate which reflects a "salvage" value of $187,379.12.  The equipment is located at the Debtor's leased facility.  As such, the Bankruptcy Estate's administrative expense for the lease will increase the longer this equipment remains there.  The true liquidation value of the equipment is not known as such value would be determined by a duly noticed auction.  <u>See generally</u>, Declaration of Brian D. Shapiro.

22. The Bankruptcy Estate is also in possession of completed product that has some type of value. The Estate is in possession of 19 cases of the product known as Benefit 24, 89 cases of Benefit 20, and 77 cases of Benefit 18. Also, there are approximately 3850 individualized pouches that have not been labeled nor boxed. All cases consist of 48 pouches. This product also remains at the Debtor's leased facility. Id.

23. It is the Trustee's belief that Medolac has potential value as an operating entity. For instance, Medolac was awaiting a formal agreement to produce its product for a large hospital consortium. Unfortunately, such written agreement was provided to Medolac after the conversion of the case. In addition, Medolac had received an order of 62 cases which could have resulted in a receivable of $83,052.17. Due to the conversion of the case to a Chapter 7, Medolac is not operating. Id.

24. The Trustee did consider filing a motion to operate the business, but the Estate had no funds to continue to be a viable business and it would need the consent along with additional contribution of funds by Hughes to operate the business. Hughes was not willing to consent nor lend any additional funds. As such, the Trustee chose not to proceed with the filing of the motion to operate. Accordingly, the value of the Estate has significantly decreased and as time continues to go by, it is likely that the value of the Estate will continue to decrease. Moreover, as a potential foreclosure was imminent, the Trustee had limited time to find a potential purchaser for the Estate's assets or even to attempt to market the assets for sale through a public action. Id.

25. As to a public auction, in the Trustee's experience, an auctioneer would likely charge a 25% commission, and a 10% buyer's premium plus costs. If an auction were to occur, the first money recovered would have to pay back the secured creditors which includes Hughes, the Small Business Administration ("**SBA**") and any finance company of the "leased" equipment. By focusing only on Hughes and the SBA, the Estate would need to be able to sell the Estate's assets for at least one

million dollars to break even ($250,000 commission, $600,000 owed to Hughes and $150,000 owed to the SBA).  Id.

26. The Trustee would have a difficult time to proceed with a public auction.  The terms of the DIP Financing Motion, which was approved by this Court, provided in part that the stay was terminated in favor of Hughes without the need of any additional court order.  Absent the Settlement Agreement, a consensual stay was not agreeable by Hughes.  It is the Trustee's belief that to obtain a stay of any foreclosure, he would be forced to file an adversary proceeding against Hughes and request that he be enjoined from proceeding on the foreclosure.  If an adversary proceeding was filed, then the Trustee would be concerned about the likelihood of success and the cost to maintain such proceeding.  As a foreclosure is pending, the timing to secure and properly market a public auction is extremely limited  Id.

27. To recover funds for the Estate, the Trustee has alleged that Hughes is not properly secured in the cash located in the bank accounts, the account receivables, the avoidance actions, and other potential actions.  The Trustee has advised Hughes if he moves forward through the foreclosure process, he is subject to the equitable doctrine of marshalling.  Finally, if Hughes forecloses on the Estates' assets, the Trustee has alleged that he could be subject to an avoidance action because there is a potential that the actual value of the assets of the Estate could be valued significantly more than the amount owed to Hughes.  Id.

28.  Due to the allegations made by the Trustee, Hughes and the Estate negotiated a resolution to resolve any and all disputes.  An agreement has been reached which will result in funds being paid to the Estate along with a retention of a variety of causes of action.  A copy of the agreement along with an amendment is attached hereto collectively as **Exhibit 6** (the "**Settlement Agreement**").  See generally, Trustee's Declaration in Support.

29. The Settlement Agreement resolves all disputes, and the pertinent part of the Agreement provides as follows:

    a.   Hughes underlying debt will be fully satisfied by the retention of the Estate's assets.  However, the Estate shall retain the following assets:

        1.   Cash held by the Debtor in any account.

        2.   All Debtor's account receivables.

        3.   Any and all claims against Prolacta.

        4.   All Chapter 5 avoidance claims

    b.   After paying applicable costs, the proceeds, if any, received on the claims against Prolacta, cash held in any account and the account receivables, shall be divided between Hughes and the Estate.  Hughes shall be entitled to receive 50% of the net proceeds of such assets.

    c.   Hughes shall pay the Estate an additional $750,000.00 to satisfy the claims asserted by the Estate.

    d.   Hughes shall not be permitted to foreclose on its remaining Collateral until the earlier of, entry of this Court's order approving the Settlement Agreement or 6 days after entry of an order denying the Settlement Agreement.

    <u>Id</u>.

30. Prior to entering into the Settlement Agreement, the Trustee examined factors including the probability of success in any claims against Hughes, the difficulties in the matter of collection, the cost and complexity of litigation and the best interest of creditors.  Each of the factors played a part in the Trustee's decision to enter into the Settlement Agreement.  <u>Id</u>.

31. The Trustee was concerned about the viability of the allegation he has made against Hughes.  The Bankruptcy Court would be forced to interpret its own order and the agreement made between the Chapter 11 Debtor and Hughes.  The Court would

need to determine what is the collateral securing Hughes' loan.  It is not entirely certain that the Court would rule in favor of the Trustee as to his allegations.  <u>Id.</u>

32. The Trustee is more confident on his marshalling allegation and fraudulent transfer allegation, but such allegations are only viable if the elements of such causes of action are met and that the value of the assets are significantly more than the amount of the debt.  Considering the ability to foreclose, the dwindling value of the assets, the continuing liability of the Bankruptcy Estate for storing these assets at the leased facility,  and that no interested party has made an offer to purchase such assets, the Trustee believes that such allegations are legitimate, but the success is not guaranteed.  <u>Id.</u>

33. The Trustee is concerned about the collectability of Hughes.  Although he does believe that Hughes may be collectable, it is unknown what he personally owns or whether his assets are protected through limited liability companies or other sources of asset protection.  <u>Id.</u>

34. The cost and complexity of this matter should not be understated.  The Bankruptcy Estate has no funds to litigate this case.  The cost of prosecution will necessitate a litigation attorney willing to take such matter contingent upon collection.  Any litigation is complex and potential litigation involving interpretation of court orders, commercial law, fraudulent transfer law and bankruptcy law.  The case will be extremely complex.  <u>Id.</u>

35. The amount obtained by the Estate by virtue of the Settlement Agreement is in the best interest of creditors.  Based upon the amount of the debt in the schedules and the applicable proof of claims which have been reviewed by the Trustee, it appears that there will be funds available to pay priority unsecured creditors and potentially unsecured creditors.  The Trustee will also be able to utilize the funds to investigate other potential actions.  <u>Id.</u>

36. Based upon the Trustee's business judgment and the examination of applicable factors, the Trustee believes that Settlement Agreement is in the best interest of the Bankruptcy Estate. Id.

## **LEGAL ARGUMENT**

**JURISDICTION, VENUE; CORE PROCEEDING**

37. This Court has jurisdiction over Medolac's Chapter 7 bankruptcy case. 28 U.S.C. §§ 1334(a) and 157(a), and LR 1001(b)(1).

38. Venue of Medolac's Chapter 7 bankruptcy case is proper in the District of Nevada under 28 U.S.C. §1408 and 1409.

39. Under 28 U.S.C. §§ 1334 and 157(b)(2)(H), (K) and (O), bankruptcy courts have core subject-matter jurisdiction as to proceedings to determine, avoid or recover fraudulent conveyances, determination of the validity, extent or priority of liens and other proceedings affecting the liquidation of the assets of the estate.

40. The statutory predicate for the relief sought is Sections 105(a), 363(b) and Rule 9019.

**CONTROLLING LAW**

41. The Trustee is requesting this Court to approve the Settlement as stated within the Settlement Agreement pursuant to Section 105(a) and Rule 9019(a). Rule 9019(a) provides:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.

42. "The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and

dubious claims." *In re A & C Properties*, 784 F.2d 1377, 1380-81 (9th Cir. 1986). The bankruptcy court has great latitude in approving compromise agreements. *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988). However, the court's discretion is not unlimited. The court may approve a compromise only if it is "fair and equitable." *A & C Properties* at 1381. In approving a proposed compromise in bankruptcy proceedings, the court must consider: (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. Id. at 1381 (citations omitted). "It is not necessary to satisfy each of these factors provided that the factors as a whole favor approving the settlement." *In re Pacific Gas & Elec. Co*., 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004). Ultimately, the Court must determine if the settlement is reasonable given the particular circumstances of the case. *A & C Properties*, 784 F.2d at 1381. The Court's role in considering a proposed compromise is "to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness." Id. at 417 citing *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991). Although the Trustee bears the burden of persuasion, "a court generally gives deference to a trustee's business judgment in deciding whether to settle a matter." *In re Mickey Thompson Entm't Group, Inc*., 292 B.R. 415, 420 (9th Cir. BAP 2003). See also, *In re Hyloft*, 451 B.R. 104 (Bankr D. Nev. 2011) [Court finding that the settlement was not fair and equitable under the A & C

Factors] and *In re Endoscopy Ctr. of Southern Nevada*, 451 B.R. 527 (Bankr. D. Nev 2011) [Trustee met his burden demonstrating that the settlement was in the best interest of the estate].

43. Applying the A&C Properties factors, the Trustee submits the proposed Settlement Agreement is fair and equitable, within the Trustee's reasonable business judgment, and in the best interest of the Debtor's estate for the following reasons.

**Probability of Success**

44. The Trustee is confident that he has claims against Hughes. However, the Trustee acknowledges that there is always some level of uncertainty and risk in litigation. Although no adversary case has been filed against Hughes, the Trustee has examined potential defenses as to his claims and is forced to acknowledge that it is an uphill battle to prevail against Hughes. In particular, the Trustee is aware of the Court order approving the financing agreement with Medolac, that equitable considerations could favor Hughes not the Estate, and that there is an issue as to the determination of the value of the Estate's assets. For instance, for the Estate to prevail on valuation, it must be a high valuation. Considering that Debtor is not operating, some of the equipment is leased, and Liquid Gold, Prolacta nor no other party made an offer to purchase such assets, the Trustee may have a difficult time in asserting a marshalling action and/or fraudulent transfer action. Reviewing these potential defenses available to Hughes, the Trustee has determined that reasonable defenses exist with respect to the underlying theories of recovery.

### Difficulties in the Matter of Collection

45. The Settlement Agreement provides terms of resolution of all disputes as between the Estate and Hughes. The Settlement Agreement allows for certainty in both means of payment and collection from Hughes. While the Trustee, upon information and belief, expects that Hughes could have the financial wherewithal to satisfy a judgment, that does not necessarily mean that Hughes would either willingly or promptly do so such that the Trustee's further resort to remedies under either the Bankruptcy Code or otherwise applicable law can be categorically dismissed out of hand. Accordingly, the payment and collection issues only slightly favors settlement or is, at worst, a neutral factor in the Trustee's analysis of the approval of the Settlement Agreement.

### Cost and Complexity of Litigation

46. If the Bankruptcy Estate files an Adversary Proceeding against Hughes, the complexity, inconvenience, delay, and expense can be expected to increase substantially; especially if the Adversary Case were to proceed to a trial on the merits. The allegations against Hughes arise from the DIP Financing Agreement, the equitable doctrine of marshalling and fraudulent transfer law. These claims involve fact intensive questions, as well as complicated questions of law, the resolution of which could potentially require costly legal research and briefing, evaluation, development, the collection of vast amounts of documentary evidence in preparation for trial, and potentially lengthy direct and cross-examinations of witnesses (and related preparation) with no certainty of achieving an outcome that is at least as favorable to the Bankruptcy Estate as

that set forth in the Settlement Agreement. Further, even a successful outcome through litigation through trial on the merits could likely result in an appeal by the losing party of one or more of the legal and factual issues that would likely be contested were an adversary case be litigated through a trial on the merits.

47. Thus, the complexity, inconvenience, delay, uncertainty, and expense of litigating the Adversary Case through a trial on the merits militates heavily in favor of resolving this dispute through the Settlement Agreement.

**Interests of Creditors.**

48. The Settlement Agreement provides for a full and final resolution of the claims against Hughes. The Trustee believes that the Settlement Agreement and corresponding terms thereunder best serve the interests of all creditors because it secures additional funds in the form of the Settlement Funds for the Bankruptcy Estate and removes Hughes' claim against the Bankruptcy Estate. The Settlement Agreement thereby increases the prospects of payment of estate dividends to holders of allowed prepetition general unsecured claims against the Bankruptcy Estate and reduces the risk of delayed and expensive litigation of the filing and prosecution of an adversary case. The Settlement Agreement also resolves the allegations in an efficient manner, thereby minimizing further litigation, bankruptcy costs and attorneys' fees.

**Sale Aspects of Approval of Settlement.**

49. Where a settlement of a dispute involves the sale of legal claims to one of the settling parties, such as in the case at hand, the court should apply the requirements of section 363 of the Bankruptcy Code to the sale. See *Adeli v. Barclay (In re*

*Berkeley Del. Court, LLC)*, 834 F.3d 1036, 1039-1040 (9th Cir. 2016) (citing *Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.*), 292 B.R. 415, 422 (B.A.P. 9th Cir. 2003)); see also *Fitzgerald v. Ninn Worx Sr, Inc. (In re Fitzgerald)*, 428 B.R. 872, 884 (B.A.P. 9th Cir. 2010) (noting that "[t]he sale at issue here was both a sale under section 363 and a compromise under Rule 9019.").  In *Mickey Thomson*, the BAP explained that "the disposition by way of 'compromise' of a claim that is an asset of the estate is the equivalent of a sale of the intangible property represented by the claim" and thus that "a bankruptcy court is obliged to consider . . . whether any property of the estate that would be disposed of in connection with the settlement might draw a higher price through a competitive process and be the proper subject of a section 363 sale."  292 B.R. at 421-22.

50. Section 363(b)(1) of the Bankruptcy Code provides that a trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.  This provision generally allows a trustee (subject to Court approval) to sell property of the estate outside the ordinary course of business where the proposed sale is a sound exercise of the trustee's business judgment and the sale is proposed in good faith and for fair value.  See *Walter v. Sunwest* Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) (quoting *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.*), 780 F.2d 1223, 1226 (6th Cir. 1986), and in turn *citing Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.*), 722 F.2d 1063, 1069-71 (2d Cir. 1983)).

51. "The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances." *Simantob v. Claims Prosecutor, LLC (In re Lahijani*), 325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005).  The following additional factors are instructive in evaluating a proposed sale:  "(i) whether adequate and reasonable notice has been provided to parties in interest, including full disclosure of the sale terms and the debtor's relationship with the purchaser, (ii) whether the sale price is fair and reasonable, and (iii) whether the proposed buyer is proceeding in good faith." *Family Christian, LLC*, 533 B.R. at 626; *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

52. Although nothing in the Bankruptcy Code prohibits a sale to insiders, "insider sales are subject to 'heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction.'" *In re Roussos*, 541 B.R. 721, 730 (Bankr. C.D. Cal. 2015) (quoting *In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015)).  This is because insiders "usually have greater opportunities for . . . inequitable conduct." *Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991); see also *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 745 (6th Cir. 2001); *In re Tidal Const. Co., Inc.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) ("[E]ven when parties are completely forthright with the facts surrounding the transfer, § 363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse."); *Rickel & Associates v. Smith (In re Rickel & Assocs., Inc.*), 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002) (same); *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 837 (Bankr. E.D. Va. 1997) (same).  As applied

in the case at hand, Hughes, a party to the proposed Settlement Agreement is not only the DIP lender but also an equity security holders in the Debtor, and thus an insiders.  As a result, the Court must strictly scrutinize this proposed sale transaction.

53. In this instance, parties have been given reasonable notice of this motion and opportunity to object and/or present the Trustee a better offer.  Further, all parties are aware that Hughes is not only the DIP lender to the Debtor but was also an equity holder of the Debtor.

54. Given the fact that Debtor is not operating, the value of its assets is deteriorating daily with the Bankruptcy Estate's administrative expenses continue to increase, the amounts to be paid by Hughes for the Bankruptcy Estate's consent to Hughes' strict foreclosure in satisfaction of the DIP loan facility is more than fair and reasonable.

55. Proposal of the Settlement Agreement between Hughes and the Trustee is made in good faith.

56. If a valid business justification exists for the resolution contemplated by the Settlement Agreement – as it does in this Chapter 7 Case – a trustee's decision to enter into such an agreement and seek approval of the same enjoys a strong presumption that in making a business decision the trustee acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the estate.  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Therefore, any party objecting to the proposed resolution must make a showing of bad faith,

self-interest or gross negligence. *In re Integrated Res., Inc.*, 147 B.R. at 656 (citing *Smith v. Van Gorkom,* 488 A.2d 858, 872-73 (Del. 1985)); see also *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D. N.Y. 1986) (Where the trustee articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the trustee's conduct.).

## **Cause Exists To Eliminate Any Stay Imposed By The Bankruptcy Rules.**

57. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

58. The Trustee requests that any order approving this Motion be effective immediately, thereby waiving the 14-day stays imposed by Bankruptcy Rules 6004. This waiver or elimination of the 14-day stay is necessary to complete the strict foreclosure and the funds to be received by the Bankruptcy Estate as expeditiously as possible. The Trustee respectfully submits that it is in the best interest of the Estates to consummate the Settlement Agreement as soon as possible.  Accordingly, the Trustee requests that the Court eliminate the 14-day stay imposed by Bankruptcy Rule 6004.

## CONCLUSION

59. Simply put, the Settlement Agreement is fair and equitable. The settlement rests well above the lowest point in the range of reasonable potential litigation and settlement outcomes within the meaning of the Ninth Circuit's governing decision in A & C Properties. For the reasons set forth herein, the Trustee submits that under the circumstances of this case, the Settlement Agreement is fair and reasonable and should be approved with a waiver of any stay imposed by the Bankruptcy Rules.

DATED: <u>7-18-21</u>

*/s/ Brian D. Shapiro*
**BRIAN D. SHAPIRO, ESQ.**
**Law Office of Brian D. Shapiro**
510 S. 8th Street
Las Vegas, NV 89101
(702) 386-8600 Fax (702) 383-0994
brian@brianshapirolaw.com
Proposed Attorney for Trustee

EXHIBIT 1



Donald H. Cram
Attorney
Direct Line: (415) 677-5536
dhc@severson.com

One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

July 6, 2021

**<u>Via E-Mail and FedEx</u>**

Medolac Laboratories
Attn: Elena Medo
1031 Boulder City Parkway
Boulder City, Nevada 96005
E-mail: emedo@medolac.com

Matthew C. Zirzow
Larson & Zirzow, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
E-mail: mzirzow@lzlawnv.com

      Re:    *In re Medolac Laboratories, A Public Benefit Corporation*
             Case No.21-11271-abl
             **Notice of Default – Debtor in Possession Loan and Security Agreement**

Dear Ms. Medo and Mr. Zirzow:

As you know, my firm represents Doug Hughes, the lender under that Debtor in Possession Loan and Security Agreement dated March 18, 2021 ("DIP Loan Facility"). The purpose of this letter is to provide you notice of the following occurrences that constitute events of default by the borrower, Medolac Laboratories ("Borrower") under section 8 of the DIP Loan Facility:

1.     Borrower's inability to proceed as a debtor under Subchapter V of Chapter 11 of the Bankruptcy Code;

2.     The milestone requirement having not been met, namely Borrower's failure to confirm a Plan within 100 days after the petition date; and

3.     Conversion of the Chapter 11 Case to a Chapter 7 under the Bankruptcy Code.

Please also take notice, that lender intends to exercise his remedies under section 9.2 of the DIP Loan Facility. Lender reserves the right to pursue other remedies that he is entitled to under the terms of the DIP Loan Facility.

13117.0001/15832674.1

San Francisco ~ Orange County



Medolac Laboratories
July 6, 2021
Page 2


       Please feel free to contact me should you have any questions or should you wish to discuss this matter in greater detail.

                    Very truly yours,


                    /s/Donald H. Cram

                    Donald H. Cram

DHC:dhc

cc:    Brian Shapiro, Subchapter V Trustee (via email)
       Terri H. Didion, Assistant United States Trustee (via email)

EXHIBIT 2



**Severson & Werson**

A Professional Corporation

Donald H. Cram
Attorney
Direct Line: (415) 677-5536
dhc@severson.com

One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

July 14, 2021

<u>**Via FedEx and U.S. Mail**</u>

Medolac Laboratories, A Public Benefit
Corporation
Attn: Elena Medo
1031 Boulder City Parkway
Boulder City, Nevada 89005

Matthew C. Zirzow
Larson & Zirzow, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

Brian Shapiro
Chapter 7 Trustee
510 S. 8th Street
Las Vegas, NV 89101

Crestmark Vendor Finance, A Division of
Metbank
5480 Corporate Drive, Suite 350
Troy, MI 48098

Stearns Bank N.A.
500 13th Street
Albany, MN 56307

Targeted Lease Capital LLC
5500 Main Street, Suite 300
Williamsville, NY 14221

Thermo Fisher Financial Services, Inc.
168 Third Ave.
Waltham, MA 02451

M2 Lease Funds LLC
175 N. Patrick Blvd., Ste. 140
Brookfield, WI 53045

Navitas Credit Corp.
201 Executive Center Drive, Suite 100
Columbia, SC 29210

United States Small Business Administration
10737 Gateway West, 300
El Paso, TX 79935

Re:    **NOTIFICATION OF PROPOSAL TO ACCEPT COLLATERAL IN FULL
SATISFACTION OF SECURED OBLIGATION**
Debtor: Medolac Laboratories, A Public Benefit Corporation
Secured Party: Doug Hughes
Collateral: All Assets of the Debtor

Dear Madam/Sir:

The Debtor, Medolac Laboratories, A Public Benefit Corporation ("Debtor"), is in default
under a Debtor in Possession Loan and Security Agreement dated March 18, 2021, entered into
between the Debtor and the Secured Party, Doug Hughes ("Secured Party"), and approved by the



Medolac Laboratories
July 14, 2021
Page 2

United States Bankruptcy Court for the District of Nevada in the bankruptcy case of *In re Medolac Laboratories, A Public Benefit Corporation*, Case No. 21-11271-abl, by Final Order entered April 26, 2021 [*Docket No. 90*], granting a first priority security interest in the Collateral consisting of All Assets of the Debtor (the "Collateral").  The Collateral does not include equipment leased by the Debtor.  The outstanding balance due from the Debtor to the Secured Party as of July 13, 2021, is $599,336.14 (the "Balance").

The Secured Party shall accept the Collateral in full satisfaction of the debt due from the Debtor.

If you have any objection to Secured Party's proposal to accept the Collateral in full satisfaction of the Balance, we must receive your signed written statement of your objection within twenty (20) days from the date of this notice.  If we have not received a signed, written objection within that time period, you will be deemed to have consented to this proposal and will have no further right to object, and the Secured Party will retain the Collateral in full satisfaction of the Balance, as described in this notice.

Very truly yours,


/s/Donald H. Cram

Donald H. Cram

DHC:dhc

cc:    Terri H. Didion, Assistant United States Trustee (via email)

# EXHIBIT 3

**Trustee Brian Shapiro**

| | |
|---|---|
| **From:** | Trustee Brian Shapiro |
| **Sent:** | Saturday, July 3, 2021 10:04 AM |
| **To:** | mguymon@goldguylaw.com |
| **Cc:** | Brian D. Shapiro, Trustee |
| **Subject:** | Medolac |

Ms. Guymon:

Considering the ruling last night on converting the case, I wanted to let you know that I have advised the UST after the hearing of such outcome.  I am unaware if I will be appointed as the Chapter 7 Trustee.  However, if I am, it appears that the first order of business is attempting to do an immediate 363 sale of all assets, excluding avoidance actions and cash.

As you are aware, the DIP Lender can immediately take control of the collateral, foreclose on its collateral and doing so without the necessity of obtaining any further order of the Court.  Based upon my quick calculations, the amount owed on the $500,000 note at a 20% interest rate (this is the default rate) is approximately $576,027.40 .  It would seem to me that considering the amount of the debt and the necessity to bring funds into the Estate, an offer should be more than $1 million.  Quite frankly, I would want an offer that permits the Court to give us his immediate attention to push the sale through.

If a sale agreement is reached, then it appears to me that a Trustee will need to immediately take control of the assets (competing against the Lender), file an emergency motion to reinstate the stay and contemporaneously file a 363 motion.  In my opinion, due to your Clients' litigation, the hard assets could be sold free and clear, but the Fortifier formula and other "intellectual property" would have to be sold without warranty nor free and clear of such claims.  Of course, if your Client is the purchaser, then it is a non-issue.

To the extent that your Client has any interest, then I would strongly recommend that they act fast to complete such sale.  Another consideration your Client may want to consider is having the Trustee waive the pre-petition attorney client privilege.

If there is any interest, then let me know.  Here is my cell number (which you likely already know) 702-460-1512.

~ B

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**Trustee Brian Shapiro**

| | |
|---|---|
| **From:** | Marjorie Guymon <mguymon@goldguylaw.com> |
| **Sent:** | Wednesday, July 7, 2021 6:53 PM |
| **To:** | Trustee Brian Shapiro |
| **Cc:** | Chris Kroes |
| **Subject:** | Re: Medolac |

Before we could do so we would need to know what the assets are. Will you be doing an inventory?

Marjorie A. Guymon, Esq.
GOLDSMITH & GUYMON, P.C.
2055 Village Center Circle
Las Vegas, Nevada  89134
(702)873-9500
goldguylaw.com
goldguytrusts.com


On Jul 7, 2021, at 6:27 PM, Trustee Brian Shapiro <brian@trusteeshapiro.com> wrote:


Marjorie. I was just advised that I am being appointed as the chapter 7 trustee. Accordingly if there is any interest in purchasing the assets then let me know.

Brian

Brian Shapiro
510 S. 8th Street
Las Vegas, NV 89101
(p) 702-386-8600
e-mail: Brian@TrusteeShapiro.com
Brian@BrianShapiroLaw.com

**Trustee Brian Shapiro**

**From:** Marjorie Guymon <mguymon@goldguylaw.com>
**Sent:** Tuesday, July 13, 2021 2:14 PM
**To:** Trustee Brian Shapiro; Livermon, Charlie
**Cc:** Didion, Terri  (USTP); Matt Zirzow; Strozza, Nick  (USTP); Chris Kroes; Donald H. Cram
**Subject:** RE: Medolac
**Attachments:** medolac message to customers.jpg

Brian,

At this time Prolacta is not interested in purchasing the assets or funding continued operations in order to sell product.  I appears that the debtor is thwarting your efforts to sell product in any event.  See attached notice sent to Medolac customers.

Sincerely,

*Marjorie A. Guymon*

Marjorie A. Guymon, Esq.
Goldsmith & Guymon, P.C.
mguymon@goldguylaw.com
2055 Village Center Circle
Las Vegas, NV 89134
Phone:  (702) 873-9500
Fax:  (702) 873-9600

Please visit our websites at:
www.goldguylaw.com
www.goldguytrusts.com

"Like Us" on Facebook for updates and information.



PRIVILEGE AND CONFIDENTIALITY NOTICE
***********************************************************************************
**************************
IRS Rules of Practice require us to inform you that advice, if any, in this email (including any attachments) concerning federal tax matters is not intended to be used and cannot be used or relied upon for the purpose of avoiding penalties under the Internal Revenue Code, nor for promoting, marketing or recommending any transaction or matter addressed herein.  For your protection, do not include account numbers, Social Security numbers, credit card numbers, passwords or other non-public information in your e-mail.


This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately at (702) 873-9500.

**From:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Sent:** Tuesday, July 13, 2021 8:03 AM
**To:** Livermon, Charlie <Charlie.Livermon@wbd-us.com>; Marjorie Guymon <mguymon@goldguylaw.com>
**Cc:** Trustee Brian Shapiro <brian@trusteeshapiro.com>; Didion, Terri (USTP) <Terri.Didion@usdoj.gov>; Matt Zirzow <MZirzow@lzlawnv.com>; Strozza, Nick (USTP) <Nick.Strozza@usdoj.gov>
**Subject:** Medolac

Dear Charlie and Marjorie:

Please note that a dispute has arisen between the Estate and the DIP Lender, and it is unlikely that I will be filing the motion to operate.  As such, I am once again inquiring if your respective Clients have any interest in purchasing the assets of the estate?  Such assets include all items listed in the bankruptcy schedules (excluding any cash and causes of actions).   Time is of the essence to reach an agreement and to file such applicable motions because the DIP Lender has already submitted a notice of default and can proceed with its remedies.

Feel free to reach out to me if your respective Clients and/or any third party they know may be interested in such assets. If I do not hear back from you, then I will presume that they have no interest.

~ Brian


Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994


This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

## Trustee Brian Shapiro

| | |
|---|---|
| **From:** | Trustee Brian Shapiro |
| **Sent:** | Friday, July 16, 2021 5:03 PM |
| **To:** | Marjorie Guymon; Trustee Brian Shapiro |
| **Cc:** | Chris Kroes; Didion, Terri  (USTP); Gulden, Cameron  (USTP) |
| **Subject:** | RE: Medolac |
| **Attachments:** | RE: Medolac; Property Schedules - flagged.xlsx |

Marjorie:

If you may recall, just this past Tuesday, you advised me that Prolacta was <u>not</u> interested in purchasing such assets.  A copy of your prior email is attached for your convenience. Accordingly, you left me under the impression that you did not want any additional follow up as to the items and inventory.

Considering your recent email that there is now a renewed interest, attached is a list of the inventory and the following is my best response as to the remaining questions:

> Question:     What amount of milk is on hand?  Of the milk, how much is raw and how much is in the benefit product form?

>> Answer:      There is a significant amount of raw milk on the premises.  Based upon the agreement with the co-op it is my understanding that the remaining raw milk on the premises is owned by the co-op not the Debtor.  As to product, there are approximately 177 cases in product form and about 3800 cases that have not been labeled.  All product is Benefit 18, 20 or 24.

> Question:     What is the amount of cash on hand?

>> Answer:      The Bankruptcy Estate is in possession of $184,770.79

> Question:     What is the current a/r?

>> Answer:      There is $137,737.20 in account receivables.  Due to the conversion to a Chapter 7 and my past experiences on collecting receivables post-conversion, I would not be surprised if the collectability is less than 50%.  However, it is my understanding that such accounts are for hospitals and other medical centers.  As such, my estimation could be off.

> Question:                 Are you selling trademarks, names or customer lists?  Are you selling SOPs, forumlas [sic formulas] and/or research information?

>> Answer:      As of this date, the Bankruptcy Estate has not entered into any agreement to sell any of the assets.  To the extent that the Bankruptcy Estate were to sell assets, it would likely include any and all assets of the Bankruptcy Estate except for cash, avoidance actions and any other actions.

Thank you for your inquiry.  If there is any interest in purchasing such assets, then I urge you to act promptly because time is of the essence.

`B

Brian D. Shapiro
Bankruptcy Trustee
510 S. 8th Street
Las Vegas, NV  89101
(t) 702-386-8600; (f) 702-383-0994

This e-mail message is a confidential communication from the Bankruptcy Trustee Office of Brian D. Shapiro and is intended only for the named recipient(s) above and may contain information that is a trade secret, proprietary, privileged or attorney work product. If you have received this message in error, or are not the named or intended recipient(s), please immediately notify the sender at 702.386.8600 and delete this e-mail message and any attachments from your workstation or network mail system.

**From:** Marjorie Guymon <mguymon@goldguylaw.com>
**Sent:** Friday, July 16, 2021 3:58 PM
**To:** Trustee Brian Shapiro <brian@trusteeshapiro.com>
**Cc:** Chris Kroes <chris@mccarthykroes.com>
**Subject:** Medolac

Brian,

As a potential buyer of assets, and a possible objector to the pending 9019 motion, Prolacta would like a current inventory to know what is being sold.  I had previously asked you for an inventory and you advised me that you would be going to the premises last week to check out the assets and would get back to me.

What amount of milk is on hand?
Of the milk, how much is raw and how much is in the benefit product form?
What is the amount of cash on hand?
What is the current a/r?
Are you selling trademarks, names or customer lists?
Are you selling SOPs, forumlas and/or research information?

Sincerely,

*Marjorie A. Guymon*

Marjorie A. Guymon, Esq.
Goldsmith & Guymon, P.C.
mguymon@goldguylaw.com
2055 Village Center Circle
Las Vegas, NV 89134
Phone:  (702) 873-9500
Fax:  (702) 873-9600

Please visit our websites at:
www.goldguylaw.com
www.goldguytrusts.com

"Like Us" on Facebook for updates and information.



PRIVILEGE AND CONFIDENTIALITY NOTICE
**************************************************************************************************
************************
IRS Rules of Practice require us to inform you that advice, if any, in this email (including any attachments) concerning federal tax matters is not intended to be used and cannot be used or relied upon for the purpose of avoiding penalties under the Internal Revenue Code, nor for promoting, marketing or recommending any transaction or matter addressed herein.  For your protection, do not include account numbers, Social Security numbers, credit card numbers, passwords or other non-public information in your e-mail.


This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately at (702) 873-9500.

EXHIBIT 4

| Lessor | Description of Equipment | Purchase Option Price | Amount Owed |
|---|---|---|---|
| Brickhouse Capital, LLC Crestmark Equipment Finance | 1 Retort | $1.00 | |
| Brickhouse Capital, LLC Targeted Lease Capital | 1 Spectramax Microplate Reader with Injectors<br>1 Spectramax ID5 Injector<br>1 Power Cord<br>1 Spectramax ID5 Scan Later Set<br>1 Centrifuge | Purchase Finance | Approx. $48,957.30 |
| Domino Amjet, Inc. | 1 Ax Driven Airdryer<br>1 AX SERIES ITM TYPE 2<br>1 Pulse RS 6M, 60u, Printhead & Conduit<br>1 Ax Starter Pack<br>1 Status Pack<br>1 Comms Pack<br>1 Professional Printing Pack<br>1 Remote Touchscreen 10 inch<br>1 CABLE 0.7M REMOTE TOUCHSCREEN 10 INCH<br>1 SUPPORT UI ASSY<br>1 FLOOR MOUNTING KIT<br>1 NA 29IN AX PRINTER STAND - AX350 OR AX550<br>1 BEACON ASSEMBLY TYPE 2<br>1 PHOTOELECTRIC COMMUNICATION SENSOR WITH LUMBERG CONNECTOR<br>1 ENCODER KIT D+ BCP7<br>1 Ax550i RS Printer<br>1 3BK102 - Ink Printer<br>2 SPECIALIST 3BK102S THERMOCHROMIC BLACK-TO-RED INK VEGETABLE Oil RESISTANT<br>1 MAKE-UP FOR 3BK102S- CASE OF 4 CARTRIDGES<br>2 WASH, WI-300 1 LT EA<br>1 AX-SERIES SAFEGUARD 100 3 YEAR INVOICED IN ADVANCE | None | |
| M2 Lease Funds | 1 6' Thermo Hamilton Concept Fume Hood<br>1 Microfluidics M-700 Homogenizer Microfluidizer<br>8 Skidding | Purchase Finance | |

| | 1 CBIN - 30 x 36 x 32<br>1 Enerquip Heat Exchanger<br>1 Fisher Scientific lsotemp Programmable Furnace<br>5  VWR Single Channel Pipettes<br>1 Filtrine Recirculating Loop Chiller<br>1 Vacuum Oven<br>1 Laboratory Workstation on Wheels, 6 Foot | | |
|---|---|---|---|
| Brickhouse Capital, LLC<br><br>Navitas Credit Corp. | 1 Copeland l0HP Compressor, 120K.@+45/130 460/3<br>1 COPELAND SALVAGE DISCUS COMPRESSOR (CORE)<br>1 COPE DISCUS COMP lSHP 63K@-2S/10S 208/230/460<br>1 COPELAND SALVAGE DISCUS COMPRESSOR (CORE)<br>2 IRP DP CONT ACTOR 3P 60AMP 120V AC COIL<br>2 A V9000 RECORDER CONTROLLER 4 PEN<br>1 RTD SANITARY<br>1 RID SANITARY<br>1 RID SANITARY<br>1 RTD SANITARY<br>1 RID SANITARY<br>1 RID SANITARY<br>2 MOUNTING BRACKET FOR A V-9000 AND AJ-300<br>6 CT1407SF0311A2 WIRING HEAD CT<br>1 KIT TOOL STD M700<br>1 SPAREPARTSM7.125-30<br>1 TOOL SEAL REMOVAL ASSY M700 30K<br>1 PLUNGER 30K 1.000/.999 OD 17-4 PH | Purchase Finance | |
| Boulder Investo, LLC (Landlord) | 1031 and 1027 Nevada Highway, Boulder City, NV. | None | Monthly rent of $18,800.00 |
| Stearns Bank Lease | 1 HP sp2-12H Automatic Filling and Capping | Purchase Agreement | $88,966.77 through 7/23/21 |
| ThermoFisher Scientific | 1 QS5 (A28139) | $1.00 Buyout | |
| ThermoFisher Scientific | ShopAmp Tube Stirip, Gelow Power, Nanodrop, Spectromoter, MagMax (difficult to read) | $1.00 Buyout | |

EXHIBIT 5

| # | Date Acq | Description | Cost | Salvage Value | Depr Basis | Location | Flag | Description | | |
|---|----------|-------------|------|---------------|------------|----------|------|-------------|---|---|
| | | | | | *For Liquidation Calculation* | | | | | |
| 3 | 7/1/2013 | FREEZER | 484.92 | 0 | 484.92 | Lab | Blue | chest freezer | 1 | 1 |
| 4 | 10/1/2013 | TRAILER | 1000 | 250 | 750 | Parking Lot | Blue | Trailer in parking lot | 1 | 1 |
| 5 | 2/4/2014 | CALAIS HUMAN MILK ANALYZER | 59500 | 10000 | 49500 | Lab | Blue | | 1 | 1 |
| 6 | 2/11/2014 | BLACK FREEZER BINS | 710.21 | 50 | 660.21 | Warehouse | Blue | Storage for Milk | 1 | 1 |
| 7 | 2/25/2014 | VACUUM SEALER | 2165 | 300 | 1865 | Small Cleanroom | Blue | One Uline Sealer | 1 | 1 |
| 8 | 3/1/2014 | STAINLESS STEEL TANK SYSTEM | 39090 | 7174.12 | 31915.88 | Warehouse (main) | Blue | CIP tank system | 1 | 1 |
| 9 | 3/1/2014 | MOVEABLE CLEAN ROOM | 85845.9 | 10000 | 75845.9 | Warehouse (Main) | Blue | Free Standing and Walls for Elena's new office | 1 | 1 |
| 10 | 3/1/2014 | CIPSYSTEM | 46645.43 | 8000 | 38645.43 | Warehouse (Main) | Blue | | 1 | 1 |
| 11 | 3/1/2014 | VAT FOR THAWING | 12158.43 | 0 | 12158.43 | Warehouse (Main) | blue | 2 original hot and cold vat | 1 | 1 |
| 12 | 3/1/2014 | CHILLER | 19394.32 | 4000 | 15394.32 | Warehouse (Main) | Blue | One of two original chillers | 1 | 1 |
| 14 | 3/1/2014 | SAFETRY EYE WASH STATION | 1175.24 | 0 | 1175.24 | Warehouse (Main) | Blue | | 1 | 1 |
| 15 | 3/1/2014 | WATER HEATER FOR CIP SYSTEM | 8969.67 | 500 | 8469.67 | Warehouse (Main) | Blue | | 1 | 1 |
| 16 | 3/1/2014 | PUMP FOR VAT | 2409.75 | 300 | 2109.75 | Warehouse (main) | blue | Stainless Pump | 1 | 1 |
| 17 | 3/1/2014 | PUMP FOR CLEAN ROOM | 1325 | 200 | 1125 | Warehouse (Main) | blue | Stainless Pump | 1 | 1 |
| 19 | 3/8/2014 | WIRE KENNEL FOR CHEMICAL STORAGE | 359 | 30 | 329 | Outback | Blue | fencing around boilers | 1 | 1 |
| 20 | 3/12/2014 | STORAGE BINS | 1078.8 | 50 | 1028.8 | Warehouse (Main) | blue | Storage Bins | 1 | 1 |
| 22 | 4/9/2014 | LUMINATOR & DOCKING STATIONS | 2353.76 | 300 | 2053.76 | Lab | Blue | Camera and UV illuminator for lab work | 1 | 1 |
| 23 | 4/9/2014 | WASHER & DRYER | 1149.95 | 300 | 849.95 | Warehouse (Main) | Blue | Stacked Laundry System | 1 | 1 |
| 25 | 5/7/2014 | STAINLESS STEEL CART | 1215.31 | 300 | 915.31 | Warehouse (Main) | Blue | Rolling Cart | 1 | 1 |
| 27 | 5/19/2014 | FREEZER TRAYS | 378.4 | 50 | 328.4 | Warehouse (Main) | Blue | Some of the Trays | 1 | 1 |
| 28 | 6/4/2014 | 64 STORAGE BINS | 575.36 | 75 | 500.36 | Warehouse (Main) | Blue | Storage Bins for Milk | 1 | 1 |
| 29 | 6/4/2014 | SHELVING | 179.98 | 25 | 154.98 | Warehouse (Main) | Blue | Basic Shelves (garage style) | 1 | 1 |
| 30 | 6/4/2014 | 3WIRE RACKS | 476.97 | 75 | 401.97 | Warehouse (Main) | Blue | Freezing Racks | 1 | 1 |
| 31 | 6/6/2014 | 3 DOOR FREEZER | 4380 | 500 | 3880 | R&D | Blue | 3 door upright | 1 | 1 |
| 32 | 6/12/2014 | ANDRITZ FRAUTECH COLD MILK... | 26682 | 4000 | 22682 | Large Cleanroom | Blue | Separator (large) | 1 | 1 |
| 33 | 6/24/2014 | SC-450 AUTO SCRUBBER | 4151.79 | 800 | 3351.79 | Back Hallway | Blue | Walk Behind Scrubber | 0 | 1 |
| 34 | 7/10/2014 | STORAGE RACKS | 855 | 200 | 655 | Freezer | Blue | Freezing Racks | 1 | 1 |
| 35 | 7/16/2014 | CLEAN ROOM ADDITIONS (MOVABLE... | 1081.89 | 100 | 981.89 | Warehouse (main) | Blue | Roll Style | 1 | 1 |
| 36 | 7/21/2014 | COMMERCIAL BUG ZAPPER | 587.93 | 50 | 537.93 | Warehouse (Main) | Blue | | 1 | 1 |
| 37 | 7/24/2014 | BENCH SCALE | 1115.08 | 200 | 915.08 | Warehouse (Main) | Blue | Incoming Cooler Scale | 1 | 1 |
| 38 | 7/29/2014 | WAREHOUSE RACKS | 629.93 | 100 | 529.93 | Warehouse (Main) | Blue | tool Racking | 1 | 1 |
| 39 | 8/28/2014 | CLEAN ROOM ADDITIONS (MOVABLE... | 766.8 | 50 | 716.8 | Warehouse (main) | Blue | additional Plastic | 1 | 1 |
| 40 | 9/2/2014 | AIR COMPRESSOR | 4758.52 | 750 | 4008.52 | Warehouse (Main) | Blue | | 1 | 1 |
| 41 | 3/9/2015 | CONVEYOR SYSTEM | 16663.53 | 3000 | 13663.53 | Warehouse (main) | blue | Overhead Conveyer | 1 | 1 |
| 42 | 3/9/2015 | VATS | 43945.75 | 8000 | 35945.75 | Warehouse (Main) | blue | Next 2 vats - not including the original two | 0 | 1 |
| 43 | 3/9/2015 | CHILLER | 11450 | 1500 | 9950 | Warehouse (Main) | Blue | One of two original Chillers | 1 | 1 |
| 44 | 3/9/2015 | TANKS | 18369.35 | 5000 | 13369.35 | Large Cleanroom | Blue | Broken Conical , good large tank *** | 1 | 1 |
| 45 | 3/9/2015 | WASH TUNNEL | 5243.51 | 800 | 4443.51 | Back Hallway | Blue | | 1 | 1 |
| 46 | 3/15/2016 | 110 RO MINI SPIRAL FILTRATIO SYSTEM | 10510 | 750 | 9760 | Lab | Blue | | 1 | 1 |
| 47 | 8/10/2016 | STAINLESS STEEL TABLE W/ CASTORS | 350 | 100 | 250 | | Blue | General basic steel table | 1 | 1 |
| 48 | 9/16/2016 | 24" X 24" TABLE FOR WAREHOUSE | 115 | 10 | 105 | Large Cleanroom | Blue | Tall Mount For Hopper | 1 | 1 |
| 49 | 10/1/2016 | BEE MINI30 HOMOGENIZER | 64950 | 0 | 64950 | Small Cleanroom | Blue | Small Homogenizer | 1 | 1 |
| 50 | 10/10/2016 | JOA MODEL PF-200 PISTON FILLER | 6500 | 0 | 6500 | R&D | Blue | | 1 | 1 |
| 51 | 10/10/2016 | JACKETED HOPPER W/ STIRER | 3900 | 0 | 3900 | Large Cleanroom | Blue | | 1 | 1 |
| 52 | 10/10/2016 | CS-13 BAG SEALER SYSTEM | 3800 | 0 | 3800 | R&D | Blue | Blue non-vacuum sealer | 1 | 1 |
| 53 | 10/10/2016 | ASC CONVEYOR W/ RUBBER BELT | 595.99 | 0 | 595.99 | | Blue | Boxed Conveyer | 1 | 1 |
| 54 | 10/10/2016 | 8 CUSTOM STEEL TRAYS | 1859 | 0 | 1859 | R&D | Blue | Small Retort Trays (Metal) specific to packaging | 1 | 1 |
| 58 | 10/17/2016 | BACK UP GENERATOR | 1699.98 | 0 | 1699.98 | Warehouse (main) | Blue | | 1 | 1 |
| 59 | 10/27/2016 | 4.4 GALLON EXPANSION TANK | 760.01 | 0 | 760.01 | Warehouse (Main) | Blue | Pump Here, expansion tank abandoned | 1 | 1 |
| 60 | 11/17/2016 | 2 SCALES | 345.75 | 0 | 345.75 | Large Cleanroom | Blue | | 1 | 1 |
| 62 | 5/20/2017 | FILTRATION SKID | 22391.13 | 0 | 22391.13 | Large Cleanroom | Blue | | 1 | 1 |
| 63 | 7/1/2017 | RE-TORT MACHINE | 100972 | 0 | 100972 | R&D | Blue | Small Retort | 1 | 1 |
| 64 | 7/17/2017 | MOTOR CONTROL FOR SEPARATOR | 337.5 | 0 | 337.5 | Large Cleanroom | Blue | | 1 | 1 |
| 65 | 9/13/2017 | 16 11x8.5 - 3/4" TEFLON ROUTED TRAYS | 7585 | 0 | 7585 | R&D | Blue | New Trays for Small retort (Plastic) specific to packaging | 1 | 1 |
| 66 | 1/10/2018 | BAND SEALER | 1612.92 | 0 | 1612.92 | R&D | Blue | | 1 | 1 |

| Color | Designation |
|-------|-------------|
| Pink | Lease |
| Yellow | Stay With Building |
| Blue | Liquidation |
| Orange | Broken - Scrap Materials |
| Green | BC Electric |

| Location Codes |
|----------------|
| Lab |
| Parking Lot |
| Warehouse (Main) |
| Back Hallway |
| R&D |
| Small Cleanroom |
| Large Cleanroom |
| Outback |
| Freezer |
| Conference Room |
| Roof |
| ALL |

| # | Date | Description | | | | Location | Color | Notes | | |
|---|------|-------------|---|---|---|----------|-------|-------|---|---|
| 67 | 1/11/2018 | CARDINAL 180 INDICATOR SCALE & 4x4... | 995 | 0 | 995 | Warehouse (main) | Blue | | 1 | 1 |
| 68 | 4/10/2018 | 2.5 TON PALLET JACK | 281.44 | 0 | 281.44 | Warehouse (main) | Blue | | 1 | 1 |
| 69 | 6/12/2018 | ICE MAKER | 2000 | 0 | 2000 | Back Hallway | Blue | | 1 | 1 |
| 73 | 7/31/2018 | JACKETED UNITANK & HOSES | 5554.15 | 0 | 5554.15 | Large Cleanroom | Blue | | 1 | 1 |
| 74 | 10/10/2018 | BOILER | 180343.8 | 10000 | 170343.8 | | Blue | Two Units | 1 | 1 |
| 75 | 11/13/2018 | SEALER AND CAPPER | 17550 | 1500 | 16050 | R&D | Blue | | 1 | 1 |
| 76 | 12/9/2018 | WELDER | 2295 | 200 | 2095 | Blue | | Broken | 1 | 1 |
| 82 | 10/30/2019 | ELECTRIC FORKLIFT | 4000 | 500 | 3500 | Warehouse (main) | Blue | | 1 | 1 |
| 83 | 4/30/2020 | PD PROCESS PUMP | 2059.14 | 250 | 1809.14 | Warehouse (main) | Blue | | 1 | 1 |
| 88 | 10/2/2020 | SELF DUMPING HOPPER | 1163.94 | 200 | 963.94 | Warehouse (main) | Blue | | 1 | 1 |
| 89 | 10/15/2020 | EQUIPMENT FROM ULMER'S | 50375.63 | 0 | 50375.63 | Warehouse (main) | Blue | | 0 | 1 |
| 92 | 12/29/2020 | STEEL COR CONVEYOR | 396.21 | 0 | 396.21 | Warehouse (main) | Blue | | 1 | 1 |
| 141 | 5/7/2014 | DYMO PRINTER | 271.39 | 40 | 231.39 | Warehouse (Main) | Blue | | 1 | 1 |
| 143 | 5/23/2014 | HONEYWELL VOYAGER 1202G SCANNER | 439 | 50 | 389 | Warehouse (Main) | Blue | | 1 | 1 |
| 144 | 6/18/2014 | DYMO TWIN TURBO 450 PRINTER | 208.35 | 25 | 183.35 | Warehouse (Main) | Blue | | 1 | 1 |
| 152 | 10/3/2014 | FINGER PRINT SCANNER | 168.3 | 20 | 148.3 | ALL | Blue | | 1 | 1 |
| 155 | 11/18/2016 | PARAGON BAR CODE READERS | 2164.22 | 0 | 2164.22 | Conference Room | Blue | Scanner and sticker combined order | 0 | 1 |
| 164 | 4/29/2020 | HP PRINTER FOR SHIPPING | 340.21 | 25 | 315.21 | Warehouse (Main) | Blue | | 1 | 1 |
| 165 | 9/15/2020 | UNINTERRUPTED POWER SUPPLY | 357.62 | 25 | 332.62 | Warehouse (Main) | Blue | | 1 | 1 |
| 166 | 10/15/2020 | VARIABLE FREQUENCY DRIVE | 478.58 | 50 | 428.58 | Warehouse (Main) | Blue | | 1 | 1 |
| 172 | 3/10/2014 | WATER BATH | 257.55 | 30 | 227.55 | Lab | Blue | Gone | 1 | 1 |
| 173 | 5/1/2014 | 3 COMPARTMENT FREEZER | 1007.69 | 200 | 807.69 | Lab | blue | Lab Fridge (mismarked) | 1 | 1 |
| 174 | 8/18/2014 | 2 TUBE CENT STERILE RACKS | 330.76 | 50 | 280.76 | Lab | blue | | 1 | 1 |
| 175 | 8/19/2014 | NUAIRE BIOLOCIAL SAFETY HOOD | 1000 | 75 | 925 | Lab | blue | | 1 | 1 |
| 176 | 8/19/2014 | ROBOCYLER 96 PCR MACHINE | 350 | 150 | 200 | Lab | blue | | 0 | 1 |
| 177 | 8/19/2014 | SPECTRAFUGE MICRO CENTRIFUGE | 325 | 150 | 175 | Lab | blue | | 1 | 1 |
| 178 | 8/19/2014 | FISHER UV TRANSLUMINATOR | 700 | 35 | 665 | Lab | blue | | 1 | 1 |
| 179 | 8/19/2014 | BIORAD POWER SUPPLY | 75 | 20 | 55 | Lab | blue | | 1 | 1 |
| 180 | 8/19/2014 | VWR CO2 INCUBATOR | 300 | 75 | 225 | Lab | blue | | 1 | 1 |
| 181 | 8/20/2014 | HOT STIR MACHINE | 321.42 | 50 | 271.42 | Lab | blue | | 1 | 1 |
| 182 | 8/20/2014 | PH METER | 905.14 | 75 | 830.14 | Lab | blue | | 1 | 1 |
| 183 | 8/27/2014 | INCUBATOR SHAKER PLATFORM | 6203.22 | 1500 | 4703.22 | Lab | blue | | 1 | 1 |
| 184 | 8/27/2014 | AUTOCLAVE BASKETS | 11600.88 | 2000 | 9600.88 | Lab | blue | | 1 | 1 |
| 185 | 8/29/2014 | NIKON E200 MICROSCOPE | 5034.04 | 1250 | 3784.04 | Lab | blue | | 1 | 1 |
| 186 | 9/3/2014 | TUBE CENTRIFUGE RACK | 330.76 | 50 | 280.76 | Lab | blue | | 1 | 1 |
| 187 | 9/12/2014 | GLASSWARE & SUPPLIES | 7979.87 | 600 | 7379.87 | Lab | blue | | 1 | 1 |
| 188 | 9/17/2014 | 320 x .001g BALANCE SCALE | 1064.2 | 200 | 864.2 | Lab | blue | | 1 | 1 |
| 189 | 10/23/2014 | @ WATER SYSTEM | 3376.91 | 400 | 2976.91 | Lab | blue | | 1 | 1 |
| 190 | 10/29/2014 | OSMOMETER | 2495 | 300 | 2195 | Lab | blue | | 1 | 1 |
| 191 | 11/5/2014 | MINI SUB V+CEKK GT, GEL CAST 7X10... | 418.95 | 0 | 418.95 | Lab | blue | | 1 | 1 |
| 192 | 10/16/2017 | TANGENT LAB FILTRATION SYSTEM | 661 | 75 | 586 | Lab | blue | | 1 | 1 |
| 193 | 2/13/2018 | ROSS ULTRA GLASS PH/ATC ELECT... | 613.2 | 0 | 613.2 | Lab | blue | | 1 | 1 |
| 194 | 8/16/2018 | LMI UNI-DOSE U031-281TT PUMP | 215.94 | 0 | 215.94 | Lab | blue | | 1 | 1 |
| 195 | 8/28/2018 | SEWARD STOMACHER 80 BA 7020... | 527.83 | 0 | 527.83 | Lab | blue | | 0 | 1 |
| 196 | 9/5/2018 | SORVALL RC-5B REFRIFERATED ... | 814.98 | 0 | 814.98 | Lab | blue | | 1 | 1 |
| 197 | 1/15/2019 | CENTRIFUGE 5430R | 8374.37 | 1200 | 7174.37 | Lab | blue | | 1 | 1 |
| 199 | 11/25/2019 | NEW LEAF FEEDING PUMP | 525.49 | 50 | 475.49 | Lab | blue | | 0 | 1 |
| 202 | 3/13/2020 | SLAVIC CREAM SEPARATOR | 215.66 | 10 | 205.66 | Lab | blue | | 1 | 1 |
| 18 | 3/7/2014 | MILK FILTER | 1484.6 | 25 | 1459.6 | Warehouse (Main) | Orange | disposable filtration module | 1 | 1 |
| 57 | 10/10/2016 | VIDEOJET 1220 | 9001.6 | 0 | 9001.6 | | Pink | Leased Domino Brand Misstated | 1 | 1 |
| 78 | 5/6/2019 | NEW RE-TORT | 325610.4 | 30000 | 295610.4 | Warehouse (main) | Pink | | 1 | 1 |
| 81 | 9/15/2019 | FILLING MACHINE | 139399 | 15000 | 124399 | Large Cleanroom | Pink | Main Filler in | 1 | 1 |
| 84 | 9/25/2020 | M700 HOMOGENIZER | 114277.7 | 20000 | 94277.66 | Large Cleanroom | Pink | | 1 | 1 |
| 87 | 9/25/2020 | 2 AV9000 TEMPERATURE RECORDER ... | 18225.49 | 1500 | 16725.49 | Warehouse (main) | Pink | | 1 | 1 |
| 198 | 1/15/2019 | SPECTAMAX ID5 MICROPLATE READER | 49181.39 | 5000 | 44181.39 | Lab | pink | | 1 | 1 |
| 200 | 2/5/2020 | QUANTUM STUDIO 5 DNA TESTER | 25895.63 | 1500 | 24395.63 | Lab | pink | | 1 | 1 |
| 201 | 2/5/2020 | NANODROP SPECTROMETER | 16132.6 | 1600 | 14532.6 | Lab | pink | | 1 | 1 |
| 13 | 3/1/2014 | SPRINKLER SYSTEM | 2453 | 400 | 2053 | Warehouse (Main) | Yellow | | 1 | 1 |
| 21 | 3/25/2014 | CARPETING | 1203.39 | 100 | 1103.39 | Warehouse (Main) | Yellow | Entry | 1 | 1 |
| 24 | 4/28/2014 | DOOR IMPROVEMENT [MOVABLE... | 592.93 | 50 | 542.93 | Small Cleanroom | Yellow | Two White Doors on small cleanroom | 1 | 1 |

| # | Date | Description | Amt 1 | Amt 2 | Amt 3 | Location | Color | Notes | A | B |
|---|------|-------------|-------|-------|-------|----------|-------|-------|---|---|
| 55 | 10/10/2016 | BOILER INSTALL & FREIGHT | 39998.77 | 0 | 39998.77 | | Yellow | Installation Work | 1 | 1 |
| 56 | 10/10/2016 | RE-TORT INSTALL & FREIGHT | 18807.42 | 0 | 18807.42 | | Yellow | Retort Install Work | 1 | 1 |
| 77 | 3/1/2019 | VAT MODIFICATIONS | 3734.82 | 0 | 3734.82 | Warehouse (main) | Yellow | | 1 | 1 |
| 79 | 9/15/2019 | NEW CLEAN ROOM | 65395.09 | 7500 | 57895.09 | Warehouse (main) | Yellow | | 1 | 1 |
| 80 | 9/15/2019 | HEPA FILTRATON SYSTEM FOR CLEAN... | 16284.74 | 2500 | 13784.74 | Warehouse (main) | Yellow | | 1 | 1 |
| 85 | 9/25/2020 | COPELAND 10HP COMPRESSOR | 5865.69 | 800 | 5065.69 | Roof | Yellow | | 1 | 1 |
| 86 | 9/25/2020 | COPELAND 15HP COMPRESSOR | 8798.54 | 1200 | 7598.54 | Roof | Yellow | | 1 | 1 |
| 90 | 10/21/2020 | SMOKE DETECTOR & MISC | 1,435.95 | 100 | 1335.95 | Warehouse (main) | Yellow | | 1 | 1 |
| 91 | 10/21/2020 | ACCESS CONTROL HARDWARE FOR... | 1892.16 | 75 | 1817.16 | Warehouse (main) | Yellow | | 1 | 1 |
| 26 | 5/12/2014 | EVAPORATING COOLING FAN | 3765.52 | 800 | 2965.52 | | | | 0 | 1 |
| 61 | 3/15/2017 | FORKLIFT | 2340 | 0 | 2340 | | | Gone | 0 | 1 |
| 121 | 3/21/2019 | 6 L-SHAPED DESKS | 509.22 | 100 | 409.22 | | | | 0 | 1 |
| 122 | 5/1/2019 | TRADE SHOW BOOTH | 9361.45 | 750 | 8611.45 | | | | 0 | 1 |
| 123 | 3/12/2020 | 4 GLASS & METAL DESKS | 1299.35 | 200 | 1099.35 | | | | 0 | 1 |
| 124 | 7/10/2020 | DENON AUDIONIDEO RECEIVER | 302.37 | 50 | 252.37 | | | | 0 | 1 |
| 127 | 3/17/2013 | PRINTER | 254.55 | 0 | 254.55 | | | | 0 | 1 |
| 128 | 4/19/2013 | COMPUTER | 539.99 | 0 | 539.99 | | | | 0 | 1 |
| 129 | 8/2/2013 | LAPTOP COMPUTER | 793.13 | 0 | 793.13 | | | | 0 | 1 |
| 130 | 8/6/2013 | PPT PROJECTOR | 466.95 | 0 | 466.95 | | | | 0 | 1 |
| 131 | 9/9/2013 | COMPUTERS | 1149.98 | 0 | 1149.98 | | | | 0 | 1 |
| 132 | 12/13/2013 | PRINTER | 299.99 | 20 | 279.99 | | | | 0 | 1 |
| 133 | 2/25/2014 | HP PAVILION 23 COMPUTER | 799.99 | 100 | 699.99 | | | | 0 | 1 |
| 134 | 3/6/2014 | DESK TOP COMPUTER | 806.99 | 100 | 706.99 | | | | 0 | 1 |
| 139 | 3/21/2014 | 2 LAPTOP COMPUTERS | 1844.97 | 200 | 1644.97 | | | | 0 | 1 |
| 140 | 3/24/2014 | APPLE iPHONE & ACCESSORIES | 902.9 | 100 | 802.9 | | | | 0 | 1 |
| 142 | 5/20/2014 | HP PAVILLION COMPUTER | 799.99 | 75 | 724.99 | | | | 0 | 1 |
| 145 | 7/3/2014 | COMPUTER MONITOR | 119.99 | 15 | 104.99 | | | | 0 | 1 |
| 146 | 7/28/2014 | HP OJ6700 PRINTER/ FAX | 1874.97 | 200 | 1674.97 | | | | 0 | 1 |
| 147 | 8/11/2014 | HP PAVILLION COMPTER | 749.99 | 100 | 649.99 | | | | 0 | 1 |
| 148 | 8/11/2014 | HP 110-210 DESKTOP COMPUTER | 279.99 | 50 | 229.99 | | | | 0 | 1 |
| 149 | 9/30/2014 | BAR TENDER AUTOMATION PRINTER... | 750 | 50 | 700 | | | | 0 | 1 |
| 150 | 10/1/2014 | HP PAVILLION COMPUTER | 649.99 | 80 | 569.99 | | | | 0 | 1 |
| 151 | 10/2/2014 | HP PAVILLION COMPUTER | 749.99 | 100 | 649.99 | | | | 0 | 1 |
| 153 | 10/14/2014 | HP PAVILLION COMPUTER | 699.99 | 75 | 624.99 | | | | 0 | 1 |
| 154 | 10/20/2014 | 4 HP PAVILLION COMPUTERS | 2799.96 | 400 | 2399.96 | | | | 0 | 1 |
| 156 | 8/22/2017 | DELL INSPIRON 13 7000 LAPTOP... | 584.36 | 0 | 584.36 | | | | 0 | 1 |
| 157 | 11/9/2017 | ASUS LAPTOP COMPUTER | 864.92 | 75 | 789.92 | | | | 0 | 1 |
| 158 | 1/2/2018 | HP COLOR LASER JETPRO MFP | 342.04 | 0 | 342.04 | | | | 0 | 1 |
| 159 | 4/11/2018 | HP 15-aq273 LAPTOP COMPUTER | 809.61 | 0 | 809.61 | | | | 0 | 1 |
| 160 | 5/1/2018 | DELL INSPIRON 3263 COMPUTER | 541.24 | 0 | 541.24 | | | | 0 | 1 |
| 161 | 12/13/2018 | DELL INSPIRON 24-377 COMPUTER | 757.74 | 100 | 657.74 | | | | 0 | 1 |
| 162 | 12/21/2018 | DELL INSPIRON 15-5000 COMPUTER | 557.42 | 75 | 482.42 | | | | 0 | 1 |
| 163 | 4/4/2020 | ACCOUNTING LAPTOP COMPUTER | 758.61 | 50 | 708.61 | | | | 0 | 1 |
| 169 | 11/14/2017 | HP15-BS033CL COMPUTER | 490.86 | 50 | 440.86 | | | | 0 | 1 |
| 207 | 3/31/2020 | ICE MAKER | 594.94 | 75 | 519.94 | | | | 1 | 1 |
| 208 | 5/6/2020 | THEMO SCIENTICIC LABORATORY... | 4018.88 | 750 | 3268.88 | | | | 1 | 1 |
| 210 | 4/1/2018 | 1989 DODGE RAM 1500 TRUCK | 4000 | 0 | 4000 | | | | 0 | 1 |
| 211 | 9/14/2020 | FORD F-150 TRUCK (BLACK) | 10000 | 2000 | 8000 | | | | 0 | 1 |
| 214 | 11/1/2016 | CEILING INSULATION | 5276.8 | 0 | 5276.8 | | | | 0 | 1 |
| 215 | 4/12/2018 | SINK FOR CLEAN ROOM | 5004.82 | 0 | 5004.82 | | | | 1 | 1 |
| 216 | 11/9/2018 | HIGH LED LIGHTING | 2300 | 200 | 2100 | | | | 0 | 1 |
| 217 | 11/12/2018 | FINGER PRINT ELECTRONIC ACCESS | 489.98 | 25 | 464.98 | | | | 1 | 1 |
| 218 | 3/1/2019 | FIRE SPRINKLER  SYSTEM | 11810 | 1000 | 10810 | | | | 0 | 1 |
| 219 | 4/1/2019 | LEASEHOLD IMPROVEMENTS | 113450.8 | 0 | 113450.8 | | | | 0 | 1 |
| 220 | 9/3/2020 | 2 RING CENTRAL VIDEO DOOR BELLS | 1089.1 | 75 | 1014.1 | | | | 0 | 1 |
| 221 | 9/3/2020 | SECURITY GATE | 2486.12 | 500 | 1986.61 | | | | 0 | 1 |
| 224 | 3/16/2021 | EXTERIOR REMODEL | 71225.14 | 0 | 71225.14 | | | | 0 | 1 |
| 95 | 9/4/2020 | REFRIDGERANT RECOVERY | 647.50 | 100.00 | 547.50 | | | | 1 | 1 |
| 96 | 9/28/2020 | DELTA 10" TABLE SAW | 648.42 | 100.00 | 548.42 | | | | 1 | 1 |
| 97 | 9/28/2020 | CHOP SAW | 433.16 | 75.00 | 358.16 | | | | 1 | 1 |
| 98 | 11/9/2020 | Work Stand | 193.99 | 25.00 | 168.99 | | | | 0 | 1 |
| 101 | 12/11/2013 | OFFICE FURNITURE | 2,961.94 | 500.00 | 2,461.94 | | | | 0 | 1 |
| 102 | 12/17/2013 | OFFICE DESK | 746.99 | 125.00 | 621.99 | | | | 0 | 1 |
| 103 | 1/10/2014 | OFFICE FURNIURE | 282.97 | 40.00 | 242.97 | | | | 0 | 1 |
| 104 | 4/3/2014 | CELL PHONE | 292.20 | 25.00 | 267.20 | | | | 0 | 1 |
| 105 | 7/2/2014 | FILE CABINET | 153.99 | 50.00 | 103.99 | | | | 0 | 1 |
| 106 | 7/2/2014 | TELEPHONE | 99.99 | 20.00 | 79.99 | | | | 0 | 1 |
| 107 | 7/14/2014 | 4 SHELF STORAGE CABINET | 245.98 | 30.00 | 215.98 | | | | 0 | 1 |
| 108 | 8/13/2014 | DESK&HUTCH | 580.97 | 100.00 | 480.97 | | | | 0 | 1 |
| 109 | 8/22/2014 | DESK& HUTCH | 580.97 | 100.00 | 480.97 | | | | 0 | 1 |
| 110 | 8/27/2014 | OFFICE CHAIR | 59.99 | 10.00 | 49.99 | | | | 0 | 1 |

EXHIBIT 6

# SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is made and entered into as of the date all signatories below have executed the Agreement (the "Effective Date") by Brian D. Shapiro, in his capacity as Chapter 7 Trustee (the "Trustee") on behalf of Medolac Laboratories, A Public Benefit Corporation's bankruptcy estate ("Bankruptcy Estate"), on the one hand, and Doug Hughes or his assignee ("Hughes"), on the other. Hughes and Trustee are collectively the "Parties," and each individually is a "Party."

## RECITALS

This Agreement is entered into with reference to the following facts and recitals which are true to the best of the Parties' knowledge and belief, and are made part of this Agreement:

WHEREAS, Medolac Laboratories, A Public Benefit Corporation ("Debtor") filed for relief under Subchapter V of Chapter 11 of the Bankruptcy Code on March 16, 2021, in the Bankruptcy Court for the District of Nevada ("Bankruptcy Court"), Case No. 21-11271-abl ("Bankruptcy Case").

WHEREAS, Trustee was appointed as the Subchapter V trustee in the Bankruptcy Case.

WHEREAS, Hughes is the debtor-in-possession lender under that Debtor in Possession Loan and Security Agreement dated March 18, 2021 ("DIP Loan Facility"), entered into between the Debtor and Hughes which was approved by the Bankruptcy Court by Interim Order entered in the Bankruptcy Case on March 30, 2021 [*Docket No. 52*] and by Final Order entered in the Bankruptcy Case on April 26, 2021 [*Docket No. 90*], granting Hughes a super-priority administrative claim and a first priority security interest all assets of the Debtor (the "Collateral").

WHEREAS, Debtor defaulted under the terms of the DIP Loan Facility and Hughes issued a Notice of Default on July 6, 2021 to Debtor, Trustee and the Office of the United States Trustee.

WHEREAS, the Bankruptcy Case was converted to a Chapter 7 proceeding by Bankruptcy Court orders entered on July 7, 2021 [*Docket Nos. 234 & 236*] and the Trustee was appointed the Chapter 7 Trustee in the Bankruptcy Case.

WHEREAS, Debtor's business operations have been closed since July 2, 2021.

WHEREAS, since his appointment as Chapter 7 trustee, Trustee has attempted to generate interest in an asset sale process with respect to the Collateral and has sought out potential bidders. However, to date, Trustee has not received any bid proposals.

WHEREAS, Hughes began his strict foreclosure of the Collateral by issuing a Notice of Proposal to Accept Collateral in Full Satisfaction of Secured Obligation on July 14, 2021

("Foreclosure Notice"). As set forth in the Foreclosure Notice, Hughes is owed in excess of $599,336.14 under the terms of the DIP Loan Facility.

WHEREAS, the Bankruptcy Estate has approximately $171,218.00 in cash which Hughes maintains is part of the Collateral.

WHEREAS, Trustee has learned of certain causes of action that the Bankruptcy Estate may have against Prolacta and/or the Federal Drug Administration ("FDA") that Trustee wishes to investigate and possibly pursue, and which Hughes maintains is part of the Collateral.

WHEREAS, Trustee disputes the extent of Hughes lien in certain other assets of the Bankruptcy Estate, including, but not limited to accounts receivable, which Hughes maintains is part of the Collateral.

WHEREAS, Trustee has asserted that the Bankruptcy Estate may object to Hughes Foreclosure Notice and seek to stay any strict foreclosure pending a Bankruptcy Court resolution of these issues (the "Disputes"). The deadline for which the Trustee has to object to Hughes acceptance of the Collateral in full satisfaction of the secured obligation under the DIP Loan Facility as set forth in the Foreclosure Notice is August 3, 2021.

WHEREAS, after further discussions, the Trustee, on behalf the Bankruptcy Estate, and subject to Bankruptcy Court approval, is willing to resolve the Disputes on the terms and conditions set forth in this Agreement.

WHEREAS, the Parties agree that it is in their mutual interests to avoid the uncertainty and expense of litigating the Disputes by reaching a settlement and accommodation of the certain matters encompassed herein, without any admission of law or fact.

WHEREAS, the Trustee believes the resolution of the Disputes on the terms and conditions set forth in this Agreement is fair, reasonable, adequate, and in the best interests of the Bankruptcy Estate. Hughes denies the claims asserted by the Trustee with respect to the Disputes, and denies any wrongdoing or liability, but is concerned that the value of the collateral continues to deteriorate given the closure of Debtor's business operations and desires to resolve the Disputes and complete the strict foreclosure of the Collateral as soon as possible on the terms and conditions set forth below in order to avoid the burden, and expense of future delay and/or litigation.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties covenant and agree as follows:

## TERMS AND RELEASES

1. ## SETTLEMENT PROVISIONS

   A. **Agreement Execution**. Within three (3) business days from the date of request by counsel for Hughes, Trustee, shall execute two original counterparts of this

Agreement and deliver one original counterpart and a completed W-9 tax form to Hughes' Counsel identified below.

**B. Bankruptcy Court Approval.** This Agreement is subject to, and shall not become effective, until it is approved by written order of the Bankruptcy Court in the above-mentioned Bankruptcy Case upon such notice as may be required. Within three (3) business days of full execution of this Agreement, the Trustee shall file the appropriate motion in the Bankruptcy Case seeking Bankruptcy Court approval of this Agreement pursuant to Bankruptcy Rule 9019 which shall include the appropriate request pursuant to 11 U.S.C. § 363(b) on an expedited basis.

**C. Payment by Hughes.** Conditioned upon full execution of this Agreement, submission by Trustee to Hughes of a completed and executed Form W-9 and after Bankruptcy Court approval of this Agreement, Hughes shall pay to Trustee a total of Seven Hundred and Fifty Thousand Dollars ($750,000.00) ("Settlement Amount") as follows:

(i) $300,000.00 by wire to Trustee on the earlier of the effective date of strict foreclosure on the Collateral or August 31, 2021; and

(ii) $450,000.00 by wire to Trustee on or before August 31, 2021.

**D. Retention of Assets by the Bankruptcy Estate.** The Bankruptcy Estate shall retain the following assets subject to the provisions of section 1.E. below and said retained assets shall not be included in the Collateral ("Retained Assets"):

(i) Any and all claims or causes of action against Prolacta ("Prolacta Claims") (for avoidance of doubt, any claims against the FDA shall be deemed a part of the Collateral);

(ii) All cash held by Debtor in any account;

(iii) All Chapter 5 avoidance claims or causes of action; and

(iv) All Debtor's accounts receivable.

**E. Sharing Proceeds from Retained Assets with Hughes.** The Trustee, on behalf of the Bankruptcy Estate shall share proceeds from the administration and/or disposition of the Retained Assets with Hughes as follows:

(i) 50% of all cash held by Debtor in any account;

(ii) 50% of the net proceeds from Prolacta Claims after payment of fees and costs related to litigating these claims or causes of action; and

(iii) 50% of the net proceeds from Debtor's accounts receivable after payment of costs and expenses incurred in collecting the accounts receivable.

**F. Assignment of Prolacta Claims and Administration.** After investigation, if the Bankruptcy Estate elects not to pursue the Prolacta Claims or fails to administer the Prolacta Claims within 18 months from the date of this Agreement, the Trustee shall assign the Prolacta Claims to Hughes or his assignee. Trustee shall consult with Hughes concerning the resolution or disposition of any Prolacta Claims.

**G. Extension of Hughes Strict Foreclosure.** To the extent that the Bankruptcy Court does not approve this Agreement, then Hughes' (or his assignee) pursuant to the terms of the DIP Loan Facility, shall not seek to complete its strict foreclose on the Collateral any earlier than six (6) days after entry of an order disapproving this Agreement. To the extent that the Bankruptcy Court approves this Agreement, then upon entry of such order, Hughes (or his assignee) may immediately complete its strict foreclose on the Collateral.

**H. Trustee's Consent to Hughes Strict Foreclosure of Collateral.** The Trustee, on behalf of the Debtor and the Bankruptcy Estate shall not object to Hughes' (or his assignee's) strict foreclosure and acceptance of the Collateral, hereby consents to the same and shall take any reasonable action in response to any reasonable request from Hughes to facilitate the same. The strict foreclosure of the Collateral will be deemed in full satisfaction of Hughes' secured obligation under the DIP Loan Facility owed by the Debtor.

**I. Full Satisfaction.** The Settlement Amount is in full satisfaction of each and every claim that could be asserted against Hughes by Debtor and/or the Bankruptcy Estate and it includes all attorneys' fees and costs that Trustee, Debtor and/or the Bankruptcy Estate may have incurred in connection with the Bankruptcy Case.

**J. Trustee's Release.** For consideration of the Settlement Amount, the receipt and sufficiency of which are hereby expressly acknowledged, the Trustee on behalf of Debtor and the Bankruptcy Estate (for purposes of this paragraph only collectively **"Estate Releasors"**) except for the obligations stated within this Agreement, unconditionally and irrevocably remises, waives, satisfies, releases, acquits, and forever discharges Hughes and his, predecessors, successors, assigns, assignees, affiliates, partners, joint ventures, co-venturers, attorneys, vendors, accountants, nominees, agents (alleged, apparent or actual), representatives, employees, managers, and/or each person or entity acting or purporting to act for him or on his behalf and all of its subsidiaries and affiliates (for purposes of this paragraph only collectively the **"Hughes Releasees"**), and each of them respectively, from and against any and all past and present claims, counterclaims, actions, defenses, affirmative defenses, suits, rights, causes of action, lawsuits, set-offs, costs, losses, controversies, agreements, promises and demands, or liabilities, of whatever kind or character, direct or indirect, whether known or unknown or capable of being known, arising at law or in equity, by right of action or otherwise, including, but not limited to, suits, debts, accounts, bills,

damages, judgments, executions, warranties, attorneys' fees, costs of litigation, expenses, claims and demands whatsoever that the Estate Releasors, or their attorneys, agents, representatives, predecessors, successors and assigns, have or may have against the Hughes Releasees, for, upon, or by reason of any matter, cause or thing, whatsoever, in law or equity, including, without limitation, the claims made or which could have been made by the Trustee, Debtor or the Bankruptcy Estate arising from the Bankruptcy Case, the DIP Loan Facility, the Disputes, as well as any claim or issue which was or could have been brought in the Bankruptcy Case (collectively "**Estate Released Matters**").

K. **Hughes' Release.** For consideration of entering into this Agreement, the receipt and sufficiency of which are hereby expressly acknowledged Hughes (for purposes of this paragraph only collectively "**Hughes Releasors**"), except for the obligations stated within this Agreement and any future distribution that could be made to equity holders of the Debtor, unconditionally and irrevocably remises, waives, satisfies, releases, acquits, and forever discharges the Bankruptcy Estate, the Debtors, the Subchapter V Trustee, the Trustee and its, predecessors, successors, assigns, assignees, affiliates, partners, joint ventures, co-venturers, attorneys, vendors, accountants, nominees, agents (alleged, apparent or actual), representatives, employees, managers, and/or each person or entity acting or purporting to act for him or on his behalf and all of its subsidiaries and affiliates (for purposes of this paragraph only collectively the "**Estate Releasees**"), and each of them respectively, from and against any and all past and present claims, counterclaims, actions, defenses, affirmative defenses, suits, rights, causes of action, lawsuits, set-offs, costs, losses, controversies, agreements, promises and demands, or liabilities, of whatever kind or character, direct or indirect, whether known or unknown or capable of being known, arising at law or in equity, by right of action or otherwise, including, but not limited to, suits, debts, accounts, bills, damages, judgments, executions, warranties, attorneys' fees, costs of litigation, expenses, claims and demands whatsoever that the Hughes Releasors, or their attorneys, agents, representatives, predecessors, successors and assigns, have or may have against the Estate Releasees, for, upon, or by reason of any matter, cause or thing, whatsoever, in law or equity, including, without limitation, any claims made or which could have been made by Hughes arising from the Bankruptcy Case, the DIP Loan Facility, the Disputes, as well as any claim or issue which was or could have been brought in the Bankruptcy Case (collectively "**Hughes Released Matters**").

2. **ADDITIONAL TERMS**

   A. **Adequate Consideration.** The consideration received in connection with this Agreement is fair, adequate and substantial and consists only of the terms set forth in this Agreement.

   B. **Covenant Not to Sue.** The Trustee and Hughes agree not to cause claims to be made in any court or other forum against the Parties for any matter within the scope of the releases contained herein.

**C. Further Assurances.**  Each Party agrees to take all reasonable steps necessary to effectuate the terms of this Agreement.

**D. No Admission of Liability.**  Each of the Parties understands and agrees that this Agreement and the settlement provided for herein, are intended to compromise disputed claims and defenses, to avoid litigation and to buy peace, and that this Agreement and the settlement provided for herein shall not be construed or viewed as an admission by any Party of liability or wrongdoing, such liability being expressly denied.  This Agreement, and the settlement provided for herein, shall not be admissible in any lawsuit, administrative action, or any judicial or administrative proceeding if offered to show, demonstrate, evidence or support a contention that any of the Parties acted illegally, improperly, or in breach of law, contract or proper conduct.

**E. Waiver.**  The failure of the Trustee to demand from Hughes performance of any act under the Agreement shall not be construed as a waiver of a the Trustee's right to demand, at any subsequent time, such performance.  The failure of Hughes to demand from Trustee performance of any act under the Agreement shall not be construed as a waiver of Hughes' right to demand, at any subsequent time, such performance.

**F. Tax Consequences.**  The Trustee agrees that if it is later determined by the Internal Revenue Service or any other taxing body that taxes of any type should have been paid in connection with any benefit they receive pursuant to this Agreement, they will be solely responsible for paying such taxes.  Hughes makes no representation or warranty regarding the legal effect or tax consequences of this Agreement, or of any such filing or reporting by Hughes.  The Trustee further expressly acknowledges that he neither received nor relied upon any tax advice from the Hughes or his representatives and attorneys.

**G. Choice of Law.**  This Agreement shall be construed in accordance with and all disputes hereunder shall be controlled by the laws of the State of Nevada without regard to Nevada's choice of law rules and the United States of America.

**H. Hughes' Counsel.**  As used in this Agreement, the phrase "Hughes' Counsel" means Severson & Werson, APC, Donald H. Cram, Esq., One Embarcadero Center, 26th Floor, San Francisco, California 94111.

**I. No Interpretation of Captions or Headings.**  The captions and headings within this Agreement are for ease of reference only and are not intended to create any substantive meaning or to modify the terms and clauses either following them or contained in any other provision of this Agreement.

**J. Severability.**  If any provision of the Agreement or the application thereof is held invalid by a court, arbitrator or government agency of competent jurisdiction, the Parties agree that such a determination of invalidity shall not affect other provisions

or applications of the Agreement which can be given effect without the invalid provisions and thus shall remain in full force and effect or application.

**K. Neutral Interpretation and Counterparts.** The Parties shall be deemed to have cooperated in the drafting and preparation of this Agreement. Hence, any construction to be made of this Agreement shall not be construed against any Party. This Agreement may be executed in counterparts and each executed counterpart shall be effective as the original. All faxed, emailed, or electronic signatures affirming this Agreement constitute an original signature.

**L. Integration / Single Agreement.** This Agreement constitutes a single, integrated, written contract expressing the entire understanding and agreement between the Parties, and the terms of the Agreement are contractual and not merely recitals. There is no other agreement, written or oral, expressed or implied between the Parties with respect to the subject matter of this Agreement and the Parties declare and represent that no promise, inducement or other agreement not expressly contained in this Agreement has been made conferring any benefit upon them or upon which they have relied in any way. The terms and conditions of this Agreement may not be contradicted by evidence of any prior or contemporaneous agreement, and no extrinsic evidence may be introduced in any judicial proceeding to interpret this Agreement.

**M. Amendments to the Agreement.** This Agreement shall not be altered, amended or modified by oral representation made before or after the execution of this Agreement. All amendments or changes of any kind must be in writing, executed by all Parties.

**N. Authority.** Trustee represents and warrants that he has not sold, transferred, conveyed, assigned, or otherwise disposed of any right, title or interest in any of the Estate Released Matters herein to any person or entity, and that Trustee is not aware of any other person or entity who may have or who has asserted or can assert a right, title, or interest in any of the Estate Released Matters covered by this Agreement. Trustee further affirms that he is fully capable of executing this Agreement and understand its contents and further that he has legal counsel of his own choice or that he has had an opportunity to obtain such legal counsel to explain the legal effect of signing this Agreement.

**O. Advice of Counsel.** Each Party to this Agreement acknowledges that it has had the benefit of advice of competent legal counsel or the opportunity to retain such counsel with respect to its decision to enter into this Agreement. The individuals whose signatures are affixed to this Agreement in a personal or representative capacity represent that they are competent to enter into this Agreement and are doing so freely and without coercion by any other Party or non-party hereto.

**P. Successors.** This Agreement shall inure to the benefit of the respective heirs, successors, and assigns of the Parties, and each and every one of the Releasees shall be deemed to be intended third-party beneficiaries of this Agreement.

**Q. Attorneys' Fees.** Unless otherwise expressly set forth herein, each of the Parties shall bear its own attorney's fees, costs, and expenses in connection with the matters set forth in the Agreement, including, but not limited to, the Litigation and the negotiations and preparation of this Agreement. However, if any Party institutes legal proceedings over the enforcement of this Agreement or any provision of it, the prevailing Party shall be entitled to recover from the losing Party its costs, including reasonable attorneys' fees, at both the trial and appellate levels.

**R. Waiver of Trial by Jury.** The Parties knowingly, voluntarily and intentionally waive the right they may have to a trial by jury in respect to any litigation based hereon, or arising out of, under or in connection with this Agreement, any document contemplated to be executed, or any underlying matter, course of dealing, statement (whether verbal or written) or action of the Parties.

**S. Jurisdiction.** The Parties agree that the Bankruptcy Court shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement. In the event any proceeding is commenced to interpret or enforce this Agreement, it shall be commenced in the Bankruptcy Case. If the Bankruptcy Case is closed, the aggrieved party shall move to reopen the Bankruptcy Case.

IN WITNESS WHEREOF, the Parties hereto evidence their agreement as a sealed instrument and have executed this Agreement as of the day and year first below written.

**BRIAN D. SHAPIRO, TRUSTEE**

Name: _____

Date: ___7-16-2021___

**DOUG HUGHES**

Name: _____

Date: ___7-15-21___

# AMENDMENT TO SETTLEMENT AGREEMENT AND RELEASE

On July 16, 2021, Brian D. Shapiro, in his capacity as Chapter 7 Trustee (the "Trustee") on behalf of Medolac Laboratories, A Public Benefit Corporation's bankruptcy estate ("Bankruptcy Estate"), on the one hand, and Doug Hughes or his assignee ("Hughes"), on the other entered into a Settlement Agreement and Release ("Agreement"). The Agreement is incorporated within this amendment as if fully stated herein. Hughes and Trustee are collectively the "Parties," Such Agreement is hereby amended to add the following terms:

The Parties agree that:

1.  Unless otherwise revised herein, all terms of the Agreement remain unchanged and are deemed to be enforceable.

2.  The Parties acknowledge that the Trustee has the responsibility to maximize recovery and value to the Bankruptcy Estate for the benefit of the creditors of the Bankruptcy Estate. The Parties acknowledge that the Trustee has received inquiries from third parties about the assets of the Bankruptcy Estate and may receive additional inquiries. The Trustee may need to respond to such inquiries. Accordingly, nothing contained in this Agreement shall prevent the Trustee from furnishing information, or entering into discussions or negotiations, with, any person or entity in connection with an inquiry by a third party interested in purchasing the assets of the Bankruptcy Estate, entering into an agreement with a third party in purchasing the assets of the Bankruptcy Estate and filing a motion seeking such approval of such agreement.

3.  In the event the Trustee enters into an agreement with a third party for the purchase of assets of the Bankruptcy Estate and files a motion seeking approval of such agreement, Hughes shall have the right to terminate the Agreement and the Bankruptcy Estate shall reimburse Hughes for expenses incurred in preserving the Bankruptcy Estate's assets in the amount of $75,000.00.

4.  The Agreement is subject to Bankruptcy Court approval and the Trustee shall request the Bankruptcy Court to hear such matter on shorten time. However, the Parties acknowledge that the request for shorten time is subject to the approval by the Bankruptcy Court. Accordingly, the date of such hearing and/or the decision on the motion to approve this Agreement is not within the control of the Trustee. If the Bankruptcy Court does not approve the request for shorten time, then the Trustee shall set such motion to approve this Agreement on such date and time provided by

the Bankruptcy Court through regular court calendaring procedures and Hughes shall have the right to terminate the Agreement.

5. The Parties acknowledge that the Court may not make an immediate decision after hearing the motion to approve this Agreement. To the extent that the Bankruptcy Court does not enter an order approving this Agreement prior to August 31, 2021, then payment of the entire $750,000.00 to the Trustee by Hughes shall be due and owing the earlier of ten (10) days after entry of an order approving the Agreement or the effective date of foreclosure on the Collateral as defined under the Agreement.

IN WITNESS WHEREOF, the Parties hereto evidence their agreement as a sealed instrument and have executed this Amendment as of the day and year first below written.

**BRIAN D. SHAPIRO, TRUSTEE**

Name: _____

Date: ___7-19-2021_____

**DOUG HUGHES**

Name: _____

Date: ___7-19-21_____