Goldsmith & Guymon, P.C.
Marjorie A. Guymon
Nevada Bar No. 4983
mguymon@goldguylaw.com
Christi T. Dupont
Nevada Bar No. 15537
cdupont@goldguylaw.com
2055 Village Center Circle
Las Vegas, Nevada 89134
Telephone: (702) 873-9500
Facsimile: (702) 873-9600
Attorneys for PROLACTA BIOSCIENCE, INC.

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

MEDOLAC LABORATORIES,
A PUBLIC BENEFIT CORPORATION,

Debtor.

)
)
)
)
)
)
)
)

Case No. 21-11271-abl
Chapter 7

Hearing Date: OST PENDING
Hearing Time: OST PENDING

### PROLACTA BIOSCIENCE, INC.'S MOTION FOR PRESERVATION OF EVIDENCE

Prolacta Bioscience, Inc. ("Prolacta"), by and through counsel, Marjorie A. Guymon, Esq., of the law offices of GOLDSMITH & GUYMON, P.C., files its Motion for Preservation of Evidence ("Motion"). Said Motion is made and based, in part, upon the action now pending in the California Superior Court of Orange County, Case No. 30-2015-00767116-CU-NP-CJC ("the State Court Case"), and the pending Ex Parte Application for Order to Show Cause re: Preliminary Injunction, and for Temporary Restraining Order to Prevent Spoliation of Evidence ("Ex Parte Application") therein, said action this Court having taken judicial notice thereof, all pleadings and

...

...

...

...

...

...

papers on file herein, the Declarations of Scott Elster (ECF 303), Briana McCarthy, Esq. (ECF 330) the Declaration of Marjorie A. Guymon, Esq. in Support of Motion for Preservation of Evidence submitted herewith, and the oral argument of counsel upon hearing.

DATED: August 12, 2021.

GOLDSMITH & GUYMON, P.C.

By: _____
Marjorie A. Guymon, Esq.
Nevada Bar No. 4983
mguymon@goldguylaw.com
Christi T. Dupont
Nevada Bar No. 15537
cdupont@goldguylaw.com
2055 Village Center Circle
Las Vegas, Nevada 89134
Telephone: (702) 873-9500
Attorneys for PROLACTA BIOSCIENCE, INC.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Statement of Facts

1. This Court is well aware of the litigation between Prolacta and the Debtor, Medolac (hereinafter "Medolac"). However, for preservation of the record, Prolacta provides a summary as follows.

**A.    Background**

2. Prolacta manufactures and sells a human-based milk product and fortifier for premature infants. Prolacta is a private, California-based company that creates specialty products derived from breastmilk. The firm buys milk from lactating donors and creates multiple products, including "donor milk," a full milk feeding product, and "human milk fortifiers."

3. Elena Medo ("Ms. Medo") is one of three cofounders of the Prolacta. She was relieved of her duties as the CEO of Prolacta by the Prolacta Board of Directors in 2006. However, Ms. Medo subsequently transitioned to a consulting role on July 15, 2008. Ms. Medo continued to act as a consultant to Prolacta's Board of Directors until February 26, 2009, when she signed a Termination Agreement. Ms. Medo was the majority common stockholder in Prolacta for three (3) years thereafter. She eventually sold all of her financial interest in

2

1    Prolacta.

2    4.    While still employed at Prolacta, Ms. Medo and her daughter, Adrianne Weir ("Ms. Weir")

3    started a competing company known first as Neolac, and then after a name change, Medolac

4    ("Debtor"). Ms. Medo and Ms. Weir stole and utilized a number of critically important,

5    confidential trade secrets from Prolacta and used that purloined information to help found

6    and establish Debtor.

7    5.    Prolacta discovered, in late 2014, that Ms. Medo, in violation of State and Federal law, had

8    taken and was utilizing proprietary and confidential Prolacta data. That data and information

9    included, but was not limited to, Prolacta customer lists, medical data bases, confidential

10    pricing and profit information, Standard Operating Procedures ("SOP") which are the high-

11    tech recipes for creating a product, as well as the Prolacta formula and manner to create a

12    product known as a "Fortifier".  Ms. Medo used this information to create Debtor's Benefit

13    line and Fortifier formula, as well as sell Debtor's product to Prolacta customers.

14    **B.    The State Court Case**

15    6.    On January 20, 2015, as first amended on April 13, 2015, Prolacta, as plaintiff, filed its

16    original complaint against Ms. Medo individually in the Superior Court, Orange County,

17    California, Case No. 30-2015-00767116-CU-NP-CJC ("the State Court Case"). The State

18    Court Case is venued in the Orange County Superior Court, complex division. Over the

19    ensuing years and voluminous discovery, Prolacta amended its complaint three more times,

20    and now includes Debtor and Ms. Weir (collectively "Defendants").

21    7.    On November 14, 2017, Prolacta filed its Fourth Amended Complaint (the Complaint"), the

22    current operative complaint in the Prolacta Litigation, which asserts the following claims:

23    1. Conversion against the Defendants of Prolacta's trade secret confidential material and proprietary information, including electronic and physical files and documents related to Prolacta's operations, corporate structure,

24    management, marketing and promotional materials and presentations, product information and price lists.

25    

26    2. Intentional interference with prospective economic advantage against the Defendants for providing Prolacta's proprietary and confidential information and trade secrets, disparaging Prolacta to customers, potential customers, and

27    Prolacta employees with the intent to steal business and employees from Prolacta and/or with the intent to damage Prolacta's reputation and business,

28    and with Debtor being vicariously liable for the harm caused.

3

3. Unfair competition pursuant to California Business & Professionals Code § 17200, et seq., against the Defendants by: (1) acts that were unlawful, unfair, and/or deceptive other than misappropriation of trade secret information from Debtor by allegedly providing non-trade secret, confidential material and proprietary information and documents to Ms. Medo and/or Debtor; (2) by allegedly breaching their contractual obligations to Prolacta, including nondisclosure agreements and/or contractual confidentiality provisions; (3) by allegedly deceptively and falsely disparaged Prolacta to Prolacta's customers, potential customers and employees with the intent to steal business and employees away from Prolacta and/or with the intent to damage Prolacta's reputation and business and in breach of Ms. Medo's Termination Agreement, and with Debtor being vicariously liable for the alleged harm caused.

4. Breach of alleged fiduciary duty of Ms. Medo in her capacity as an officer and director of Prolacta and, as such, owed a fiduciary and undivided duty of loyalty and confidentiality to it.

5. Breach of contract against Ms. Weir and Ms. Medo for alleged breaches of Non-Disclosure Agreements by allegedly disclosing confidential and trade secret information, proprietary data, documents and property belonging to Prolacta after termination of their employment, and utilizing Prolacta's trade secret information to benefit and provide an unfair advantage to Debtor as a competitor.

6. Breach of contract against Ms. Medo for breach of Ms. Medo's Termination Agreement with Prolacta for allegedly: (1) failing and refusing to return all materials belonging to Prolacta to Prolacta; (2) utilizing confidential proprietary information which was stolen from Prolacta; and (3) disparaging Prolacta to customers, potential customers and Prolacta employees.

7. Violation of the Uniform Trade Secrets Act, Cal. Civil Code § 3426 et seq., against the Defendants for taking, acquiring, using and/or disclosing Prolacta's trade secrets, including customer lists, sales contact databases, medical databases, product pricing formulae, cost information and profit margin calculations, research and development documentation and results, documents and records related to Prolacta's clinical trials and product research and other proprietary information.

8. Civil conspiracy against all Defendants.

9. Vicarious liability pursuant to Cal. Civil Code § 2338 Debtor, with Debtor vicariously liable for Ms. Weir's and Ms. Medo's alleged misdeeds.

8.    The Complaint seeks the following relief:

1. For an Order requiring defendants to show cause, if any, as to why they should not be enjoined as hereinafter set forth during pendency of this litigation.

2. For a temporary restraining order, preliminary injunction and a permanent injunction, all enjoining defendants, their agents, servants and employees, and all persons acting under or in concert with defendants:

4

A. From contacting whether telephonically, in person, in writing, by facsimile, e-mail or by any other form of electronic, written or oral communication to any of plaintiff's customers;

B. From contracting with, and/or selling to and/or engaging in any other business relationship with any of plaintiff's customers;

C. From divulging, making known, or making any use whatsoever of plaintiff's confidential information and trade secrets, including any part(s), portion(s), version(s), variation(s), derivation(s) or copy(ies) thereof.

D. To immediately return all of plaintiff's proprietary and trade secret information, including any and all hard copies or computerized copies or facsimiles thereof of plaintiff's business files including plaintiff's preferential customer list and other proprietary information;

E. To immediately return all of plaintiff's personal property;

F. For any and all other injunctive relief under California Civil Code Section 3426.2 to eliminate any and all commercial advantage that otherwise could be derived from the misappropriation set forth above.

3. For payment of a reasonable royalty under California Civil Code Section 3426.2.

4. For compensatory damages and damages for loss of profits proximately caused by defendant, in an amount according to proof exceeding the jurisdictional minimum of this court.

5. For damages for unjust enrichment in an amount according to proof.

6. For punitive and exemplary damages in an amount to be determined.

7. For reasonable attorney's fees incurred in this action pursuant to contract and by statute.

8. For doubling of any compensatory damages under California Civil Code Section 3426.3(c).

9. For an Order under California Civil Code Section 3426.5 preserving the secrecy of the trade secret information by reasonable means including the granting of a protective order and a sealing of the records in this action pertaining to the preferential customer list and other trade secrets.

9.    During the pendency of the litigation, there was a tremendous amount of both motion practice and discovery. To illustrate the volume of motion practice in the State Court Case, there have been 1,451 filings in the State Court Case.  There were multiple discovery conferences and hearings. Prolacta and Debtor each served hundreds of discovery requests, and served subpoenas for records on various third parties, including Salesforce.com, Inc., the California Department of Public Health, and the University of California, Irvine. During the course of discovery, the parties took 60 depositions, in 13 states, and in roughly 28 cities.

Ms. Medo in particular was deposed for more than a week. Debtor produced over 55,000 documents as part of the discovery process. The total size of this file exceeds 300,000 pages, filling dozens and dozens of banker boxes, plus a massive amount of electronic data. During the course of discovery, Ms. Medo and Debtor were sanctioned a total of six times for a total of almost $30,000 for their abuse of the discovery process.

10.    Prolacta obtained two experts to address monetary damages, Brian Daniel, MBA, and David Weiner. Both experts supported substantial monetary damages suffered by Prolacta in the State Court, providing expert opinions under penalties of perjury.

11.    On September 10, 2019, the California State Court Judge Glenda Sanders continued the trial to January 6, 2020, with all discovery to be completed by December 5, 2019. On January 13, 2020 the Court continued the trial to February 24, 2020, with a pre-trial conference on January 29, 2020. The trial estimate was 28 days.

12.    Trial in the Prolacta Litigation was expected to be lengthy. For example, the parties filed a list of 60 expected witnesses and estimated their testimony lasting more than 245 hours (and thus more than 30 days at 8 hours a day), and an exhibit list that contained 2,180 potential exhibits.

13.    On February 24, 2020, trial in the Prolacta Litigation began before a jury, and Prolacta began putting on its case-in-chief. Several key witnesses took the stand, including Dr. Diniz, the former chief medical officer for Debtor. Dr. Diniz testified that Debtor utilized stolen trade-secret SOP's from Prolacta, in the formulation of Debtor's product. However, trial was stopped after several weeks on March 12, 2020, due to order of the Governor of California and Presiding Judge closing the courts due to the COVID-19 pandemic.

14.    On May 26, 2020, Prolacta sought a mistrial due to the delay in the proceedings, and the California State Court entered an order on September 14, 2020.

15.    On January 12, 2021, the California State Court held a Status Conference and ordered that trial in the Prolacta Litigation would re-commence anew from the beginning starting on January 10, 2022. The retrial, just like the original trial, is expected to take a month or more of trial time, and involve the an extensive number of exhibits and witnesses.

6

**C.**    **The Bankruptcy**

16.    On March 17, 2021, Debtor filed Chapter 11 Bankruptcy, Subchapter V.  *See* ECF No. 1.

17.    On March 18, 2021, Brian D. Shapiro was appointed Subchapter V Trustee.  *See* ECF No. 7.

18.    Among Debtor's first day motions was a DIP Financing Motion.  *See* ECF No. 19.  Prolacta filed a limited opposition to this DIP Financing Motion, informing the Court and all parties in interest that to the extent the Debtor was proposing to pledge assets belonging to Prolacta, Prolacta opposed the DIP Financing Motion.  *See* ECF No. 64.

19.    This Court granted the DIP Financing Motion on April 26, 2021.  *See* ECF No. 90. Subsequent thereto, the DIP Lender issued a super-priority loan of $500,000 to Debtor, secured by a blanket lien on all Debtor's assets.

20.    Debtor filed its Schedules on March 30, 2021. *See* ECF No. 50.  Among the assets listed are assets owned by Prolacta and the subject of the State Court Case.

21.    Prolacta filed its Motion for Relief from the Automatic Stay ("Motion for Relief") on April 7, 2021.  *See* ECF No. 66.  The matter was heard on May 12, 2021, oral findings of fact, conclusions of law and–having found cause– a favorable ruling given on May 26, 2021, and the Order for Relief entered on June 4, 2021.  *See* ECF No. 213.

22.    Prolacta and Liquid Gold filed independent Motions to Dismiss on May 13, 2021 (*See* ECF No. 124) and May 14, 2021 (*See* ECF No. 136).  Both Motions to Dismiss were heard and subsequently granted on July 2, 2021.  *See* ECF No. 234.  Specifically, this Court independently granted both Motions to Dismiss for cause and converted Debtor's case to a Chapter 7. An Order Converting the case was entered on July 7, 2021. *See* ECF 237 and 237.

23.    As part of the State Court Case discovery process, Ms. Medo provided a declaration dated March 2, 2020 in which she referred to four prior laptops that she previously testified had been damaged.  It became clear that Ms. Medo had perjured herself and withheld evidence. During trial, the California Court ordered that Defendants produce whatever still existed of the computers and explain what happened to them and the data on them. However, Covid-19

hit, the trial never resumed and a mistrial was declared.  *See* Declaration of Briana McCarthy, Esq., ECF 330.

24.  The Trustee's Motion to Approve Settlement contains an Exhibit 5 describing 9 laptops and 17 desktops, identifying one purchased in 2013, two purchased in 2014, three purchased in 2017, and two purchased in 2018.  This contradicts Ms. Medo's testimony that she only had one laptop, or that she only had four laptops.  Specifically, Prolacta is entitled to prevent spoliation of **32 estate assets** listed by the Trustee, with a **total combined value of $2,000,** that constitute and/or contain relevant evidence in the state court case.  Any acts that would cause or contribute to spoliation should be enjoined.  Those 32 assets are the laptops computers, desktop computers, printers, mobile devices and equipment listed in ECF 279 at *Exhibit 5,* at rows 127-134, 139-140, 142, 146-151, 153-154, 156-163 and 169; as well as any and all data storage media (*e.g.*, external hard drives, flash drives, CDs, DVDs, data back-up device/equipment) that were owned by Ms. Medo or Medolac, and which are now part of the Medolac estate.) *See* Id.

25.  Due to the Trustee's attempt to transfer assets, including assets of Prolacta and evidence in the State Court Case, Prolacta's State Court Case counsel issued a July 28, 2021 Preservation Letter to the Trustee to protect and preserve evidence the subject of various items of concealed evidence.  *See* ECF No. 300, Trustee's Third Supplement to Motion to Reinstate the Stay as to Prolacta, Exhibit 1.  *See also,* Declaration of Briana McCarthy, Esq., ECF 330.  A Preservation Letter was also sent to the DIP lender, Doug Hughes, on July 28, 2021.

26.  The Trustee did not consent to the preservation of evidence, and Prolacta sought an Ex Parte Application for Order to Show Cause Re: Preliminary Injunction, and for Temporary Restraining Order to Prevent Spoilation of Evidence - in particular the computers, electronic data and other digital evidence currently in the custody and control of the Trustee ("Application")– in the California Superior Court.    Id.

27.  The Trustee filed a Motion to Reimpose the Stay as to Prolacta.  *See* ECF No. 260.  As a result, Prolacta elected to reduce its claim to $0 and focus on its claims pertaining to the theft of its assets in the State Court Case.  *See* Claim No. 28.  Prolacta also filed a Motion to

1      Withdraw Proof of Claim, ECF No. 294, and set the matter on shortened time for August 24,

2      2021. *See* ECF 308.

3   28. The Trustee's Motion to Reimpose the Stay was heard on shortened time on August 6, 2021,

4      and an oral ruling given by the Court on August 9, 2021, wherein due to a procedural error

5      and not substantive grounds, the Trustee's motion was granted, without prejudice.

6   29. As a result of this Court's order reimposing the stay, Prolacta is unable to proceed with the

7      preservation of evidence in the State Court Case.  However, to be clear, the laptops in Ex.

8      5 are presumably all of the Medolac laptops, not just Ms. Medo's.  Her testimony at

9      deposition is largely that she only has her current laptop, and all prior laptops were

10     destroyed/damaged/crashed. Her declaration addresses 3 laptops, but Prolacta believes she

11     had approximately 7 laptops. She consistently claims, both at her depositions and in her

12     declaration, that the only laptop she still has is her current laptop and that all data on the

13     prior laptops was lost due to hard-drive crashes/damage to the computer. Prolacta believes

14     approximately 4-7 of the laptops listed in Exhibit 5 are Ms. Medo's laptops, and in

15     particular, the laptop purchased in 2013 [row 129], at least one of the laptops purchased in

16     2014 [row 139], the Asus laptop purchased in 2017[row 157], and at least one of the laptops

17     purchased in 2018 [rows 159, 162]. Ms. Medo's testimony establishes that she had a

18     minimum of 4 laptops, at least 3 of her prior laptops were destroyed, and the single laptop

19     in her possession, custody or control is her current laptop which was purchased in 2018.  Her

20     testimony is plainly contradicted by the fact that the Trustee's inventory lists 9 laptops, 8 of

21     which match the descriptions and approximate time of purchase of the 4 laptop computers

22     to which she testified.

23  30. Prolacta has requested that the Trustee allow its forensic expert to access the assets in

24     question in order to copy the contents contained on the computers/laptops/printers; however,

25     the Trustee has failed to respond other to state that he is not in possession of the assets;

26     rather, the DIP Lender now holds possession. *See* Declaration of Marjorie A. Guymon, Esq.

27     in Support of Motion for Preservation of Evidence submitted herewith.

28  ...

9

31. Prolacta has also requested of the DIP Lender access to the assets in order to preserve the content prior to any sale or execution on foreclosure. As of the date of the filing of this Motion there has been no reply.

32. The Trustee filed a Motion to Approve Settlement and Declaration thereto on July 19, 2021. *See* ECF No. 279 and 280. The matter was set on shortened time for August 6, 2021. *See* ECF No. 287.

33. Of the assets listed in Trustee's Settlement are "Claims Against Prolacta and Claims arising out of intellectual property" of an unknown amount. *See* ECF No. 279, Page 4 of 52. The Trustee intends on retaining these claims with the possibility of assignment to the DIP Lender should the Trustee decide not to pursue the claims. *See* ECF No. 279.

34. At the hearing on the Trustee's Motion to Approve Settlement he represented as follows:

> I went to the location and I obtained a spreadsheet which was provided, and it was attached to this motion. I believe it's Exhibit Number 5, and it was represented to me that all of those assets were located on the premises. It is not a small premises, Your Honor. It is fairly large. Imagine a grocery store, a large grocery store, that was changed into this business. Huge freezers and other equipment was located on the premises, and I was assured that the items that were on that list were located in the property, and I put that within my declaration. But the list, for avoidance of doubt, was produced by the debtor's principals, and that's where that spreadsheet came from.

> Again, I obtained that because I knew that the estate was going to lose control of that location in favor of the DIP lender pursuant to the DIP lender's underlying agreement. In fact, they did lose control as the DIP lender had taken possession of all of the collateral, pursuant to its rights under the agreement and pursuant to this prior order in essence terminating the stay.

> *See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO APPROVE SETTLEMENT, 52-53:15-8.

35. Prolacta requested the same due diligence as provided to Mead Johnson and the Trustee has refused. The Trustee admitted Mead Johnson, a potential bidder of the purchase of the assets of the Estate, was afforded some due diligence by the Trustee.

> After the filing of the motion, several creditors or several parties of interest, I should say, came to the

trustee's attention that were potentially interested in
purchasing the assets of the estate. One of those is Prolacta,
and the other is Mead Johnson. Mead Johnson had the ability to
do a little bit of due diligence based upon the limited
information and documents that the estate was able to obtain.
I say estate. I mean myself as trustee and in fact, I think
spent about nine hours at my office going through documents
that the estate had.

*See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

APPROVE SETTLEMENT, 55:13-22.

I would also note that I was happy
that we had Mead Johnson actually do some due diligence, and
kick the tires.

*See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

APPROVE SETTLEMENT, 60:21-23.

36.    The Trustee admits that the Estate cannot sell assets that are not property of the Bankruptcy

Estate nor certain Estate assets that are subject to claims of ownership by third parties.

They were aware -- this is being Mead Johnson.
They're aware that the estate could not sell assets that were
not property of the bankruptcy estate. However, the estate was
unable to make a determination as to what assets the estate
actually owns, in particular, the fortifier, which is the -- I
guess the big issue that's in dispute with Prolacta.

*See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

APPROVE SETTLEMENT, 55-56:23-3.

37.    Prolacta and the Trustee came to an understanding wherein the Trustee would convert the

9019 Motion to Approve Settlement to a 363 Sale Motion, with Prolacta as the initial bidder

at $1,650,000. The Trustee stated to the Court that this was a better offer than settling with

the DIP Lender.

Conversely, and probably more importantly at this
time, Prolacta has made a -- and I'm sure Ms. Guymon will
advise this Court in a moment, what I consider to be a firm
offer as well as a better offer than what the proposed
settlement is with the DIP lender,...

*See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

APPROVE SETTLEMENT, 56:14-18.

11

1    I was going to present the motion to approve the
     settlement, and suggest, Your Honor, that that motion was
2    certainly in the best interests of the bankruptcy estate, and
     that the ANC factors clearly were met, despite the opposition
3    which was filed by Prolacta, but based upon the representations
     that were made to me this morning at approximately 9:15 a.m.,
4    and confirmed by emails, it would be clear to the estate that
     the offer which is being made by Prolacta is a better offer
5    than the settlement motion which is being heard today.

6    *See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

7    APPROVE SETTLEMENT, 58-59:23-6.

8    38.    In fact, the Trustee represented, and Prolacta confirmed, the terms of the offer to the Court.

9    MR. SHAPIRO: ...that they're willing to make an initial binding
     overbid offer on the settlement in the amount of $1,650,00 for
10   any and all assets of the estate excluding cash, account
     receivables, and all causes of action in an as-is/where-is
11   condition, without any representations or warranties, including
     but not limited to transferability of such assets, and that
12   Prolacta, by and through Ms. Guymon, has advised me that her
     client is going to wire such funds into her trust account later
13   today.

14   *See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

15   APPROVE SETTLEMENT, 57:7-15.

16   MS. GUYMON: Yes, Your Honor. The terms that were
     set forth on the record by Mr. Shapiro are accurate. My
17   client, maybe not happily, but in order to preserve the
     evidence and preserve its property interests, has agreed to pay
18   $1,650,000 and wire those funds into my trust account, and has
     agreed to the trustee's requests for no representations or
19   warranties as to the assets.

20   *See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

21   APPROVE SETTLEMENT, 69:9-15.

22   39.    The DIP lender agreed that Prolacta's offer was a better offer and he was willing to delay

23   execution to allow the sale to proceed.

24   I mean, assuming Prolacta follows through and makes the
     deposit into Ms. Guymon's trust account, and the trustee
25   receives confirmation of that today, I think a robust 363
     process with a sale free and clear of liens would benefit the
26   estate.

27   *See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

28   APPROVE SETTLEMENT, 68:19-23.

40.  Prolacta represented to the Trustee and provided proof that the wire was accomplished. *See* Declaration of Marjorie A. Guymon, Esq. in Support of Motion for Preservation of Evidence submitted herewith.

41.  The Trustee and Prolacta worked diligently through the weekend and into Monday and Tuesday (August 9 and 10) to prepare the Purchase and Sale Agreement and the Motion for an order establishing Bidding Procedures for the sale of substantially all of the assets of the bankruptcy estate, approving form and manner of the sale Set Auction Date and Sale Hearing; Approve Form of Order on Sale; and Grant Related Relief. These documents were, in essence, finalized on August 10th. *See* Declaration of Marjorie A. Guymon, Esq. in Support of Motion for Preservation of Evidence submitted herewith.

42.  On August 9, 2021, due to this Court's oral ruling reinstating the automatic stay on procedural grounds, in the abundance of caution in order to avoid the loss of Prolacta's assets and preserve evidence, Prolacta counsel contacted those entitled to weigh in on Prolacta's request for an Order Shortening Time on its Renewed Motion for Relief From Stay. Almost unanimously, the response was no. *See* Id.

43.  Although an email was circulated clarifying Prolacta's primary objective was to preserve its evidence for the State Court Case, the Trustee subsequently sent an email on August 10, 2021 at 6:09 p.m. to Prolacta counsel advising that "the Estate has serious concerns that such a motion and (even the request via email) could or has chilled the potential of third-party bids." The Trustee further stated that in order for the Estate to proceed with any agreement for the purchase of estate assets "the Estate has decided that it is not willing to enter into any agreement with Prolacta without the support of Liquid Gold." *See* Id.

44.  Prolacta counsel contacted Liquid Gold counsel to discuss its concerns with the proposed purchase of the Estate Assets. It is Prolacta's understanding that Liquid Gold will only support Prolacta's purchase of the assets if the starting bid is increased to $2 Million. Id.

45.  As of the filing of this Motion, there is no stalking-horse bid, there is no 363Sale Procedures Motion, and Prolacta assumes no sale of assets will be accomplished at the continued hearing on the Trustee's Motion to Approve Settlement on August 24, 2021. Id.

46. Prolacta seeks this Court's order directing the Trustee/Hughes that they are required to preserve this evidence and produce it to Prolacta for photographing, forensic examination and copying in compliance with the law as set forth below.

## II. Statement of Law and Argument

Federal Law is clear that a party to litigation has a responsibility to preserve evidence. *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 612 (S.D. Tex. 2010) (quoting *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) ); *Toth v. Calcasieu Parish*, No. 06-998, 2009 WL 528245, at *1 (W.D. La. Mar. 6, 2009) (citing *Zubulake v. UBS Warburg, L.L.C.*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ); *In re Krause*, 367 B.R. 740, 764 ("A duty to preserve evidence arises when the party has notice that the evidence is relevant to litigation or should know that the evidence may be relevant to future litigation"); *Stillwater Liquidating LLC v. Net Five at Palm Point, LLC (In re Stillwater Asset Backed Offshore Fund Ltd.)*, Adv. No. 14-02245, 2017 WL 1956848, at *5 (Bankr. S.D.N.Y. May 10, 2017) ("Parties have a duty to preserve documents that they know or should know could be relevant to pending, imminent, or reasonably foreseeable litigation.").

The Trustee has a duty to preserve evidence under his responsibility and control the subject of pending litigation. *See Kronisch v. United States*, 150 F.3d 112, 130 (2nd Cir. 1998)(Trustee has an uncompromising duty to preserve relevant evidence whenever litigation is pending). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (2003). *See also, Philips Electronics Nor. Amer. Corp. v. BC Technical*, 773 F. Supp.2d 1149, 1159 (2011)(Under the federal rules, the litigants and counsel were expected to take the necessary steps to ensure that relevant records were preserved when litigation was reasonably anticipated or began, and that those records were collected, reviewed, and produced to the opposing party during the discovery process.)

The Trustee is the legal representative and fiduciary of Debtor/Defendant Medolac, an officer of the court, and stands in the shoes of the Debtor with regard to claims against the same. *See* 11 USCA §§ 323, 541, 544, 704(1); *see also, Trustee v. Joseph (In re Joseph)*, 208 B.R. 55, 60 (B.A.P. 9th Cir. 1997); *In re Cont'l Coin Corp.*, 380 B.R. 1, 5 (Bankr. C.D. Cal.2007); *Sherman*

1   v. *FSC Realty LLC (In Re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 272 (Bankr. N.D.
2   Tex.2003); *Hedrick v. Tennessee Valley Authority Board of Directors*, 2014 WL 1515422
3   (E.D.Tn. 2014).

4          Given the above, the Trustee has a duty to preserve Medolac's computers, laptops, printers,
5   data storage media, and all data contained thereon as Prolacta is entitled to conduct a forensic search
6   of all the equipment and to preserve all evidence for use at trial. Prolacta has attempted to work with
7   the Trustee on the preservation of all relevant evidence and minimize the impact to the Bankruptcy
8   Estate. *See* Declaration of Briana McCarthy, Esq., ECF 330; *see also* Declaration of Marjorie A.
9   Guymon, Esq. in Support of Motion for Preservation of Evidence submitted herewith.

10          At the initial hearing on Prolacta's Application (August 2, 2021), the California Superior
11  Court acknowledged this Court's superior authority as it relates to the property of the estate,
12  requested instruction from the Bankruptcy Court clarifying whether the Order Lifting the Stay
13  includes granting her authority to issue orders to enforce prior orders of the California Court and
14  exercise her police power to preserve evidence, and continued the matter to August 9, 2021 at 1:30
15  p.m. This hearing has since been vacated due to the Court's oral ruling of August 9th reimposing
16  the stay. Id.

17          It is Prolacta's desire that this Court either instruct the California Superior Court that it is
18  able to rule on the Application under its police powers even when that evidence is part of the
19  Bankruptcy Estate, including a preliminary injunction if found appropriate, restraining and enjoining
20  Medolac, Trustee, Hughes, and each of their, attorneys and agents, from selling, purchasing,
21  conveying, transferring, removing, concealing, destroying, purging, foreclosing upon or otherwise
22  disposing of the laptops computers, desktop computers, printers, mobile devices and equipment
23  listed in Prolacta's Ex Parte Application, including any and all, data storage media (*e.g.*, external
24  hard drives, flash drives, CDs, DVDs, data back-up device/equipment) that were owned by
25  Debtor/Defendant Medolac, and which are now part of the Medolac estate, until 30 days after
26  completion of trial in the case pending in state court, or that this Court enter an order to preserve
27  evidence. *See* ECF 330, Declaration of Briana McCarthy, Esq.

28  ...

1    The Trustee is attempting to dispose of *absolutely essential* evidence in the State Court Case

2    without regard to Prolacta's rights, thus unjustly bolstering the Estate's ability to defend the State

3    Court Case while seeking to pursue yet undisclosed and likely time-barred claims of Medolac

4    against Prolacta.

5    The Trustee has rejected "a firm offer as well as a better offer than what the proposed

6    settlement is with the DIP lender" because Prolacta is asserting its absolute right to demand the

7    preservation of evidence for the State Court Case, suggesting this will quell bidding.  Rather than

8    simply allow Prolacta access to the computers/laptops/printers to preserve the evidence by

9    stipulation, the Trustee rescinded his agreement as represented to this Court and forced Prolacta to

10   seek remedy through the Court as requested herein.  The Trustee has dealt unfairly with Prolacta,

11   refusing to allow Prolacta the same due diligence as Mead Johnson with regard to the purchase of

12   the Estate assets or allow Prolacta to inspect the assets.

13   The Trustee attempts to excuse his behavior by suggesting that the DIP Lender now has

14   possession of these items. However, the Trustee's duty to preserve extends to assets he does not

15   have possession.  *In re Correra*, 589 B.R. 76, 133 (Banrk. N.D. Texas 2018).  The *Correra* court

16   also held that a federal court has the inherent power to sanction a party who has abused the judicial

17   process, and that the spoliation of evidence is one such abuse. Id. at 127, citing *Ashton v. Knight*

18   *Transp., Inc.*, 772 F.Supp.2d 772, 799 (N.D. Tex. 2011).  Spoliation is the "destruction or material

19   alteration of evidence or the failure to preserve property for another's use as evidence in pending or

20   reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)

21   (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999) ); BLACK'S LAW

22   DICTIONARY 1531 (9th ed. 2009); *U.S. v. Parks (In re Krause)*, 367 B.R. 740, 764 (Bankr. D.

23   Kan. 2007) (defining spoliation as "the destruction or significant alteration of evidence, or the

24   failure to preserve property for another's use as evidence in pending or reasonably foreseeable

25   litigation").

26   Furthermore, as the Court witnessed at the hearing on August 6th, the DIP Lender is

27   supportive of the sale of assets and amenable to the requests of the Trustee.

28   ...I was going to just make I guess
     the offer that my client -- I mean, my client is obviously

16

interested in having the settlement approved, but understands
that, you know, the trustee has to do what's in the best
interests of the estate, and, you know, my client is interested
in what's best for the estate and creditors as well.

*See* Exhibit A, TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO

APPROVE SETTLEMENT 67:14-19.

...But I was going to offer
to -- my client has instructed me that he will delay that --
voluntarily delay that foreclosure process so that a more
robust, I guess, 363 process can occur, and instead of, you
know, having it next week, would refrain from foreclosure for a
two-week period, just to have a more robust procedure, as the
Court is alluding to.

Id. at 68:3-9.

I just -- I mean, I think
with -- I mean, assuming Prolacta follows through and makes the
deposit into Ms. Guymon's trust account, and the trustee
receives confirmation of that today, I think a robust 363
process with a sale free and clear of liens would benefit the
estate.

Id. at 68:18-23.

Prolacta specifically does not request this Court issue a preliminary injunction as the same

requires the filing of an adversary proceeding. *See* Federal Rules of Bankruptcy Procedure, Rules

7001(7) and 7065. Prolacta has always maintained its desire to proceed with its jury trial in the

Complex Division of the California Superior Court before the Judge who previously impaneled and

conducted the jury trial for three weeks.  Filing an adversary proceeding would further dilute

Prolacta's attempts to avoid submitting the State Court Case to this Court's jurisdiction.

However, this Court has authority to instruct the California Superior Court or otherwise enter

an order requiring the Trustee and/or the DIP Lender to preserve evidence pursuant to those cases

cited above.  Also, this Court has broad discretion to prevent an abuse of process under 11 U.S.C.

§105(a) which provides:

The court may issue any order, process, or judgment that is necessary or appropriate
to carry out the provisions of this title. No provision of this title providing for the
raising of an issue by a party in interest shall be construed to preclude the court from,
sua sponte, taking any action or making any determination necessary or appropriate
to enforce or implement court orders or rules, or to prevent an abuse of process.

17

### III. Conclusion

WHEREFORE, Prolacta respectfully requests that this Court either instruct the California Superior Court that it is able to rule on the Application under its police powers even when that evidence is part of the Bankruptcy Estate, including a preliminary injunction if found appropriate, restraining and enjoining Medolac, Trustee, Hughes, and each of their, attorneys and agents, from selling, purchasing, conveying, transferring, removing, concealing, destroying, purging, foreclosing upon or otherwise disposing of the laptops computers, desktop computers, printers, mobile devices and equipment listed in Prolacta's Ex Parte Application, including any and all, data storage media (*e.g.*, external hard drives, flash drives, CDs, DVDs, data back-up device/equipment) that are owned by Debtor/Defendant Medolac, and which are now part of the Medolac estate, until 30 days after completion of trial in the case pending in state court, or in the alternative that this Court enter an order to preserve evidence. Specifically Prolacta seeks this Court's order directing the Trustee/DIP Lender that they are required to preserve this evidence and produce it to Prolacta for photographing, forensic examination and copying in compliance with the law as set forth.

DATED:  August 12, 2021.

GOLDSMITH & GUYMON, P.C.

By: _____
Marjorie A. Guymon, Esq.
Nevada Bar No. 4983
mguymon@goldguylaw.com
Christi T. Dupont
Nevada Bar No. 15537
cdupont@goldguylaw.com
2055 Village Center Circle
Las Vegas, Nevada 89134
Telephone:  (702) 873-9500
Attorneys for PROLACTA BIOSCIENCE, INC.

18

1

EXHIBIT A

2

TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO APPROVE
SETTLEMENT

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (LAS VEGAS)

IN RE:                          .   Case No. 21-11271-abl
                                .   Chapter 7
MEDOLAC LABORATORIES, A         .
PUBLIC BENEFIT CORPORATION, .       300 Las Vegas Blvd. South
                                .   Las Vegas, NV 89101
            Debtor.             .
                                .   Friday, August 6, 2021
. . . . . . . . . . . . . . .       9:38 a.m.


TRANSCRIPT OF ORDER SHORTENING TIME RE: MOTION TO
APPROVE SETTLEMENT FILED BY BRIAN D. SHAPIRO
ON BEHALF OF BRIAN D. SHAPIRO [279];
ORDER SHORTENING TIME RE: MOTION TO REINSTATE STAY
AS TO PROLACTA FILED BY BRIAN D. SHAPIRO
ON BEHALF OF BRIAN D. SHAPIRO [260]
BEFORE THE HONORABLE AUGUST B. LANDIS
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:          Larson & Zirzow
                         By:  MATTHEW C. ZIRZOW, ESQ.
                         850 E. Bonneville Ave.
                         Las Vegas, NV 89101
                         (702) 382-1170

Chapter 7 Trustee:       Law Office of Brian D. Shapiro
                         By:  BRIAN D. SHAPIRO, ESQ.
                         510 S. 8th Street
                         Las Vegas, NV 89101
                         (702) 386-8600


APPEARANCES CONTINUED.


Audio Operator:          C. Shim, Remote ECR


Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com


    Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):                              2

For Mead Johnson &        Shea Larsen
Company:                  By:  JAMES PATRICK SHEA, ESQ.
                          1731 Village Center Circle, Ste. 150
                          Las Vegas, Nevada 89134
                          (702) 471-7432

                          Sheppard, Mullin, Richter & Hampton
                          By:  MICHAEL T. DRISCOLL, ESQ.
                          30 Rockefeller Plaza
                          New York, NY 10112
                          (212) 634-3055

For Prolacta             Goldsmith & Guymon, P.C.
Bioscience Inc.          By:  MARJORIE GUYMON
                         2055 Village Center Circle
                         Las Vegas, NV 89134
                         (702) 873-9500

For Doug Hughes:         Severson & Wierson, APC
                         By:  DONALD H. CRAM, ESQ.
                         One Embarcadero Center, 26th Floor
                         San Francisco, CA 94111
                         (415) 677-5536

For M-2 Lease Funds,     Hayes & Welsh
Secured Creditor:        By:  MEGAN MCHENRY, ESQ.
                         199 N. Arroyo Grande Blvd., Suite 200
                         Henderson, NV 89074
                         (702) 434-3444

For Liquid Gold:         Womble Bond Dickinson (US) LLP
                         By:  JAMES S. LIVERMON, IIIM ESQ.
                         555 Fayetteville Street, Suite 1100,
                         Raleigh, NC, 27601
                         (919) 755-2148

Also Present:            ELENA M. MEDO
```



3

1        (Proceedings commence at 9:38 a.m.)

2              THE CLERK:  Bankruptcy Court is now in session.

3              THE COURT:  Have a seat.  All right.  We are here for

4    the two matters on my 9:30 calendar, both of which are in

5    Medolac Laboratories, a Public Benefit Corporation.  This is a

6    Chapter 7 case, Number 21-11271.  Two matters.  Item one is a

7    motion to -- on shortened time to approve a settlement.  Item

8    two relates to a motion seeking to reinstate the automatic

9    stay.  Let's start with appearances.  Let's start with the

10   trustee, just to make it easier for those of you who are trying

11   to figure out when to talk.

12             MR. SHAPIRO:  Thank you, Your Honor.  Brian Shapiro

13   on behalf of the bankruptcy estate.

14             THE COURT:  Good morning, Mr. Shapiro.

15             Next, let's talk about the debtor.

16             MR. ZIRZOW:  Good morning.  Matt Zirzow for the

17   debtor.

18             THE COURT:  Good morning, Mr. Zirzow.

19             All right.  Next -- what other appearances do we

20   have?  We've got the trustee, we've got the debtor.  Who else

21   would like to appear in connection with these matters?

22             MR. SHEA:  Good morning, Your Honor.  Patrick Shea of

23   Shea Larsen, appearing on behalf of Mead Johnson and Company.

24             THE COURT:  All right.  So --

25             MR. SHEA:  And also with me today, Your Honor, is

4

1  Michael Driscoll from the New York office of Sheppard Mullin.

2            THE COURT:  All right.  Good morning.

3            MR. SHEA:  We are representing Mead Johnson jointly.

4            THE COURT:  Good morning Mr. Driscoll and Mr. Shea.

5  I heard --

6            MR. DRISCOLL:  Good morning Your Honor.

7            THE COURT:  -- and I should have asked, also, I heard

8  voices, and I guess I should have asked next, at least one of

9  the parties who's involved in this and has been for some time,

10  which is Prolacta.

11            MS. GUYMON:  Thank you, Your Honor.  Marjorie Guymon,

12  appearing on behalf of Prolacta Bioscience Inc.

13            THE COURT:  Good morning Ms. Guymon.  I was reading

14  my notes, and I saw Mead Johnson, and I almost said Marjorie

15  Johnson.  Sorry, Ms. Guymon.  Some days I'm better than others.

16            Other appearances not yet noted?

17            MR. CRAM:  Good morning, Your Honor.  Don Cram with

18  Severson and Wierson, on -- upon -- appearing on behalf of the

19  DIP finance lender, Doug Hughes.

20            THE COURT:  All right.  All right.  So --

21            MS. MCHENRY:  Good morning, Your Honor.  Megan

22  McHenry, appearing for M-2 Lease Funds, a secured creditor.

23            THE COURT:  M-2 Lease Funds?  All right.

24            MS. MCHENRY:  Yes.

25            THE COURT:  All right.  Good morning, Ms. McHenry.

5

1      So who else have I managed to overlook here?

2      MR. LIVERMON:  Good morning, Your Honor.  Not to be

3 left out, this is Charlie Livermon on behalf of Liquid Gold.

4      THE COURT:  Good morning, Mr. Livermon.  And Liquid

5 Gold.

6      All right.  And I heard one other voice back there, I

7 think?

8      MS. MEDO:  Elena Medo, debtor.

9      THE COURT:  Good morning, Ms. Medo.

10      Other appearances in connection?

11      Actually, you're not the debtor.  Medolac

12 Laboratories, a Public Benefit Corporation, is the debtor, but

13 it's -- you're welcome to listen in on the hearing today,

14 Ms. Medo.

15      Other appearances?  Going once?  Don't be shy.  This

16 is so much easier in the courtroom, but I'll do it the best I

17 can on the telephone.  Going twice?  All right.  Appearances

18 having been noted -- oh, there is one more, it sounds like.

19      MR. SHEA:  No, Your Honor, this is Jim Shea.  I

20 wanted to first of all, apologize for speaking over Ms. Garman

21 -- Ms. Guymon as she was trying to make an appearance as well.

22 The Court's not the only one challenged by these telephonic

23 appearances, and the order in which appearances are to be

24 noted.  I didn't know if Mr. Driscoll wanted to make his own

25 appearance for the record.

6

1       THE COURT:  Mr. Driscoll, if you wish to, feel free.

2       MR. DRISCOLL:  Thank you, Your Honor.  This is Mike

3   Driscoll of Sheppard Mullin Richter & Hampton on behalf of Mead

4   Johnson and Company, LLC.

5       THE COURT:  All right.  Very well.

6       MR. DRISCOLL:  Thank you, Your Honor.

7       THE COURT:  No problem.

8       So appearances that I've noted, just walking through

9   the record that I've managed to develop so far, I have

10  Mr. Shapiro as the trustee of the Chapter 7 estate of Medolac

11  Laboratories.  I have Mr. Zirzow appearing on behalf of the

12  debtor, as well as noting Ms. Medo's appearance separately.

13  Then with respect to Prolacta, I have Ms. Guymon's appearance.

14  With respect to Mead Johnson, I have Mr. Driscoll and Mr. Shea.

15  With respect to the Chapter 11, Subchapter 5, Debtor-in-

16  Possession lender, Mr. Hughes, I have Mr. Cram appearing.  On

17  behalf of M-2 Lease Fund, I have Ms. McHenry.  On behalf of

18  Liquid Gold, Mr. Livermon.

19      I believe that's everyone.  If I haven't said your

20  name, and managed to overlook you, and you're on the telephone

21  this morning, now is your chance to cure my oversights.  Going

22  once.  Don't be shy if you're out there.  Going twice.

23      All right.  Appearances having been noted on the

24  record, there are two matters pending before me today.  We're

25  going to take them in reverse order of the way they appear on

7

1  the calendar.  We're going to start with the motion to

2  reinstate the stay as to Prolacta, filed by the trustee.  This

3  motion is opposed.  Mr. Shapiro, this is the trustee's motion.

4  Have at it.

5         MR. SHAPIRO:  Thank you, Your Honor.  Brian Shapiro

6  on behalf of the bankruptcy estate.  This is the trustee's

7  motion to -- what we classify as a motion to reinstate the

8  stay.  But to be clear, that is a title -- as pretty much as

9  required based upon the drop-and-drag indication with the Court

10 order in trying to choose what title.  But this is a Rule 60(b)

11 motion.

12        THE COURT:  Right.  That's --

13        MR. SHAPIRO:  The motion --

14        THE COURT:  That was going to be one of my questions

15 right out of the block.  I wanted to make sure I understood.

16 This is actually a motion that challenges the order that I

17 entered previously, granting relief from the automatic stay

18 pursuant to Prolacta's motion, and the predicate for the motion

19 is Rule 60.  Is that right, Mr. Shapiro?

20        MR. SHAPIRO:  Absolutely, Your Honor.  That is

21 correct.  It's -- and specifically, Rule 60(b)(4) and Rule

22 60(b)(6).

23        THE COURT:  All right.

24        MR. SHAPIRO:  The original motion, the way it was

25 initially addressed in the original motion, was asserting

8

1 Rule 60(b)(6) first, and then Rule 60(b)(4) second.  I'm going
2 to do this, in essence, in the reverse order, initially going
3 with 60(b)(4) and then 60(b)(6), just as that is how it is
4 indicated in the reply.

5          And the motion initially asserts that the order is
6 void under Rule 60(b)(4), and the reason that allegation is
7 being made is that the motion for relief was filed in the
8 Chapter 11 case, and pursuant to Bankruptcy Rule -- I got it
9 backwards myself now.

10          THE COURT:  That's okay.

11          MR. SHAPIRO:  Bankruptcy Rule 4001(a)(1), that
12 movement is required, and the language is, "shall be served
13 upon the top 20 creditors of the Chapter 11 bankruptcy estate."

14          THE COURT:  Okay.  I do have questions at this point.
15 Who was the Subchapter 5 trustee during the Chapter 11 phase of
16 this case?

17          MR. SHAPIRO:  Your Honor, I was.  I, in my individual
18 capacity, was the Subchapter 5 trustee in the Chapter 11 case.

19          THE COURT:  All right.  And as Subchapter 5 trustee,
20 did you receive notice of the stay of relief motion?

21          MR. SHAPIRO:  The Subchapter 5 trustee did receive
22 notice of the stay motion.

23          THE COURT:  All right.  And it went to
24 Brian@trusteeshapiro.com, nv22@ecfcbis.com,
25 kristen@trusteeshapiro.com, and connie@brianshapirolaw.com,



9

1  according to ECF 73, Page 2 of 6.

2          My simple question is this:  Why didn't you object to

3  service of the stay relief motion after you were served with it

4  in your capacity as the Subchapter 5 trustee in the Subchapter

5  5, Chapter 11 phase of this case?

6          MR. SHAPIRO:  Your Honor, at the time of the service

7  of the motion, I, as the Subchapter 5 trustee, was not aware

8  that the motion for relief from stay was not properly served.

9          THE COURT:  But you got --

10          MR. SHAPIRO:  In fact --

11          THE COURT:  You got the motion, and you received

12  service of it.  Help me understand how that's the case?

13          MR. SHAPIRO:  Your Honor, it was served upon the

14  Subchapter 5 trustee.

15          THE COURT:  Right.

16          MR. SHAPIRO:  As a Subchapter 5 trustee, the duties

17  and obligations of the trustee are significantly different than

18  that of a Chapter 7 trustee or a normal Chapter 11 trustee.

19          THE COURT:  I agree with that.

20          MR. SHAPIRO:  In fact --

21          THE COURT:  Doesn't the Subchapter 5 trustee have the

22  obligation of trying to assist the debtor through the sort of

23  expedited process of Chapter 11 under Subchapter 5, and

24  wouldn't stay relief be something that would have an impact on

25  being able to put together a plan that could be confirmed under

10

1   the shortened time frames that are established under

2   Subchapter 5?

3             MR. SHAPIRO:  Your Honor, one of the main goals of a

4   Subchapter 5 trustee is attempting to reach a consensual plan.

5             THE COURT:  Right.

6             MR. SHAPIRO:  And I acknowledge that a motion for

7   relief may certainly affect that.  However, the simple issue of

8   notice of whether something was noticed properly sometimes

9   could be quite frankly overlooked.  And the reason things could

10  be overlooked is when you see a certificate of service that was

11  on file, and knowing that, you know, in this particular

12  instance, counsel who has been doing this for a large amount of

13  -- a long time, one can imply that perhaps service was proper.

14            The issue that was before your -- the Court on the

15  original motion for relief was an issue that was being

16  specifically addressed by Mr. Zirzow on behalf of the debtor.

17  Behind the scenes, I, as the Subchapter 5 trustee, was clearly

18  attempting to reach resolutions in assisting the debtor, but on

19  the motion for relief from stay, the trustee arguably had some

20  type of standing to file an opposition based upon the merits of

21  the motion.  What that standing would be due to the newness of

22  the role of a Subchapter 5 trustee may be disputed in some

23  respects.

24            It's not one of the underlying expressed duties of a

25  Subchapter 5 trustee, but quite frankly, it was not, in

11

1  essence, brought to my attention that service of the motion was
2  improper, and it appears that, you know, service of the motion
3  was not perhaps brought to this Court's attention, I'm
4  assuming, based upon the motion that was filed by movant.
5  Movant in essence implied, by filing a certificate of service
6  that it served properly, the 20 largest unsecured creditors as
7  required to under the Bankruptcy Code, and I'm not asserting --
8  and please, take this in light of my comment, but we all have
9  obligations to make sure that notice is somewhat proper and
10  when you receive --

11          THE COURT:  Well, that include -- and I want to be
12  very clear on the record here.  That includes the Court, and
13  the debtor, certainly, in the Subchapter 5 case appeared
14  opposed and didn't raise the question of service as it related
15  to the stay relief motion.  Right?

16          MR. SHAPIRO:  Correct.  So any of the parties that
17  actually received notice of the motion did not raise that
18  particular issue.

19          THE COURT:  All right.

20          MR. SHAPIRO:  And thank you for addressing that, as I
21  was trying to lightly tap at, you know, the Court has that
22  obligation as well, and to make sure that notice was proper.
23  Clearly, at least I believe that if Your Honor was advised and
24  made the determination that notice, in fact, was not given, it
25  would be my belief that this Court would not even consider the

12

1 | underlying motion to terminate the stay.

2 |         I did cite to you -- it was an unpublished decision

3 | of the Ninth Circuit BAP panel in my reply that talked about

4 | the importance of giving notice to the creditors, and that it

5 | is a contested proceeding, and under that particular decision,

6 | it even indicated that a contested proceeding notice should

7 | have been given to the attention of the president, the resident

8 | agent, as well.  So which, quite frankly, I was surprised to

9 | read.  But nonetheless, notice was not, in fact, given.

10 |        I, when I was the Chapter 5 trustee, did not see

11 | that.  Clearly, the debtor did not raise that issue, and

12 | presumably did not see it.  Liquid Gold presumably did not see

13 | it.  This Court did not see it.  And the movant never

14 | represented to the Court that it actually served or did not

15 | serve the motion on the 20 largest creditors appropriately.

16 |        But the fact of the matter is, is that those

17 | creditors who were required to be noticed with the notice of

18 | motion were, in fact - did not receive service of the motion,

19 | nor the notice of hearing.  Again, if this Court was aware of

20 | that, I firmly believe that this Court would not even, at that

21 | time, consider the underlying motion without proper service.

22 |        Now, belatedly, Prolacta did serve the motion.  I

23 | don't think it was the notice of hearing, but the motion and

24 | the court order, approximately one week ago to all of these

25 | creditors.  However, those creditors, at the time of the

13

1  motion, would never receive an opportunity to actually appear
2  nor contest the underlying motion.  Respectively, based upon
3  the failure to notice, and based upon the language that's
4  contained in the rules, the underlying order, at least the
5  estate's position, is void.  Prolacta makes two different
6  allegations or two different arguments as one, that it doesn't
7  reach a level of a violation of due process because the Chapter
8  11 plan was filed and served upon all of the creditors of the
9  bankruptcy estate, as well as what you initially raised a
10 moment ago, that the Subchapter 5 trustee did receive notice
11 and had some type of obligation to bring it to the Court's
12 attention as a fiduciary to the creditors of the bankruptcy
13 estate under Section 11 U.S.C. 323.
14          Just briefly addressing those two issues, or those
15 two arguments, the plan was actually filed prior to the motion
16 for relief being filed.  I should note that they were citing to
17 the Supreme Court case of _Espinoza_ in support of that argument.
18 So just to draw the differences between those two cases, the
19 Chapter 11 plan was served prior to the motion for relief from
20 the automatic stay, and that plan provided that -- and it gave
21 a brief discussion of the Prolacta litigation, admittedly.
22 That plan also had an injunction clause, and that plan, at the
23 end of the day, was never confirmed, although admittedly, it
24 was noticed upon all creditors.
25          Comparing that to the _Espinoza_ case, which was the

14

1  student loan case in a Chapter 13 context, the Chapter 13

2  debtor was attempting to discharge a portion of the student

3  loans, and in lieu of filing an adversary case, contained that

4  language within a Chapter 13 plan.  The creditor, the United

5  States Aid Funds, did not object to the Chapter 13 plan, and

6  the underlying court approved the Chapter 13 plan.  But

7  approximately four or five years later, the student loan

8  company asserted that, in essence, the debt was not discharged,

9  because no adversary complaint was filed and no summons was

10  filed.  The Supreme Court clearly held that the underlying

11  order, even though perhaps in some respects should not have

12  been granted, that order being the confirmation of the plan,

13  they could not collaterally attack the underlying Chapter 13

14  plan.

15         The court -- Supreme Court in essence warned

16  bankruptcy courts that they should not be confirming a

17  Chapter 13 plan that has that particular language, and that, in

18  fact, an adversary proceeding is required to be filed.

19  However, in this particular instance, since the creditor

20  actually had notice of the Chapter 13 plan, and that the plan

21  was confirmed, the United States Aid Funds could not

22  collaterally attack the underlying Chapter 13 confirmation

23  order.

24         Clearly, this case is significantly different, as the

25  plan was not confirmed, had no language pertaining to the

15

1  motions for relief from stay and, in fact, if the creditor
2  actually was looking at all this, they would know at the time
3  of the filing of the bankruptcy case there was a stay in
4  effect, and that the plan provided that there was going to be a
5  permanent injunction, which would have prohibited Prolacta from
6  even moving forward with the underlying litigation.
7          The second argument that we have made is simply that
8  there's been a significant change of circumstances since the
9  motion for relief which has been filed, and that would --
10 relief again be requested under Rule -- Federal Rule 60(b)(6).
11 And the issues and the facts which I have raised in the
12 underlying motion were not brought to the Court's attention
13 when the original motion for relief was filed, because in fact,
14 those facts, in essence, were not in existence at that
15 particular time.
16         I went through in the reply specifically all the
17 different facts which occurred after the filing of motion for
18 relief from stay, which was not presented to this Court at the
19 time, and those -- just briefly, some of those facts -- I think
20 some pertinent facts specifically was that Prolacta ended up
21 filing a $18 million claim in the bankruptcy case, and that
22 Prolacta filed a motion to dismiss the case.  Prolacta filed a
23 motion to abstain.  The debtor at that time was operating, when
24 the motion for relief was filed, but subsequently clearly now
25 the debtor is no longer operating, and is not authorized to

16

1 operate.  This Court did grant the motion to dismiss and
2 subsequently converted the case.
3          At the time that you heard the motion, there was a
4 concern as to whether, in fact, that there was insurance
5 coverage or not, and there's now evidence that there is no
6 insurance coverage available to defend the litigation, nor pay
7 any judgment.  Clearly, at this moment in time, the bankruptcy
8 estate is administratively insolvent.  There was now a motion
9 to approve a settlement which has been filed under Bankruptcy
10 rule 9019.  Prolacta has now amended their proof of claim,
11 which was signed under penalty of perjury, and has amended
12 their claim to zero dollars, in essence, not asserting a claim,
13 a monetary claim against the bankruptcy estate.  In fact,
14 Prolacta has now filed a motion to withdraw their proof of
15 claim, which is pending, and I believe sometime -- to be heard
16 sometime in August.
17          Moreover, the effect of the lifting of the stay is
18 going to negatively affect the bankruptcy estate.  The Chapter
19 7 bankruptcy estate now, to the extent that the estate has
20 funds, the estate is going to be forced to, in essence, defend
21 the underlying litigation, or potentially defend, and the
22 action that has been taken by Prolacta in the state court
23 litigation is clearly affecting the bankruptcy estate.  For
24 instance, and I think one of the most significant things that
25 has been filed in the state court matter was what I have

17

 1  classified as a restraining motion.

 2          Prolacta filed a motion in state court seeking

 3  immediate ex parte relief to prevent the bankruptcy estate from

 4  selling, purchasing, conveying, and transferring property of

 5  the estate.  When the estate got noticed of this motion, the

 6  estate immediately contacted counsel, advising that it was the

 7  estate's position that such motion is a violation of the stay,

 8  and that the attorneys and Prolacta could be held in

 9  contempt --

10          THE COURT:  What stay?

11          MR. SHAPIRO:  -- based upon --

12          THE COURT:  What stay, Mr. Shapiro?

13          MR. SHAPIRO:  The Chapter 7 stay under 362 as to

14  assets of the bankruptcy estate.

15          THE COURT:  All right.

16          MR. SHAPIRO:  They're attempting to prevent the

17  estate, again, from selling, purchasing, and conveying property

18  of the bankruptcy estate.  To the extent that this Court's

19  lifting of the stay is not void as a matter of law, Your Honor

20  had a variety of restrictions and limitations in the findings

21  of fact and conclusions of law which would have prevented

22  Prolacta from filing that particular motion.

23          Despite the estate advising counsel that the estate

24  would be taking the position that that was a violation, and

25  potentially they could be held in contempt, they argued in

18

1  support -- aggressively in support of that underlying motion.
2  The transcript pertaining to that motion has been attached, I
3  believe, by Prolacta.  In a brief review, you can read, and I
4  believe I quoted in the response, that Prolacta was taking the
5  position that the order lifting the stay was all encompassing
6  wherefore all -- and they could do whatever they want against
7  the bankruptcy estate.

8          Respectively, I disagree with that position.  I don't
9  believe they have the ability to prevent the estate from
10 selling, transferring, and conveying property of the estate.
11 The estate believes that's a violation of the automatic stay,
12 of the stay, and arguably, they could be held in contempt if a
13 motion was filed requesting that.  And of course, that motion
14 is currently pending before the Court.

15         Thankfully and luckily, the state court did make the
16 decision that -- and reflected its concern that such motion was
17 a violation of the stay and the court was not going to even
18 address that particular motion.  In that motion, I should note
19 they were well aware of what was going on in state court,
20 because they were citing to the underlying 9019 motion, which
21 was -- would end up resulting in the debtor's DIP lender
22 foreclosing upon, and then subsequently obtaining all the
23 property of the bankruptcy estate, and that it was an attempt,
24 from the estate's position, to attack that particular motion in
25 another jurisdiction and arguably -- and actually, not

19

1    arguably, I'd say, actually asserting that they were attempting

2    to usurp this Court's jurisdiction by trying to get a state

3    court to enjoin this Court from actually hearing that motion at

4    the underlying -- in essence, today.

5         Again, the state court chose not to address the

6    restraining motion, and continued that matter to Monday.  I'll

7    advise the Court that the bankruptcy estate did not make a --

8    an appearance on that motion, because the estate is not

9    represented by counsel in the state court matter, because the

10   estate has no money to retain counsel to actually appear in

11   state court to defend that particular litigation at this

12   particular time.

13        THE COURT:  So what would be the net effect of the --

14        MR. SHAPIRO:  So for the --

15        THE COURT:  What would be the net effect if the

16   estate simply doesn't participate at all in the state court

17   litigation?

18        MR. SHAPIRO:  If the estate does not participate in

19   the underlying litigation, as it would appear to be indicated

20   that the debtor -- or excuse me, that the court will award some

21   type of monetary award against the bankruptcy estate, some type

22   of damages, I don't know what other relief that they are

23   potentially requesting, the order for relief clearly said that

24   they could not execute upon any type of assets of the

25   bankruptcy estate, but the effect really is, is that the estate

20

1  may have to consider potentially defending the litigation if

2  they're attempting to enjoin the estate, or prevent the estate

3  from liquidating assets and moving forward appropriately within

4  the bankruptcy proceeding.  I mean, in a --

5            THE COURT:  What assets are you talking --

6            MR. SHAPIRO:  Your Honor --

7            THE COURT:  What assets are you talking about when

8  you say that?  What assets of the estate?

9            MR. SHAPIRO:  I'm sorry, I didn't --

10           THE COURT:  What assets of the estate are you talking

11  about when you are referencing the efforts to sell the property

12  of the estate?

13           MR. SHAPIRO:  Well, to the extent that the -- well,

14  the -- any and all assets of the estate, to the extent that the

15  estate ends up selling any and all assets of the estate.

16  Arguably, if this Court does not grant the 9019 motion, which

17  results in the foreclosure of those assets, and I think that

18  motion is attempting to prevent the foreclosure, or if someone

19  decides at the time of the hearing a little bit later this

20  morning to try to top the bid, you know, that would be a

21  prevention from the estate from transferring assets of the

22  estate.

23           It's hard for me to make a determination at this

24  moment in time what additional assets that may exist that are

25  out there.  The underlying -- this is getting into the 9019

21

1  motion, and I apologize for that.

2          THE COURT:  No, that -- you've got to --

3          MR. SHAPIRO:  But as such, the --

4          THE COURT:  -- touch on it, because I asked the

5  question, Mr. Shapiro.  It's just fine.  Go ahead.

6          MR. SHAPIRO:  Thank you.  I mean, the assets -- and

7  this is again, the 9019 motion.  The assets that pursuant to

8  that motion, the estate will -- would retain are account

9  receivables, underlying causes of action, cash, avoidance

10  actions, and whether that's going to prevent the estate, as

11  they obtain an injunction from the state court from resolving

12  those causes of action, the way at least it was simply

13  described at this moment in time, you know, is unknown.  I

14  can't see what's going to occur in the future in the state

15  court litigation.  But again --

16          THE COURT:  Do you count --

17          MR. SHAPIRO:  -- the request to --

18          THE COURT:  Do you contemplate --

19          MR. SHAPIRO:  -- enjoin the estate --

20          THE COURT:  Do you contemplate --

21          MR. SHAPIRO:  -- from selling or transferring assets,

22  any assets, is simply improper.

23          THE COURT:  Understood.  Do you contemplate conveying

24  any intellectual property or similar assets that are owned by

25  Prolacta and not the estate?

22

1          MR. SHAPIRO:   The bankruptcy estate, to the extent
2  that it owns any -- let me rephrase that.
3          To the extent that it has possession of any and all
4  -- any assets that belong to Prolacta, and assuming that that
5  is not in dispute, so let's make the assumption that the estate
6  is holding on to an asset that belongs to Prolacta, the answer
7  is no.  The estate is not going to sell, transfer, or convey
8  any asset that is owned by Prolacta.
9          However, with that said, again, going into the 9019,
10 is that I do expect, at the time of that hearing, that there is
11 going to be a topping offer or a request to have an in-court
12 auction of any and all assets of the estate without warranty as
13 to ownership or transferability, in an as-is/where-is
14 condition, so to the extent that that is deemed that I'm
15 selling an asset that belongs to someone else, I am selling it,
16 again, in an as-is/where-is condition without representation as
17 to ownership, warranty, et cetera.
18          So do I intend to sell assets that don't belong to
19 the bankruptcy estate?  The answer is no.  To the extent that
20 someone based upon a potential sale takes the position that
21 that particular asset belongs to the estate in lieu of
22 Prolacta, that is certainly I guess a possibility, but if their
23 sale does occur, it would be without any type of warranty
24 whatsoever.  So it would be -- I think we've heard this -- at
25 least I heard this in law school, at one time, is that, you

23

1  know, I may not own the London Bridge, but I can sell the
2  estate's interest in the bridge, to the extent that any exists,
3  without warranty as well.
4              THE COURT:  Right.  Well, we've strayed from the --
5              MR. SHAPIRO:  So I hope that's an end-around answer
6  to this Court's question.
7              THE COURT:  No, actually, it was a fairly direct
8  answer, but let's circle back to the stay of relief motion.
9  I'm sure I'll hear more about the sale process here shortly.
10              What else do I need to know as it relates to the
11  motion to -- as it's characterized, reinstate the stay?  It's
12  really a 60(b) motion under Bankruptcy Rule 9024.  Anything
13  further to add in support of that motion from the standpoint of
14  the estate?
15              MR. SHAPIRO:  No, Your Honor.  I will just wait for
16  my opportunity to respond.
17              THE COURT:  All right.
18              MR. SHAPIRO:  Thank you, Your Honor.
19              THE COURT:  Very well.  Opposition to this motion,
20  certainly filed by Prolacta.  Ms. Guymon?
21              MS. GUYMON:  Thank you, Your Honor.  Mr. Shapiro
22  accurately represented what his argument was, but
23  misrepresented a lot of what Prolacta's underlying actions
24  since the stay was lifted encompass.  I'd like to follow the
25  same order as the trustee, just to keep the record clear.

24

1           THE COURT:  All right.

2           MS. GUYMON:  But I do want to remind Your Honor, I

3   don't think it's -- it probably hasn't escaped your memory yet,

4   the facts in this case, but for the record, I think it is

5   important just to summarize why Prolacta has been so involved

6   in this case from its inception.

7           So as you may recall, on February 24th of 2020, after

8   six years of protracted litigation, discovery on both sides,

9   depositions, an immense amount of litigation involved in this

10  case, trial began before a jury in Orange County, and Prolacta

11  put on several witnesses in its case in chief, including

12  Dr. Denitz, who was the former chief medical officer for

13  Medolac, and you have Dr. Denitz's full testimony transcript of

14  both the trial testimony and the deposition.  It was hand

15  delivered to Your Honor and filed with the Court.

16          And Dr. Denitz testified that the debtor utilized

17  stolen trade secrets from Prolacta in order to formulate the

18  debtor's product.  You -- the Court knows that trial was

19  stopped after several weeks because of the pandemic, and a

20  mistrial was ordered, and the jury discharged.  Had the

21  pandemic not happened, we wouldn't be here, continuing to try

22  to preserve and protect assets that are still in Prolacta's

23  possession, but unfortunately, were the base upon which the

24  debtor has established an entity that is competing with

25  Prolacta, based on its own formulas and processes.

25

1    Your Honor is well aware of the proceedings in the

2    bankruptcy estate.  As you touched on, Mr. Shapiro was

3    appointed the Subchapter 5 trustee.  He was involved in all of

4    the hearings.  In fact, Prolacta actually brought a motion

5    before the Court, asking the Court to require the Subchapter 5

6    trustee to get more involved, and investigate in some of these

7    assets that were absent on the debtor's schedules, and yet the

8    debtor litigated so vehemently for six years, and complained in

9    the bankruptcy case that it spent millions of dollars, to the

10    detriment of its ability to be a viable entity that could ever

11    turn a profit for its entire existence, because Prolacta was

12    litigating these issues.  But there is absolutely no reference

13    to any type of intellectual property on the debtor's schedules.

14    There was absolutely no disclosure or discussion.

15    All along, what Prolacta has wanted to do is to

16    prevent the debtor or its assigns from using stolen

17    intellectual property in furthering this economic advantage.

18    Your Honor approved the DIP financing motion in April of this

19    year.  Prolacta filed a limited opposition, again, putting

20    everybody on notice that it did not believe that the debtor had

21    the ability to pledge assets that did not belong to the

22    bankruptcy estate, and these assets are the intellectual

23    property and residue of the use of that intellectual property

24    to its economic advantage.

25    That issue has never been addressed.  Your Honor

26

1   lifted the stay, and we cite to the record wherein Your Honor
2   specifically made certain findings that the bankruptcy estate
3   -- there was a question as to whether or not the bankruptcy
4   estate owns these assets, and it needed to be determined, and
5   the proper forum was the Orange County court, where the case
6   had actually proceeded through three weeks of jury trial, and
7   that was the proper place to have these issues resolved, in
8   that complex court in Orange County.  The Chapter -- Subchapter
9   5 trustee participated in that hearing, but never filed any
10  objection, made no representations whatsoever in that hearing.
11          Your Honor, when the stay order was lifted, it was
12  with the understanding that Prolacta could proceed forward with
13  its litigation, and that included going back to where the state
14  court left off, and picking up the process.  One of the things
15  that was pending at that time in state court was the fact that
16  the -- that Medolac, the defendant in that case, had made
17  certain representations regarding electronic storage data and
18  so forth consisting of laptops, computers, and so on, and that
19  -- and those representations were that they didn't have it.
20  That the computers were broken or damaged or stolen, or, you
21  know, all types of excuses as to why those -- that information
22  could not be turned over in discovery.
23          Ms. McCarthy submitted a declaration in support of
24  our opposition, which is very thorough, and attaches every
25  single full transcript for this Court's review.  This Court may

27

1  recall that you granted the debtor's request to take judicial
2  notice of the state court proceedings as well.  And in
3  Ms. McCarthy's declaration, it is crystal clear that the debtor
4  perjured herself, specifically Ms. Medo, in the state court
5  action.  Because lo and behold, when the trustee finally
6  provides an inventory as to what the assets actually are in the
7  estate, the assets consist of 26 computers.  And it even puts
8  in there the date that the computers were purchased.  And the
9  date the computers were purchased far predates the date that
10 Prolacta filed the complaint against Medolac, and the date that
11 Ms. Medo was deposed, and stated that she didn't have these
12 computers.
13         These computers are absolutely vital to Medolac's
14 being able to prove -- or Prolacta being able to prove its
15 claims that Prolacta stole -- that Medolac stole Prolacta's
16 intellectual property.  Nowhere in any of the ex parte
17 applications filed with the California court recently does it
18 say that we want to prevent the bankruptcy trustee from selling
19 assets.  What we are attempting to do is preserve evidence, and
20 had the trustee been willing -- although I understand there's
21 no money in the estate, and so the trustee doesn't want to
22 expend a whole lot of time on any of these issues.
23         But the reality is that this is a multi-million
24 dollar issue for Prolacta, and Prolacta has the absolute right
25 under law, state and federal, and the trustee has the absolute

28

1  fiduciary obligation as a representative of Medolac, to protect
2  and preserve evidence in that state court proceeding.  And what
3  the trustee has said is, no, I'm going to allow Hughes to
4  foreclose on those laptops, and he can do whatever he wants
5  with them, and it's not my problem, and I don't have to
6  download or allow you to inspect and have your experts download
7  and preserve the evidence on the laptops, on the printers, on
8  the desktop computers.  And that's just absolutely wrong, Your
9  Honor.

10          The state court was hesitant to make a ruling without
11  clarification from the Court.  The state court did not say, oh
12  yeah, the automatic stay applies, and I can't move forward.
13  The state court gave deference to Your Honor, and said, I don't
14  want to step on the federal court's toes; I understand you have
15  a hearing coming up on Friday; I'll kick this matter until
16  Monday; you come back and tell me what the federal judge says I
17  can do.  However, the state court did specifically state that
18  it would be surprised and concerned -- I don't recall the
19  actual words that the state court used, but would be quite
20  disturbed if this Court found in contradiction of the law that
21  the trustee did not have a duty to protect and preserve
22  evidence.

23          Now, the trustee argued that notice was improper, and
24  that because of the word shall, there's no way around it.
25  Prolacta loses and the stay is -- the order lifting the stay is

29

1  void.  That's just not what the case law says, and the trustee

2  hasn't cited to any supporting case law that would support his

3  argument.

4         In fact, the trustee hasn't shown that the

5  nonconformity with the procedural rule rose to the level of a

6  Fifth Amendment due process violation, and fails to recognize

7  that Prolacta's method of service did not rise to the level of

8  such a violation of the creditor's constitutional rights to due

9  process because the trustee is the fiduciary for all of the

10 debtor's creditors under 323(a), and the trustee did get actual

11 notice.  The trustee failed to object, and further, Your Honor,

12 after the notice of the motion and the order to all of the

13 creditors, which is a $700 endeavor just for copying and --

14 just for postage alone, nobody has stepped forward, and in

15 spite of the trustee filing his motion to reimpose the stay,

16 which hearing was set forth August 24th, and then shortened at

17 the trustee's request, no other creditors have joined in the

18 motion, or have filed any type of response to the motion.

19        Any of the creditors who cared about the lift stay

20 were present and participated at the hearing in which the Court

21 lifted the stay to allow Prolacta to proceed with state court

22 -- the --

23        THE COURT:  Isn't it --

24        MS. GUYMON:  -- state court matter.

25        THE COURT:  Isn't it really more fair to say, any

30

1  creditors who actually received notice of the motion for relief
2  from the automatic stay appeared?
3          MS. GUYMON:  That's true, Your Honor.
4          THE COURT:  And so --
5          MS. GUYMON:  I will say that none of the other
6  creditors have participated in any way, shape or form in this
7  case.
8          THE COURT:  I don't disagree with you.  But for the
9  record, so it's clear, who did Prolacta serve when the stay of
10  relief motion was filed?
11         MS. GUYMON:  Prolacta served the debtor, the
12  U.S. Trustee's office, the trustee, and those requesting
13  special notice.  So Mr. Cram, Mister --
14         THE COURT:  Livermon?
15         MS. GUYMON:  -- yes.  So all those who requested
16  special notice all got notice of the motion.
17         THE COURT:  But the 20 largest didn't.  Isn't that
18  accurate?  I mean, what part --
19         MS. GUYMON:  That is --
20         THE COURT:  -- of the trustee's recitation of who was
21  served is inaccurate?
22         MS. GUYMON:  That's not in -- I didn't say that that
23  was inaccurate.
24         THE COURT:  No, no, I'm asking.  I'm not accusing,
25  Ms. Guymon, I'm asking you --

31

 1              MS. GUYMON:  No, no, no.  His representation is
 2  accurate, Your Honor.
 3              THE COURT:  All right.
 4              MS. GUYMON:  And my argument is that due process does
 5  not require actual notice.  That's what Espinoza stands for,
 6  that's what Hanover Bank stands for.  The trustee is --
 7              THE COURT:  But doesn't the rule --
 8              MS. GUYMON:  -- the fiduciary --
 9              THE COURT:  Don't the rules specifically provide, and
10  specifically, Rule 4001(a)(1), who's to be served with a motion
11  for relief from the stay, though?  I mean, am I just to ignore
12  the Bankruptcy Rule in favor of general concepts of notice, and
13  an opportunity to be heard?
14              MS. GUYMON:  No, Your Honor.  You're not.  But we
15  have to also look at whether due process was violated, whether
16  alternative service was reasonable, and whether there was any
17  harm involved in that, and our opposition and our argument is
18  that that can't be found.  Due process does not require actual
19  notice.  Notice was given through the trustee, who was the 20
20  largest unsecured creditors' fiduciary, and in any event, none
21  of those creditors, if they did care, at some point, they would
22  have stepped forward.
23              None of them cared.  Nobody has since come forward,
24  since the trustee has brought that issue to the Court's
25  attention.  The only people that this affects are Prolacta and

32

1  the bankruptcy estate, and quite honestly, the issue has to be

2  resolved.  If the Court reimposes the stay, then the issue is,

3  will it lift the stay again, or does it want to hear three

4  weeks of a bench trial on who owns these assets?  Because as

5  Your Honor has previously ruled, this issue must be determined.

6          THE COURT:  Can't I simply -- if I were to grant this

7  motion, what would stop Prolacta from simply properly noticing

8  the motion, bringing it forward for me to consider, so that I

9  could resolve the issue without the question of whether or not

10 the order that I entered has jurisdictional flaws in it?

11         MS. GUYMON:  None whatsoever, Your Honor.  We would

12 bring -- we would renew the motion and ask for an order

13 shortening time, and we would just do it all again.

14         THE COURT:  So as long as I -- if I were to grant

15 this motion, and I'll tell you, I haven't decided that question

16 just yet.  If I were to grant it, but without prejudice to

17 Prolacta's ability to bring a similar motion again, any real

18 harm to Prolacta, other than curing what could potentially at

19 least be down the road, an appellate issue?

20         MS. GUYMON:  Other than the delay, Your Honor, no.

21 And I will say the concern that we have, which may be addressed

22 in the next motion, is that we do want some directions if

23 possible from Your Honor to give to the California state court

24 judge --

25         THE COURT:  Oh, sure, I understand that.

33

1        MS. GUYMON:  -- as -- yeah, you understand that
2   issue.  Yes.  So there could be harm if we're just left to our
3   own -- if we're left to our own devices, and the settlement
4   agreement with Hughes is approved, we have an uphill battle in
5   trying to protect and preserve those assets.
6        THE COURT:  All right.  What else by way of
7   opposition from Prolacta's standpoint?
8        MS. GUYMON:  Well, Your Honor, the trustee also
9   addressed 60(b)(6), and -- so we'll address that briefly.
10        Again, the -- there are no significant changed
11   extraordinary circumstances.  Everything that the trustee cited
12   to is not extraordinary.  In -- with respect to what's going on
13   in the state court case.  Everybody knows that the issue of who
14   owns the assets needs to be resolved.  Whether it's resolved in
15   state court, or before Your Honor, it has to be resolved.  If
16   the estate has no money to defend, it's just a reality of Your
17   Honor converting rather than dismissing this case.
18        It isn't an extraordinary circumstance.  It happens
19   all the time.  The debtor is closed to business, and has
20   pledged all of its assets to secure the DIP loan.  Certainly,
21   if Your Honor approves the settlement agreement with the DIP
22   lender and the trustee, the trustee will have at least $183,000
23   with which to defend the litigation.  Of course, the trustee's
24   also going to, you know, buy litigation with regard to that
25   settlement agreement, which again, we will discuss in that

34

1  motion.

2         So the conversion from an 11 to a 7 is not

3  extraordinary, and ordinarily, would not result in the

4  reimposition of the stay as it relates to Prolacta being able

5  to proceed with its litigation, with its discovery, which would

6  include the maintenance of discovery in the hands of the

7  debtor.  The -- it's important, I think, for the Court to note

8  my -- and we raised this in our opposition, that it -- yes, the

9  case right now is administratively insolvent, and in fact, even

10 if the settlement with the DIP lender is approved, it's still

11 going to be administratively insolvent because of the $900,000

12 IRS claim, arising because the debtor failed to pay taxes and

13 -- while paying its owners and directors and officers

14 exorbitant salaries.

15        So, you know, I'm just not really sure where the

16 extraordinary circumstances are here with regard to conversion

17 or administration of the estate.  The fact that Prolacta

18 amended its proof of claim to zero was in fact a response to

19 this motion to reimpose the stay.  The trustee was attempting

20 to make the argument that, oh, Prolacta filed the proof of

21 claim after the stay was lifted, and that results in a

22 significant changed circumstance.

23        Well, Your Honor, the debtor can't have it both ways.

24 We don't file a proof of claim so that we can preserve our

25 right to go into state court and have our jury trial, but if we

35

1  don't file proof of claim, then we can't object to the plan

2  which imposes an injunction, and prevents from having our jury

3  trial.  It's just simply put Prolacta in such a difficult legal

4  quandary.  There really was no way that I could not file a

5  proof of claim on behalf of Prolacta, and risk the debtor

6  arguing that we had no standing to file the motion to dismiss,

7  which did result in the Court converting the case, or object to

8  the plan, which the Court did find was not a feasible plan.

9          So in the -- understanding that this estate is

10 administratively insolvent, Prolacta was willing to withdraw

11 its proof of claim, and focus on what it has always intended to

12 protect and preserve, which is its assets and to have that

13 tried and litigated before the Court that it started and was

14 almost finished with.  So it's disingenuous to argue that

15 because Prolacta filed a proof of claim, now the estate should

16 be reimposed.  And in any event, we filed a motion to withdraw

17 the proof of claim, and we actually asked that the time be

18 shortened, to be set to today's -- the same date as the hearing

19 on the trustee's motion to reimpose the stay, and then the

20 trustee requested that this hearing be set on shortened time.

21         So Prolacta's request to withdraw its proof of claim

22 is set for August 24th, the original date of the trustee's

23 motion herein.

24         THE COURT:  All right.  Anything further --

25         MS. GUYMON:  The --

36

1       THE COURT:  Oh, I'm sorry, Ms. Guymon.  Go right
2  ahead.  I was --
3       MS. GUYMON:  No, no --
4       THE COURT:  -- going to ask if there was anything
5  more, and there is.  Go right ahead.  I'm listening.
6       MS. GUYMON:  The -- I just want to briefly address
7  the argument of the furtherance of justice that the trustee
8  raised.  The trustee cites to numerous cases, but they're just
9  not applicable.  The substance is not supported in this case.
10 And in my -- in our opposition, we go through and cite the
11 reasons why we believe that those cases are not supportive,
12 based on their facts.
13      And the bottom line, Your Honor, is that what the
14 trustee is trying to do is have a do-over, or take the
15 opportunity to argue additional defenses that the trustee, the
16 debtor, the creditors that did participate did not previously
17 bring forth.  And the reality is that the trustee steps into
18 the debtor's shoes, and is subject to the orders that this
19 Court previously entered against the debtor.  That's the whole
20 concept of preservation of court orders.  And for those
21 reasons, Your Honor, we're asking that the Court deny the
22 motion to reinstate the motion under Rule 60(b)(4) and (6) and
23 specifically enter an order providing instructions to the
24 Orange County Superior Court with regard to the preservation of
25 evidence as delineated in the ex parte motion, which Your Honor

37

1  has a copy of as well.  Thank you.

2          THE COURT:  All right.  Before I circle back to

3  Mr. Shapiro, I want to make sure that there is nothing else

4  that I've managed to overlook.  We're here on shortened time.

5  I'll just walk through the lawyers who have appeared.

6  Mr. Zirzow, no opposition in writing to this matter, but we're

7  here on shortened time.  Anything to add on behalf of the

8  debtor?

9          MR. ZIRZOW:  Your Honor, we obviously support the

10 trustee's position.  How Prolacta has taken advantage of your

11 order in the state court action to try and interfere with the

12 trustee I think is offensive to this Court's jurisdiction, and

13 I think it also speaks, Your Honor, with all due respect, to

14 how stay of relief should have never been granted in the first

15 place, because Prolacta has used that grant to drive a truck

16 through it and especially interfere with what the trustee is

17 now trying to do.

18         So we do support the trustee's position, obviously,

19 and I say that, Your Honor, as the debtor, and also as one of

20 the largest administrative claimants in the case, now,

21 unfortunately, for me and my law firm.  Ms. Guymon is incorrect

22 about the administrative insolvency.  It is certainly true that

23 any proceeds from the settlement will be used to pay

24 administrative claims and the prepetition claim of the priority

25 tax claimant.  The estate is administratively insolvent right

38

1  now, but with this settlement, it will not be administratively

2  insolvent any more, so it's just a misstatement of the facts.

3          Unfortunately, however, Prolacta's gamesmanship with

4  whether it has a claim, first it didn't assert a claim, then it

5  had an $18 million claim when it needed it, then it tried to

6  withdraw that claim, and I guess now it's a zero claim,

7  whatever that means.  I guess it depends on which day of the

8  week you ask Prolacta whether it has a claim in this case.

9  That kind of gamesmanship I think really speaks volumes to the

10  validity of their position here.

11          But ultimately, Your Honor, as far as stay relief,

12  the trustee needs protection in order to do his job, so we

13  obviously support what the trustee is trying to do here, and

14  frankly, he needs the protection to be able to carry out

15  transactions.  And finally, if Ms. Guymon's so concerned about

16  discovery, then why doesn't she do something in this bankruptcy

17  court to avail herself of all the remedies she has to do that,

18  instead of frankly, trying to subvert this whole bankruptcy

19  court's jurisdiction by getting things, you know, TROs and

20  protective orders in California?  If she's so concerned, then

21  why not do it in the right court, here?

22          So for those reasons, Your Honor, we obviously

23  support the trustee's motion, and ultimately, I appreciate my

24  position is very limited here, but I think the trustee's

25  position makes a great deal of sense.  Thank you.

39

1          THE COURT:  All right.  From the standpoint of Liquid
2   Gold.  Mr. Livermon?
3          MR. LIVERMON:  Thank you, Your Honor.  Liquid Gold's
4   position I guess has changed in the last 24 hours, given the
5   emergence of Mead Johnson into the process, Your Honor.  We
6   were unaware of that until last night, until the filings that
7   it came in ECF that on the East Coast, came at a pretty late
8   hour, and we were not made aware of that prior to that,
9   although Mr. Shapiro did attempt to call me the day before, but
10  we never made connections on that call.
11         But given the fact that if Mead Johnson is a viable
12  candidate for acquiring these assets, then it would make sense
13  for the automatic stay to be in place to maintain the status
14  quo while that due diligence is being done.  If the Court is
15  not inclined to allow that process to go forward, then we would
16  be in support of the stay being to remain lifted so that
17  Prolacta can proceed ahead in state court.
18         So sorry to be if this, then that, position, but
19  again, it changed last night when another player came into the
20  Court and said that they were willing to purchase the assets.
21  Thank you.
22         THE COURT:  Fair enough.  Mr. Cram?
23         MR. CRAM:  Thank you, Your Honor.  Just a couple of
24  points, briefly.  I just -- I wanted to reiterate the trustee's
25  position, and the unpublished BAP case cited in the trustee's

40

1  reply.  In that particular case, the Bank of America case
2  versus LSSR, in that particular case, the Bank of America
3  actually served its stay of relief motion on all unsecured
4  creditors, but it failed to state -- set forth in its
5  certificate of service that it had served the 20 largest
6  creditors as required by Rule 4001.
7          And in that instance, just with that small defect,
8  which here, the 20 largest weren't served at all, but in the
9  context that's even serviced upon all creditors, the Bankruptcy
10 Appellate Panel said that it didn't -- the bankruptcy court
11 didn't have the jurisdiction to hear the stay relief motion,
12 and required Bank of America to go back and refile its motion.
13 And so --
14         THE COURT:  Same question for you, then --
15         MR. CRAM:  -- even --
16         THE COURT:  Same question for you, then, Mr. Cram.
17 As I asked the trustee, didn't you receive a copy of the motion
18 for relief from the automatic stay and the related notice of
19 hearing electronically?
20         MR. CRAM:  I did, Your Honor, because I had requested
21 special notice.
22         THE COURT:  So you got service at DHC@severson.com,
23 EMR@severson.com, DMG@severson.com, in connection with the
24 motion at the time it was filed.  Why didn't you bring it to
25 the Court's attention that the service was improper at that

41

1  point?

2           MR. CRAM:  Your Honor, I didn't notice -- I didn't

3  review closely the certificate of service.  I was looking at

4  the substance of the motion more than the certificate of

5  service.

6           THE COURT:  All right.  What else from the standpoint

7  of Mr. Hughes?

8           MR. CRAM:  And just in light of the changed

9  circumstances, now that this is a Chapter 7 case, as the

10 trustee pointed out, really, because of the fact that it's a

11 Chapter 7, the debtor is not operating.  The debtor is closed.

12 So there's really no reason for the state court litigation to

13 proceed.  Especially in light of the fact if there's going to

14 be -- and this is kind of, I guess, trickling over into the

15 next -- the hearing on the next motion, but if this is going to

16 morph into a full 363 sale process, I think the trustee needs

17 the benefit of the automatic stay.  The estate needs the

18 benefit of the automatic stay.  There's a significant dispute

19 over some of the assets of the debtor and the ownership of

20 those assets.

21          THE COURT:  Well, the assets in the possession of the

22 debtor, anyway.

23          MR. CRAM:  Correct.  And that's exactly right, Your

24 Honor.  And that dispute has not been resolved.  However,

25 Prolacta has filed a claim.  They've amended that claim.  So

42

1  ostensibly, their -- all of their claims can be monetized and

2  can be resolved through a distribution process which will

3  hopefully -- I mean, and hopefully, the 363 sale process will,

4  you know, have a happy ending and result in a distribution to

5  unsecured creditors.

6          So for all these reasons -- I mean, there is

7  significant change in circumstances, by virtue of the

8  conversion of the case, the --

9          THE COURT:  Is that exceptional, do you believe,

10  Counsel?  Is it exceptional for a Chapter 11 --

11          MR. CRAM:  I do --

12          THE COURT:  -- case to get converted?

13          MR. CRAM:  That is not exceptional.  But the

14  difference is exceptional.  In the Chapter 11 case, although

15  the Court granted stay relief, there was a pending hearing on a

16  motion to confirm a plan that also contained an injunction.

17  And if the Court -- had the Court confirmed that Chapter 11

18  plan, it -- in effect, it would have undone that stay relief

19  order.

20          So by virtue of the conversion of the case, that

21  potential is no longer available to the trustee.  So that's

22  significant.  That, coupled with the fact that the Court

23  ultimately didn't have the jurisdiction to enter the order it

24  entered, I think bolsters the reasons why the Court should

25  grant this motion.

43

1          THE COURT:  Terrific.  Anything further?

2          MR. CRAM:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Anything on behalf of M-2

4    Lease Fund, Ms. McHenry?

5          MS. MCHENRY:  This is Megan McHenry.  M-2 Lease Funds

6    does not oppose this motion.

7          THE COURT:  All right.  And then for Mead Johnson,

8    either Mr. Shea or Mr. Driscoll, whoever feels like addressing

9    this before the floor goes back to Mr. Shapiro for rebuttal?

10         MR. DRISCOLL:  Thank you, Your Honor.  This is Mike

11   Driscoll of Sheppard Mullin on behalf of Mead Johnson.  We're

12   not taking a position specifically with respect to this motion.

13   I would like to be heard with respect to the response, and as

14   others have indicated, that there is a substantial overlap of

15   issues between this issue and a 363 sale.

16         THE COURT:  Well, let's hang on to that --

17         MR. DRISCOLL:  Thank you, Your Honor.

18         THE COURT:  -- until the next motion and I will, I

19   promise, Mr. Driscoll, you'll have that opportunity before too

20   awful long.  Anything else as it relates to the stay from the

21   standpoint of Mead Johnson?

22         MR. DRISCOLL:  No, Your Honor, thank you.

23         THE COURT:  All right.  Very well.  Thank you,

24   Counsel.

25         So Mr. Shapiro, now you've heard the universe of

44

1  comments from those who have appeared today as it relates to

2  this motion.  The floor is yours for rebuttal.

3          MR. SHAPIRO:  Thank you, Your Honor.  Again, Brian

4  Shapiro on behalf of the bankruptcy estate.

5          Just, again, perhaps just a little bit of a preview

6  so Your Honor is well aware, it is possible that based upon the

7  next motion, this underlying issue may become a non-issue, so I

8  want Your Honor to simply be potentially aware of that.

9          Regarding simply notice, I think it's uncontested

10 that notice was not completed, was improper.  One question

11 which perhaps you asked, but I didn't hear the answer to, to

12 Ms. Guymon, is why didn't Prolacta give notice to all of the

13 creditors and why didn't Prolacta advise this Court as to why

14 they failed to serve the creditors at the time of the hearing?

15 I don't know if that question was asked or --

16         THE COURT:  No.  I just asked the very specific

17 question of who they served and what part of your recitation of

18 who got served was inaccurate.  I didn't ask the whys, because

19 I'm not really sure it matters.  But if you want to --

20         MR. SHAPIRO:  Thank you, Your Honor.

21         THE COURT:  -- opine in connection with argument, I

22 suppose, go right ahead, Mr. Shapiro.

23         MR. SHAPIRO:  Thank you, Your Honor.  You inquired

24 with Prolacta to the extent that this Court was going to set

25 aside the prior order when they had the absolute right to

45

1  refile the motion to terminate stay.  That answer clearly is

2  yes.  Of course then Your Honor would then have to reexamine

3  the factors.  The Court when it initially made its decision,

4  and again, the transcript is attached, was clearly focused upon

5  the Subchapter 5 plan, that the confirmation plan was upcoming,

6  as well as there was a motion to estimate the claim.  The

7  reason that the motion to estimate was filed was because they

8  had not yet filed a proof of claim at that particular time, and

9  again, they did file a particular claim subsequently.

10        In all of the -- perhaps not one single factor for

11  instance, the conversion of the case to a chapter -- from a

12  Chapter 11 to a Chapter 7, doesn't constitute extenuating

13  circumstances, as Your Honor correctly pointed out.  It happens

14  all the time, converting cases from Chapter 11 to 7, or even

15  vice-versa.  But when you combine all of the additional facts,

16  that's what the estate is arguing.  It's not just one single

17  item.  It's all of the different facts which have occurred.

18        I wanted to point out in their opposition, they

19  requested this Court to provide the state court with some type

20  of instructions.  I respectfully request this Court not to.  I

21  don't believe that issue is properly in front of this Court.  I

22  believe, Your Honor, that in order to clarify a prior order, an

23  apropos motion needs to be filed, likely under Rule 60 as well,

24  and that has not been done.  It was simply indicated in their

25  opposition request to clarify or further instruct the

46

1  underlying court.

2           So with that said, Your Honor, I have nothing else to

3  add.  I appreciate the time and that Your Honor heard this on

4  shortened time.  I guess I should point out the reason I

5  initially filed it without shortened time is I didn't think

6  that there was an urgency.  It didn't become an urgency really

7  until there was a threat seeking to enjoin the estate from

8  potentially selling, conveying, or transferring property of the

9  bankruptcy estate.

10          So with that said, Your Honor, I have nothing further

11  to add.  Thank you very much.

12          THE COURT:  Good enough.  The stay of relief motion

13  matters -- or actually, the motion to -- it says motion to

14  reinstate, but I understand what this really is, and counsel

15  was clear on it before what this is, is a motion to address my

16  prior order granting relief from the automatic stay under

17  Federal Rule of Civil Procedure 60(b), applicable here under

18  Bankruptcy Rule 9024.  This matter is submitted.  The record is

19  closed.  Don't bother filing anything else.  If you do after

20  the record is closed today, I will not consider it.

21          I will, however, issue my oral ruling as it relates

22  to the stay.

23          On August 9th of 2021, Ms. Shim, my last matter on my

24  10:30 calendar, and the reason that I will do it that way is

25  because that is in advance, at least, of the 1:30 hearing that

47

1 the state court kicked out on that same day.  At least the

2 parties when they appear in state court will have the benefit

3 of my ruling as it relates to the automatic stay in hand.

4        So matter submitted.  The record is closed.  I mean

5 what I say.  Don't bother filing more papers.  The oral ruling

6 on this motion will be issued on August 9th, 2021, as the last

7 matter on my 10:30 calendar.  You guys got to wait through my

8 relatively short stay relief calendar at 10:30 that morning.

9 So thank you for the argument, counsel.  It's helpful to the

10 Court.  The arguments have been, again, as it has been

11 consistently in this case, helpful in connection with my

12 calculations as to what I'm supposed to do next, and you'll all

13 know what that is on August 9th, my last matter on my 10:30

14 calendar.

15        Leaving, then, Item Number 1 on my calendar today, a

16 motion to approve a settlement.  Same appearances that were

17 noted in connection with the stay relief motion are noted here

18 as it relates to the second -- or Item Number 1 on my calendar,

19 the motion to approve the settlement.  You need not appear a

20 second time if you already have.  I just want to make sure I

21 haven't overlooked anybody.  Is there anyone else who hasn't

22 appeared that would like to appear as it relates to the motion

23 to approve the settlement?  Going once.  Don't be shy if you're

24 out there.  Going twice.  All right.  And so the record is

25 clear, appearances to -- in connection with this motion to

48

1  approve the settlement.  Mr. Shapiro on behalf of the -- as the

2  trustee, Mr. Zirzow on behalf of the debtor, Misters Driscoll

3  and Shea on behalf of Mead Johnson, Ms. Guymon for Prolacta,

4  Mr. Cram on behalf of Mr. Hughes, Ms. McHenry for M-2 Lease

5  Fund, Mr. Livermon for Liquid Gold.  The Court notes Elena

6  Medo's appearance as well.  Any other appearances out there

7  that I've managed to overlook?  Going once, again, don't be

8  shy.  Going twice.

9          All right.  Hearing none, so, Mr. Shapiro, a motion

10  couched, at least, as a motion to approve a settlement.  This

11  is yours.

12          MR. SHAPIRO:  Thank you, Your Honor.  Again, Brian

13  Shapiro on behalf of the bankruptcy estate.  And if I may, Your

14  Honor, if I just make one quick comment regarding August 9th,

15  2021, I am not, by the way requesting Your Honor to continue

16  it, but out of courtesy to this Court, that happens to be my

17  Chapter 7 panel day.  So I will likely not be on the line, as

18  much as I desire to be on the line, unless I'm able to somehow

19  pop out of that 341 meeting, I will likely have someone

20  listening in for me, but I don't mean any disrespect if I am

21  not at that hearing due to the fact I do have my Chapter 7

22  panels I believe on August 9th.

23          THE COURT:  All right. Understood and appreciate it.

24          MR. SHAPIRO:  Unless I am -- unless I'm mistaken, but

25  I believe I do.

49

1          THE COURT:  No, and I can't -- you know, I'm not
2    going to -- I'm -- I have only so much time on my calendar, and
3    as you know, and you're busy as well.  So are all the other
4    lawyers who appeared today.  This matter needs to be resolved.
5    This matter being the stay relief question.  So I'll do it as
6    scheduled, and I -- no -- no disrespect would be taken in the
7    event that you're unable to appear, as long as -- if someone
8    else listens in, that's fine, and of course if you have
9    questions about what was said, you'll be able to obtain the
10   recording of what the Court had to say by communicating with
11   the Court in the ordinary course with respect to our Courtroom
12   Deputy ought to be able to handle that, I would think.
13          So understood, Mr. Shapiro.  Thank you for the heads
14   up.  That aside, motion to approve the settlement?
15          MR. SHAPIRO:  Thank you, Your Honor.  Again, Brian
16   Shapiro on behalf of the estate.
17          Initially, I just would like to go through a little
18   bit of general background of what occurred, and how we came up
19   to today and the motion to approve the settlement, and then
20   advise this Court of kind of what has occurred actually first
21   thing this morning, right prior to the 9:30 hearing.
22          So initially, Your Honor, when this Court orally
23   granted the motion to dismiss and converted the case to the
24   Chapter 7 case, Your Honor is aware that I was the Subchapter 5
25   trustee, I was unaware at that time if I would become the

50

1 Chapter 7 trustee.  However, I wanted --

2         THE COURT:  Right.  The United States Trustee makes

3 that --

4         MR. SHAPIRO:  -- to make sure that --

5         THE COURT:  -- appointment in the interim, and we

6 have processes in place to make sure that happens in a timely

7 way.  The Court understands that transition, Mr. Shapiro.

8         MR. SHAPIRO:  Correct.  I wanted to make sure that

9 the parties that were participating knew that an immediate

10 issue was going to arise, and that was with the DIP lender.

11 The DIP lender, immediately upon entry, or not entry, upon oral

12 determination the Court was going to convert this case really

13 called the loan under default, which, based upon this prior

14 court order approving the DIP financing permitted the DIP

15 lender to, in essence, upon default, without any further order,

16 this estate was immediately terminated, obtain the collateral,

17 and then immediately proceed to foreclose upon the collateral.

18         So at that moment in time, from my perspective as the

19 Subchapter 5 trustee, time was of the essence, and whether I

20 was going to be the Chapter 7 trustee, I didn't know.  As a

21 result, the Chapter -- Subchapter 5 trustee immediately

22 contacted the two main parties that were actively involved in

23 the case, and that would be Liquid Gold and Prolacta, and urged

24 them to immediately consider potentially either financing the

25 continuing operation of the debtor in a Chapter 7 case, so

51

1   there could be some type of actual 363 sale, at least a way to
2   formulate that by a continuing operating of the company, and
3   the reason that was suggested was it appeared that as an
4   operating company, that's probably where the value was, rather
5   than simply trying to liquidate the assets.
6           Or alternatively, make an offer to purchase the
7   assets of the estate, because again, time was of the essence.
8   The DIP lender was also contacted as well, to see if the DIP
9   lender was interested in permitting, and perhaps even providing
10  additional funds for operation of the business within a Chapter
11  7, or alternatively, if the DIP lender wanted to purchase the
12  assets of the estate, again, acknowledging at least as the
13  Subchapter 5 trustee, that the business was probably more
14  valuable as an ongoing business rather than simply a
15  liquidation of the business.
16          Unfortunately, I -- well, I shouldn't say
17  unfortunately.  I was then appointed as the Chapter 7 trustee,
18  and then I started communicating as the Chapter 7 trustee to
19  the same parties as well as other parties.  Those other parties
20  would consist of parties that I became advised had some type of
21  interest in the debtor's business, to see if anyone was
22  interested in purchasing the assets of the company.
23          I received notice, and this is part of the record,
24  from Prolacta that they had no interest in either funding nor
25  purchasing the assets of the Chapter 7 bankruptcy estate.  I

52

1  was advised by the DIP lender that they had no interest in

2  throwing additional funds to operate nor purchase assets of the

3  bankruptcy estate, and regarding Liquid Gold, I don't believe I

4  received any further communication from Liquid Gold one way or

5  the other, but without a doubt, I was clearly in communication

6  with counsel for Liquid Gold.

7          I did and I believe this is part of the record as

8  well in my declaration, I had communication with several other

9  parties that may be interested in potentially purchasing assets

10  of the bankruptcy estate.  The problem that the estate had was

11  that the estate was going to, in essence, lose control of those

12  assets, based upon the agreement that Your Honor previously

13  provided to the DIP lender, as well as the lender immediately

14  being able to foreclose upon those assets.

15          I went to the location and I obtained a spreadsheet

16  which was provided, and it was attached to this motion.  I

17  believe it's Exhibit Number 5, and it was represented to me

18  that all of those assets were located on the premises.  It is

19  not a small premises, Your Honor.  It is fairly large.  Imagine

20  a grocery store, a large grocery store, that was changed into

21  this business.  Huge freezers and other equipment was located

22  on the premises, and I was assured that the items that were on

23  that list were located in the property, and I put that within

24  my declaration.  But the list, for avoidance of doubt, was

25  produced by the debtor's principals, and that's where that

53

1 spreadsheet came from.

2          Again, I obtained that because I knew that the estate
3 was going to lose control of that location in favor of the DIP
4 lender pursuant to the DIP lender's underlying agreement. In
5 fact, they did lose control as the DIP lender had taken
6 possession of all of the collateral, pursuant to its rights
7 under the agreement and pursuant to this prior order in essence
8 terminating the stay.

9          So taking that -- where we're at is that I
10 subsequently had to make a determination.  Could I bring some
11 funds into the bankruptcy estate?  After analyzing the lending
12 agreement, and knowing that no one was interested in purchasing
13 the assets at that time of the estate, although I did have
14 parties that were interested in purchasing assets, but no one
15 was willing to purchase the assets in an as-is/where-is
16 condition.  They wanted to make sure that the assets were
17 actually owned by the estate.

18          Knowing that I could not do that without litigation,
19 I wasn't agreeable unless there was some huge dollar amount
20 that was thrown to the bankruptcy estate to enter into such
21 agreement.  And there was some due diligence, which was done by
22 other parties that I was able to provide to them as well.

23          But anyhow Your Honor, I started looking into
24 potential theories of causes of action against the DIP lender,
25 and three theories of potential liability simply jumped out.

54

1 Whether the estate would prevail on that, I don't know.  But

2 those liabilities included a potential fraudulent transfer

3 action, a potential argument that the DIP lender was subject to

4 the equitable notion of marshaling, and probably the weakest

5 argument of those -- of the three would be the following, that

6 the DIP lender was not properly secured in all of the assets of

7 the bankruptcy estate.

8         Negotiations started taking place.  An offer was

9 made, and the estate entered into a settlement agreement with

10 the DIP lender as well as an amendment to that particular

11 agreement which is attached to the motion to approve the

12 settlement.

13         In essence, the settlement provides that the DIP

14 lender has the ability, assuming Your Honor is to approve it,

15 to immediately foreclose upon all of its collateral, and the

16 estate would consent to such foreclosure of the collateral.

17 The estate is not selling, nor conveying, nor transferring,

18 although one could argue that by giving up the rate -- the

19 right to contest such foreclosure, perhaps it is somewhat of a

20 sale.

21         In exchange, they would take that collateral for the

22 full amount of the underlying debt at the time of the filing

23 the motion.  It was approximated at $600,000, but it's

24 probably, I believe closer to potentially $700,000 at this

25 time.  Moreover, in exchange, the debtor -- or excuse me, the

55

1   DIP lender, agreed to pay the bankruptcy estate $750,000, and
2   agreed regarding to some of the assets, they would be deemed to
3   be property of the bankruptcy estate as well, and those assets
4   would include cash, any and all causes of action, avoidance
5   actions, that is.  A potential claim that the estate believed
6   that it may have against Prolacta, and any and all account
7   receivables.
8           As a result, I was able during this time frame to
9   collect some of those account receivables, and those funds have
10  been deposited into the trustee account, and the amount of
11  those funds were actually indicated in the reply that was filed
12  last night, what the estate currently is holding.
13          After the filing of the motion, several creditors or
14  several parties of interest, I should say, came to the
15  trustee's attention that were potentially interested in
16  purchasing the assets of the estate.  One of those is Prolacta,
17  and the other is Mead Johnson.  Mead Johnson had the ability to
18  do a little bit of due diligence based upon the limited
19  information and documents that the estate was able to obtain.
20  I say estate.  I mean myself as trustee and in fact, I think
21  spent about nine hours at my office going through documents
22  that the estate had.
23          They were aware -- this is being Mead Johnson.
24  They're aware that the estate could not sell assets that were
25  not property of the bankruptcy estate. However, the estate was

56

1  unable to make a determination as to what assets the estate
2  actually owns, in particular, the fortifier, which is the -- I
3  guess the big issue that's in dispute with Prolacta.  You've
4  seen the response, in which they desire to make a -- well, they
5  submitted a letter of intent to the estate, and filed that with
6  the Court, which is non-binding.  It has a variety of
7  qualifications, including continuing of due diligence.  It is a
8  $2 million offer, and it does exceed, in some respects, the
9  offer that was made by the DIP lender.  However, due to time
10 constraints and the potential that that would not be even
11 something that they're willing to go through, the -- I on
12 behalf of the estate don't believe that it's a feasible offer
13 at this moment in time.
14        Conversely, and probably more importantly at this
15 time, Prolacta has made a -- and I'm sure Ms. Guymon will
16 advise this Court in a moment, what I consider to be a firm
17 offer as well as a better offer than what the proposed
18 settlement is with the DIP lender, and I'd like to simply
19 recite the terms of that offer so Your Honor is quite aware of
20 what Ms. Guymon is going to make and if you'd just give me one
21 moment, as I was looking through a variety of different
22 documents.
23        THE COURT:  Take --
24        MR. SHAPIRO:  I don't have --
25        THE COURT:  I understand.  In preparing for this

57

1 hearing, Mr. Shapiro, I get it, take whatever time you need,

2 and when you find it, go right ahead.

3          MR. SHAPIRO:  Thank you, Your Honor, and I do have it

4 now in front of me.

5          It is my understanding that Prolacta, by and through

6 Ms. Guymon, is going to make the following representation to

7 this Court; that they're willing to make an initial binding

8 overbid offer on the settlement in the amount of $1,650,00 for

9 any and all assets of the estate excluding cash, account

10 receivables, and all causes of action in an as-is/where-is

11 condition, without any representations or warranties, including

12 but not limited to transferability of such assets, and that

13 Prolacta, by and through Ms. Guymon, has advised me that her

14 client is going to wire such funds into her trust account later

15 today.

16          And to clarify, again, is that the sale would not

17 include any of the cash, which is significant, Your Honor,

18 because that cash, pursuant to the settlement agreement, would

19 split 50/50; the account receivables would not be sold, again,

20 that's significant to the estate, due to the fact that that was

21 also split 50/50.

22          The estate is not selling any causes of action, and

23 those causes of action would include any potential actions

24 against Prolacta, and/or any avoidance actions to the extent

25 that any of them exist.  Moreover, again, to clarify, the

58

1  estate would not be selling, nor waiving, any type of

2  attorney/client privilege, or any other privilege to any party.

3           So what you have in front of you today, assuming

4  Ms. Guymon is going to agree with those representations, is

5  that you have a -- what I perceive to be a capping offer that

6  is better than the settlement which is now being proposed to

7  this Court.  You have the ability, I believe, as -- we did cite

8  to 363, you have the ability, Your Honor, and I would request

9  and orally move to make this motion to approve the settlement

10  into a 363 sale, and allow parties to simply overbid at a

11  future date and time.

12           Based upon my conversations with Ms. Guymon, that

13  future date and time was requested to be in approximately a

14  week.  The reason for the quick time frame, Your Honor, in some

15  respects, again is because the secured creditor has the ability

16  to potentially foreclose upon the collateral.  However,

17  pursuant to my agreement, which I entered into with the secured

18  credit -- the DIP lender, they have agreed not to foreclose,

19  pending further order of the Court, provided that the Court

20  entered an order.  I don't recall the date off the top of my

21  head, but it was sometime in August, assuming the Court entered

22  an order prior to that particular date and time.

23           I was going to present the motion to approve the

24  settlement, and suggest, Your Honor, that that motion was

25  certainly in the best interests of the bankruptcy estate, and

59

1 that the ANC factors clearly were met, despite the opposition
2 which was filed by Prolacta, but based upon the representations
3 that were made to me this morning at approximately 9:15 a.m.,
4 and confirmed by emails, it would be clear to the estate that
5 the offer which is being made by Prolacta is a better offer
6 than the settlement motion which is being heard today. And I
7 have passed that information on out of courtesy as well as
8 transparency to the DIP lender, so they're well aware of the
9 circumstances, and I also attempted, Your Honor, to advise this
10 Court maybe a minute prior to the hearing, of the potential
11 change of circumstances which occurred --
12            THE COURT:  Well, let me take that --
13            MR. SHAPIRO:  -- just moments prior to --
14            THE COURT:  Let me take that off of your plate,
15 Mr. Shapiro.  My intrepid --
16            MR. SHAPIRO:  Thank you.
17            THE COURT:  -- courtroom staff, and particularly my
18 clerk brought that to my attention, that there were matters --
19 well, and specifically, the Mead Johnson that came to his
20 attention after he had prepared last night.  He was here early
21 this morning, and so was I.  So I understand, and I appreciate
22 the additional information about Prolacta's offer.  We'll find
23 out more about that.  But I don't want you to be afraid that I
24 was unaware before today's hearing that these additional issues
25 might pop up.  So take comfort in that to the extent that there

60

1  is comfort to be had, and with that, go right ahead with your
2  motion.
3          MR. SHAPIRO:  Thank you, Your Honor.  So again, Brian
4  Shapiro on behalf of the estate.  I was going to make arguments
5  based upon the opposition which was filed by Prolacta, in the
6  arguments pertaining to standing, as well as that the estate in
7  fact met the A and C factors, and met its burden of proof.
8  However, in light of Prolacta's -- being advised that Prolacta
9  was going to make this propping offer, obviously, there's no
10 reason, I believe, to make that argument.
11          So again, orally, Your Honor, I would be making --
12 requesting this Court to continue the matter for approximately
13 one week, to give parties an opportunity if they so desire to
14 participate in an in-court auction to purchase any and all
15 assets of the estate, as I expressly stated just a moment ago,
16 with a minimum bid, which would be the opening bid, of
17 $1,650,000 by Prolacta.
18          With that said, Your Honor, I'm here to answer any
19 questions that you may have.  I should note that I'm thankful,
20 and I'm happy to hear that Prolacta is interested in purchasing
21 the assets of the estate.  I would also note that I was happy
22 that we had Mead Johnson actually do some due diligence, and
23 kick the tires.  Clearly, in a perfect world, the estate would
24 know exactly what is owned, and would have the ability to sell
25 things free and clear and provide warranties, and go through a

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

61

1  duly noticed 363 sale.  Unfortunately, this is not a perfect
2  case, and it's not a perfect world, and I don't have the luxury
3  on behalf of the bankruptcy estate to actually do that at this
4  moment in time, because I do have the possibility of these
5  assets being foreclosed upon relatively sooner than later.

6          So that's where the estate stands, and I'm more than
7  happy to answer any questions or concerns, and I'm hopeful that
8  Ms. Guymon will chime in, and hopefully agree with the
9  statements that I've made on the record.

10         THE COURT:  Sure.  I'll hear from Ms. Guymon in just
11 a moment, because I'm interested, obviously, based on your
12 representations here, Mr. Shapiro.  The concern that I have is
13 that what I have here is a motion to approve a settlement.
14 What I don't have is a pending motion for truly, a sale and
15 particularly setting it up for an auction that would contain
16 all of the provisions that you would expect in connection with
17 the 363 sale, such as specifically, what assets are being sold,
18 you know, as-is/where-is, or with some warranty.  What the -- I
19 assume I'll hear from Prolacta and they'll tell me, but I
20 assume that their bid would be a stalking horse bid.  I wonder
21 if there would then be any request for some sort of a breakup
22 fee.

23         I wonder if there would be any sort of a request for
24 establishing what the overbids would be.  I need to evaluate
25 that part of a potential sale transaction, in order to make

62

1 sure that the sale is conducted in accordance with Section 363,
2 and certainly, you have multiple bidders, which the Court is,
3 you know, again, I -- that's a good job out of the trustee to
4 -- this quickly, generate at least some market for the assets
5 that would be sold.
6          Would it be your contemplation that you would amend
7 the motion that pends before me here, which is a settlement
8 motion, so that it would in fact be a sale motion under Section
9 363 that would address the required information contained in
10 the local rules and so forth, so that whatever court consider
11 -- would conduct the auction would be able to discern how to
12 conduct it?
13          And I will tell you that I'm asking this question not
14 because I'm being pedantic.  I'm asking it because I'm not
15 going to be here next week.  I am going to be out of the
16 district, but that doesn't mean that I can't have another judge
17 conduct a Section 363 sale in my absence if they're available
18 to do so, and I certainly don't want my absence to delay what I
19 consider to be a breakwater moment in connection with the
20 administration of the Chapter 7 case.  So my -- that's a long
21 way of asking this question.  Is the idea to amend this motion
22 to make it a 363 motion so that the parties know what they're
23 -- what the structure of the proposed sale looks like?  What
24 the assets are and what the terms and conditions including with
25 that limitation, the stalking horse bid, the overbid amounts,

63

1  and the -- stalking horse bid -- oh, the breakup fees, if any,

2  as it relates to the motion?  Help me understand.

3          I think I know what you're contemplating, Mr.

4  Shapiro, but I need to be sure, because if there's going to be

5  a sale next week, then you're going to have a judge not named

6  Landis that's going to conduct that sale, and I want to be able

7  to be sure that the record is clear for the judge who conducts

8  the sale as to what the terms of the sale process would be.

9  Help me?

10         MR. CRAM:  Your Honor, can I interrupt?  This --

11         THE COURT:  No.  No.

12         MR. CRAM:  -- is Don Cram, Your Honor.

13         THE COURT:  You can't interrupt, Mr. Cram.  No.  I'm

14  talking to the trustee right now.

15         Mr. Shapiro?

16         MR. SHAPIRO:  Thank you, Your Honor.  Brian Shapiro,

17  again, Subchapter 5 trustee.

18         THE COURT:  No, former Subchapter 5 trustee, now

19  subchapter -- now Chapter 7 trustee.

20         MR. SHAPIRO:  It's been a long morning this morning.

21         THE COURT:  All right.

22         MR. SHAPIRO:  Again, Chapter -- let's just say Brian

23  Shapiro on behalf of the bankruptcy estate.  Maybe that's easy.

24         THE COURT:  All right.

25         MR. SHAPIRO:  Easier for me, Your Honor.  So from my

64

1  perspective, from the estate's perspective, it can be done in
2  two ways, and I think there is a probably better way than the
3  other, especially if Your Honor indicated that you won't even
4  be here to hear it.
5          But the first way is, you know, I can make --
6  certainly, it can be done by oral motion and advising this
7  Court of what the terms are, et cetera, because the basis of
8  the underlying motion was filed, and the citations that were
9  contained in the motion, it could be interpreted as a 363 sale.
10 And I think that's the weaker of the two statements.
11         But the other statement I could do, Your Honor, and
12 more than happy to go do that, alternatively, is actually file
13 a -- it would be either an amended motion, or an additional
14 motion to sell the assets, based upon the terms which I've
15 indicated.  There is no breakup fee, nothing was contemplated
16 pertaining to that, and in creating some type of standard
17 provisions, if someone wants to actually overbid at the time of
18 the sale, and I would -- I think that is probably quite frankly
19 the better of the two options.  It may certainly keep me busy
20 this weekend, to actually go do that as well.
21         THE COURT:  I feel you, Mr. Shapiro.
22         MR. SHAPIRO:  The issue, however --
23         THE COURT:  I feel you.
24         MR. SHAPIRO:  Yeah.  But the issue, however, and
25 let's be frank, in some respects, is one of notice.  We've

65

1  already had that argument a moment ago in the other motion.

2          Your Honor is well aware of at least my concerns in

3  other cases that I've appeared is notice has always been

4  important as a Chapter 7 trustee.  There is a huge amount of

5  creditors, and Ms. Guymon's already indicated, and believe me,

6  I'm well aware as well, the cost to file such notice and serve

7  these items just by regular mail.  To be sure, if a hearing was

8  on Friday, and I was to serve everything by U.S. Mail at the

9  latest on Monday, the time frame for a creditor to even

10  consider participating is going to be extremely limited.  And

11  acknowledging that does happen in bankruptcy court, and you do

12  the best that you can, but I want to be frank, that there would

13  be an issue of potential notice to those creditors, and the

14  cost to serve everyone, say by overnight mail maybe just

15  extremely expensive for the bankruptcy estate to go do that.  I

16  would think that perhaps I may be able to get some assistance

17  from another party, but it could be a very expensive ability to

18  actually do it.  But it may, on the other hand, could benefit

19  the estate as well.

20          So with that said, I would suggest, Your Honor, if I

21  am going to file a motion, which again, I think is the better

22  of the two options, is that perhaps not have such hearing the

23  following Friday, but perhaps sometime thereafter.  The

24  following -- the week thereafter, in order to get notice to

25  parties and give proper notice to parties, and have

66

1  opportunities if someone actually wants to appear in court.

2         And that way, it's duly noticed, everyone knows the

3  potential terms -- or not the terms, but to actually know the

4  terms and what's going to occur.  I don't know if you'll be

5  available that following week, but even if you're not, I think,

6  again, the issue of notice, to me, is very important in a

7  Chapter 7 trustee context, and I think that probably is the

8  best of the two scenarios, and I do think that still gives me

9  an opportunity to avoid any potential foreclosure by Mr. Cram's

10  client, because again, I don't believe that he can foreclose

11  until the date certain, which was contained in the motion.

12         Now, I also want to point out that that is based upon

13  my position, and he may have a contrary position.  I don't

14  know.  But pursuant to the terms of the underlying settlement

15  agreement, is if the estate enters into a 363 agreement, he has

16  the absolute right to terminate the offer and the sale, and

17  could immediately foreclose.  Knowing my discussions with

18  Mr. Cram previously, I don't think that's the intent, but that

19  would be one of my concerns as well that they would take the

20  position that they can immediately terminate and foreclose on

21  the collateral.  Based upon the motion that was filed, they

22  were not permitted to do so for again, a time certain, unless I

23  entered into a subsequent agreement.

24         THE COURT:  Fair enough.  And good enough.  Anything

25  further as it relates to Item Number 2 on the calendar before

67

1  you get the last word, because you will have it on rebuttal,

2  Mr. Shapiro?

3          MR. SHAPIRO:  Brian Shapiro on behalf of the estate.

4  No, Your Honor, I think that's enough at this time.

5          THE COURT:  All right.

6          Mr. Hughes, I said no because I was talking to the

7  trustee, but now I'm willing to hear what you have to say as it

8  relates to the motion.

9          MR. CRAM:  Your Honor, this is actually Don Cram on

10 behalf of Mr. Hughes.

11         THE COURT:  What did I say?  That's what I intended

12 to say, Mr. Cram on behalf of Mr. Hughes.

13         MR. CRAM:  Your Honor, I was just -- I'm sorry for

14 interrupting Mr. Shapiro, but I was going to just make I guess

15 the offer that my client -- I mean, my client is obviously

16 interested in having the settlement approved, but understands

17 that, you know, the trustee has to do what's in the best

18 interests of the estate, and, you know, my client is interested

19 in what's best for the estate and creditors as well.

20         THE COURT:  Well, and in getting --

21         MR. CRAM:  Having a --

22         THE COURT:  -- paid for the money that he advanced as

23 the DIP lender, I would expect.

24         MR. CRAM:  That's right, Your Honor.  And so I know

25 that there's some very tight time parameters in the event that

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

68

1  a 363, a competing 363 offer is made, and allows my client to

2  terminate the settlement agreement.  It allows my client to

3  immediately foreclose on the assets.  But I was going to offer

4  to -- my client has instructed me that he will delay that --

5  voluntarily delay that foreclosure process so that a more

6  robust, I guess, 363 process can occur, and instead of, you

7  know, having it next week, would refrain from foreclosure for a

8  two-week period, just to have a more robust procedure, as the

9  Court is alluding to.

10          THE COURT:  And I'm appreciative of that, Mr. Cram,

11  on behalf of Mr. Hughes.  That's helpful, in terms of

12  scheduling, and it certainly assists the trustee in doing what

13  he's required to do under Section 704 of the Code, which is

14  maximize the value of the assets through liquidation, and

15  that's helpful information, I'm confident, to the trustee.

16  Anything further you'd like to add on behalf of the DIP lender,

17  Mr. Hughes, Mr. Cram?

18          MR. CRAM:  No, Your Honor.  I just -- I mean, I think

19  with -- I mean, assuming Prolacta follows through and makes the

20  deposit into Ms. Guymon's trust account, and the trustee

21  receives confirmation of that today, I think a robust 363

22  process with a sale free and clear of liens would benefit the

23  estate.

24          THE COURT:  Very well.  Thank you for your input,

25  Mr. Hughes, that's help -- Mr. Hughes.  Again, Mr. Cram, on

69

1  behalf of Mr. Hughes, that is helpful.

2          The next part of the puzzle that I need to know about

3  comes from Prolacta, Ms. Guymon, because I have the Mead

4  Johnson papers on the docket, then I have the trustee's

5  representations as to Prolacta's interests in acquiring the

6  assets of the estate.

7          Help me understand what the parameters are of

8  Prolacta's interests, and the terms of their proposed purchase?

9          MS. GUYMON:  Yes, Your Honor.  The terms that were

10  set forth on the record by Mr. Shapiro are accurate.  My

11  client, maybe not happily, but in order to preserve the

12  evidence and preserve its property interests, has agreed to pay

13  $1,650,000 and wire those funds into my trust account, and has

14  agreed to the trustee's requests for no representations or

15  warranties as to the assets.

16          THE COURT:  All right.  And with respect to the

17  process, now, the trustee has suggested a 363 sale.  Your

18  client then at $1,650,000, willing to serve as a stalking horse

19  in connection with a 363 sale?

20          MS. GUYMON:  Yes, Your Honor.

21          THE COURT:  All right.  That's helpful.  And

22  obviously informs the Court with respect to the issues that are

23  pending on this motion in a substantive way.  Anything further

24  you'd like to add as it relates to this motion at this point,

25  Ms. Guymon?

70

1          MS. GUYMON:  Well Your Honor, the trustee did argue,

2    technically the motion to approve settlement, in part.  So does

3    Your Honor want to hear my argument, or may I preserve the

4    argument in the event that something happens, and a sale is not

5    concluded?

6          THE COURT:  It's not my intention to rule on this

7    motion today, at this point --

8          MS. GUYMON:  Okay.

9          THE COURT:  -- based on what I know, Ms. Guymon.  So

10   to the extent that there are additional issues that need to be

11   addressed at a substantive time, I think they'll be addressed

12   in a different procedural posture, but we'll find out soon

13   enough.  Anything else?

14         MS. GUYMON:  No, Your Honor.

15         THE COURT:  All right, thank you, Ms. Guymon.

16         On behalf of Mead Johnson, who made my life

17   interesting this morning by making a $2 million bid on specific

18   assets of the estate, Mr. Driscoll, Mr. Shea, your thoughts?

19         MR. DRISCOLL:  Yes.  Yes, Your Honor, thank you.

20   Mike Driscoll of Sheppard Mullin on behalf of Mead Johnson and

21   Company, LLC.  Your Honor, Mead Johnson, as you're aware, filed

22   a response which is at ECF Number 339.  We are happy to hear

23   that the trustee is going to move forward with an auction

24   process.  We'd like to note a few things.

25         First, I'd like to start with who Mead Johnson is,

71

1  why we are here, what are some of the challenges going forward

2  for Mead Johnson, and why our presence in an auction process

3  would be critically important for the estate.

4          So first, who is Mead Johnson?  Your Honor, we are a

5  global leader in developing and marketing nutritional products

6  for infants, including Enfamil brand.  We sell products in more

7  than 70 -- we sell more than 70 products in 50 countries.  In

8  short, we are a highly sophisticated and major player in infant

9  nutrition.  Given our deep badge of expertise, we are well

10  poised to take what may be an incomplete product, get

11  approvals, and get it to market.

12          If Medolac's claims are true with respect to the

13  efficacy and the safety of this product, the human milk

14  fortifier may be a promising product, so we see potential here.

15  We have the interests, tools, and experience to get this

16  product to reach its full potential and get it into the hands

17  of hospitals and parents to help infants.  In light of our

18  interest, yesterday we submitted a conditional offer to

19  purchase the fortifier and related assets for 2 million.

20          And so next I'd like to address, what are the

21  conditions and what are the problems that we see, Your Honor?

22  So despite our significant interest in the fortifier product,

23  we see problems.  First, we will need additional diligence to

24  get comfortable.  Gaps in the diligence that have been

25  available to us is, where is the fortifier, its recipe, and

72

1 related products?  So where are they stored?  Who has claims to

2 those assets?  So obviously, we've heard of Prolacta, but who

3 else has potential claims, including former employees?  What is

4 the full scope of the agreements between Medolac and third

5 parties?  To name a few.

6           So for example, Your Honor, we will need to know

7 whether there are research universities that have partnered

8 with Medolac that claim the data as their own.  Therefore, we

9 believe that more documents and information need to uncovered

10 on an expedited basis, and this needs to occur prior to an

11 auction.  Another issue we see, obviously, is the Prolacta

12 claims, and we're aware of these claims, and we're aware of the

13 debtor's, you know, significant denials that they did not

14 engage in trade secret infringement.  We don't have a position

15 specifically as to the veracity of Prolacta's claims.  If

16 Prolacta, however, is going to bid, then we need to know if

17 they are going to contest the assets being sold free and clear,

18 and we will need to know whether they will be asserting claims

19 against the buyer, a competing buyer.

20           It's true that this Court cannot sell what it does

21 not own, but it's also true that you don't buy something that

22 you already own.  We are an outsider looking in --

23           THE COURT:  Well, I think that's --

24           MR. DRISCOLL:  -- and --

25           THE COURT:  I think that's probably an overstatement

73

1  in the context of 363 sales where there's litigation pending
2  between the creditor and the debtor, but go ahead, Counsel.
3          MR. DRISCOLL:  Understood, Your Honor.  But we're an
4  outsider looking in, and they can't have it both ways, that
5  they're going to participate in an auction and say others will
6  be liable if they buy the assets.  If they're going to
7  participate, fine, then they will need to be clear that the
8  fortifier is property of the estate, and can be sold free and
9  clear.  If they're not going to do that, then it seems that a
10 determination needs to be made of whether Medolac owns the
11 assets, the fortifier, specifically, and Your Honor has the
12 opportunity to adjudicate that issue.  The Court would not need
13 to determine the full dispute that's between Prolacta and
14 Medolac.  It would not require a three-way trial.  This is a
15 discreet, limited issue of ownership of the estate that falls
16 well within Your Honor's core jurisdiction.
17         The issue would be narrowly focused on whether the
18 fortifier is solely the debtor's property.  Ultimately, what we
19 want is a robust sale order that protects us, and potentially
20 other bidders from claims by third parties.
21         THE COURT:  Sure, what the alternative would be --
22         MR. DRISCOLL:  Your Honor --
23         THE COURT:  -- though, would be to let the trustee
24 dictate what the terms of the proposed sale would be, and then
25 let Mead Johnson decide if it wants to be a bidder.

74

1          MR. DRISCOLL:  Well, Your Honor, that's an excellent

2  point.  So while I -- we believe our participation in an

3  auction would be critical, and we would like Your Honor to set

4  the stage for that to happen.  So right now, we have a

5  $2 million conditional offer that has the ability to reach much

6  deeper into the unsecured body than even Prolacta's offer.

7  With our offer, the estate gets to keep 184K in cash, 131K in

8  receivables.  There's also the issue of whatever liability that

9  Mr. Hughes has to the estate, we take obviously no position on

10  that.  There would be the claims of the estate against

11  Prolacta.  We take no position on that.  And there would be

12  Chapter 5 claims.  So all of that gets added onto our 2 million

13  bid, and then if there is an auction, the price will only go

14  up.

15          So Your Honor, what we want is additional diligence.

16  We want clarity of the protections that we would be getting

17  under a sale order, and to the extent Your Honor is able to do

18  so, to have the auction put out as far as possible, so that,

19  you know, Mead Johnson can make a determination of whether

20  we'll actually participate.

21          Your Honor, this concludes my argument.  I'm happy to

22  answer any questions you have.  Thank you very much.

23          THE COURT:  Thank you, Counsel, but I -- you've

24  answered the questions that I had.

25          Mr. Livermon, quietly waiting, thoughts with respect

75

1  to the sale process, the way that this motion is sort of
2  morphing at this point in time?

3          MR. LIVERMON:  Thank you, Your Honor.  Of course
4  Liquid Gold would like for a robust auction process to take
5  place and have a competitive bid process, so that any that have
6  an interest in these assets can come forward and bid, having a
7  period of time to do the due diligence that gets them
8  comfortable to submit a bid.  I believe that it would be
9  appropriate for Mr. Shapiro to put forth before the Court what
10 the current offer that he has from Prolacta is, so that the
11 parties can understand what, if any, contingencies or
12 conditions go along with that, what the effect of a sale would
13 be, and let the parties come before the Court after a
14 reasonable time to submit those, any competing or topping bids
15 that they wish to make.

16         So Your Honor, I would support, obviously, an
17 adjournment of today's hearing, to give Mr. Shapiro the
18 opportunity to put before the Court a 363 procedures motion,
19 and give the parties a reasonable time to come back with a
20 topping bid.  Thank you.

21         THE COURT:  Very well.  Thank you, Mr. Livermon.

22         I haven't heard Mr. Zirzow.  Your thoughts?

23         MR. ZIRZOW:  Your Honor, on behalf of the debtor I
24 just haven't had a chance to really discuss it, and you know, I
25 understand the debtor's more limited role in a Chapter 7.

76

1  Speaking on behalf of my law firm as an administrative
2  creditor, however, you know, I hear some positive potential,
3  you know, suggestions of a sale.  I'm concerned when we have a
4  deal in hand, that, you know, we have a lot of conditional
5  offers and suggestions that people are going to offer money,
6  but frankly, Your Honor, the conversion happened a month ago.
7  I'm not sure why we're having all this last minute, you know,
8  hysterics.  People were questioned by Mr. Shapiro whether they
9  -- and Prolacta and Mead Johnson, and they both said, well, no,
10  not really, and now a day or two before the hearing, they're
11  all coming in.
12          So I don't want to lose the bird in hand we have with
13  the DIP lender for the potential of more, but with a whole
14  bunch of conditions.  So I just wanted to express that concern
15  for Your Honor.
16          THE COURT:  Sure.
17          MR. ZIRZOW:  Now what I'm hearing this morning, which
18  is also news to me, is that the DIP lender is willing to
19  forestall any foreclosure, which is encouraging.  But just, I
20  wanted to highlight for you the amount of time that has elapsed
21  since the conversion, and how these parties that are now saying
22  they're interested previously said they weren't, and hence why
23  the trustee took the action that he did.
24          So I'm concerned about timing, I'm concerned about
25  people saying things, about using it as a Trojan Horse to do

77

1  discovery, like Prolacta, or Mead Johnson, who has really been
2  sitting idly by for way too long, and now suddenly coming in.
3  But hopefully, I'm proven wrong.  Hopefully there is a real
4  sale process that started, but just understand my concern with
5  the lack of action to date.  I hope things change in the near
6  term, because I would hate for us to lose all of the offers,
7  Prolacta to back away, Mead Johnson to not get comfortable with
8  the many, many conditions it wants, and Mr. Hughes to say, you
9  know what, I'm just going to foreclose, and I'm not going to
10 pay the estate 750,000.  So I just wanted to express that for
11 Your Honor.  Thank you.
12         THE COURT:  All right.  So, Mr. Shapiro, now you've
13 heard the universe of comments back as it relates to what was
14 originally a motion to settle, which is now apparently seeming
15 to morph at least towards, if not morphing into a Section 363
16 sale.  Rebuttal?
17         MR. SHAPIRO:  Brian Shapiro on behalf of the
18 bankruptcy estate.
19         First of all, thank you for everyone for making
20 comments.  I certainly appreciate that.  But Your Honor, the
21 estate is on a very, very tight time frame.  I appreciate the
22 DIP lender's agreement to extend the ability to foreclose.  I
23 have obviously been aware of their ability to do so, and
24 however, with all due respect to Mr. Zirzow, I do have a
25 obligation on behalf of the bankruptcy estate for all creditors

78

1    in order to bring potentially additional funds into the estate.

2              Considering the representations in the agreement that

3    you heard from Ms. Guymon, it appears to me that their offer is

4    better than what the estate is getting pursuant to the

5    settlement with the DIP lender.  So my suggestion, Your Honor,

6    and request, is that Your Honor continue this matter, so

7    continuing the motion to approve a settlement to perhaps a

8    week, week and a half, when Your Honor is back, and then during

9    that time frame, I would file -- I would classify it more as an

10   amendment to the motion to approve the settlement, so it would

11   be a motion to approve a settlement, or alternatively, a 363

12   sale, and set forth the terms as indicated between myself and

13   Ms. Guymon that were on the record earlier today, which would

14   give the -- any party an opportunity to come in and overbid.

15             Unfortunately, as I indicated earlier, this isn't a

16   perfect case in a perfect world, and the requests by Mead

17   Johnson, I don't believe it's something that the estate could

18   accomplish, and doesn't have the funds to litigate that

19   particular issue.  Mead Johnson has not come to the table

20   saying that they're willing to give concrete funds that are

21   non-refundable to the estate, or even pay for such litigation.

22   Accordingly, the estate is between the proverbial rock and a

23   hard place, looking at potentially settling with Mr. Hughes or

24   alternatively selling the assets, subject to all liens and

25   encumbrances, as-is/where-is, without any warranties or

79

1  representations, and if someone is interested in purchasing

2  those assets, they would have an opportunity to do so.

3          THE COURT:  Okay.

4          MR. SHAPIRO:  So again, on behalf of the estate, I

5  would request this Court to continue this matter to a

6  particular date and time, and then also I guess orally

7  requesting to the extent necessary, shortened time so I can

8  file and serve an amendment to the motion which would be in

9  essence an alternative to the 9019 motion, which would be the

10 363 sale with particular terms.

11         THE COURT:  All right.  My real issue is one of

12 calendaring.  I will be out of the district beginning on the

13 11th.  I will be back on the bench -- I will be back on the

14 bench on the 23rd.  And the 23rd is not great.  The 24th, I

15 already have pending matters as it relates to Medolac, set for

16 1:30, and it already has the afternoon.

17         I am sensitive, and I understand the desire to have

18 this matter move forward swiftly, and I am also, concomitantly,

19 interested in making sure that parties have the opportunity to

20 properly evaluate the alternative proposed mechanism for

21 liquidating the assets of the estate that's come forward as a

22 result of the dialogue with the Court here today.

23         My question, Mr. Shapiro, is this.  We're here on

24 August 6th.  When would you contemplate having -- and I'm just

25 going to ask you.  When would you contemplate having a motion

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

80

1  to amend the settlement motion on file?

2          MR. SHAPIRO:  Presuming that Ms. Guymon and I could

3  perhaps work together to make sure that we both agreed to the

4  applicable terms, I would -- hopefully that -- it would be no

5  later than the following Monday, if not sooner.  So in essence,

6  no later than the 9th.

7          THE COURT:  Okay.

8          MR. SHAPIRO:  But it is possible that it could be

9  filed perhaps even tomorrow, but I -- out of an abundance of

10 caution, I would say the 9th.

11         THE COURT:  All right.

12         Ms. Guymon, is that an issue for you?  We're here at

13 almost noon on a Friday.  We're talking about filing a motion

14 on Monday that has some very substantive terms to it.  Are you

15 comfortable with an August 9th date for contemplated motion?

16 Again, adding the sale piece to the existing motion to approve

17 the settlement?

18         MS. GUYMON:  Yes, Your Honor.

19         THE COURT:  All right.  So if that motion is filed by

20 August 9th, the next question is, because it seems to be my

21 bailiwick this week in connection with these motions to deal

22 with the question of service.  And an opportunity for parties

23 to do legitimate due diligence as it relates to potential

24 competing bids.  How long, Mr. Shapiro, would be a reasonable

25 period of time do you believe for conducting that sort of due

81

1 diligence?

2          MR. SHAPIRO:  Your Honor, just to inquire regarding

3 service?

4          THE COURT:  Right.  Well, I have --

5          MR. SHAPIRO:  Of the motion --

6          THE COURT:  I have twofold concerns.  One is making

7 sure that the parties have full notice and an opportunity to be

8 heard as it relates to the hearing on the motion, and an

9 opportunity to bid.  I'm trying to get, in my own mind, sort of

10 a series of dates that will allow the motion to be filed, the

11 Court to consider it, then the actual auction itself.  And

12 those are the three sort of components that I'm looking at

13 here.  And I'm asking because I want input from the trustee.

14 It's your motion.  I want to make sure that the dates that I

15 pick are consistent with your calendar.

16          MR. SHAPIRO:  Thank you, Your Honor.  Thank you for

17 clarifying, and Brian Shapiro on behalf of the estate.

18          Your Honor, if the motion was filed and served on the

19 9th, it would give parties an opportunity hopefully they would

20 receive it within a few days, and then therefore having a

21 potential hearing -- assuming Mr. Hughes is agreeable, it could

22 be done when you come back on the 24th, but let me express

23 another issue and concern.

24          Is that the estate is not in control of the facility,

25 nor assets of the bankruptcy estate, pursuant to the agreement

82

1  with the DIP lender.  However, there are administrative costs,

2  including potential rent costs, which are going to accrue for

3  the month of August, as well as potential utilities, which may

4  accrue, and perhaps that may be hypothetically nominal at best.

5  As much as I would like to say, Your Honor, that perhaps we

6  could have the hearing the week of the 16th, assuming Mr. Cram,

7  on behalf of his client, is willing to extend the appropriate

8  deadlines and having the hearing when you return on the 24th or

9  so, would certainly be sufficient for the estate.

10         However, there is the concern of -- again, the

11  administrative expenses, which may be incurring again, just so

12  everyone is well aware, the estate is not in control of these

13  particular assets.  They are in the control of the DIP lender.

14         THE COURT:  So your idea, conceptually here, is just

15  so I'm walking through it as I'm making notes, as we go.  Have

16  the amended motion on file, and served on August the 9th.  Have

17  a hearing as it relates to the sale procedures sometime during

18  the week of the 16th, and then conduct the sale hearing, given

19  the fact that we have Medolac matters already set for August

20  24th?  Is that consistent with your calendar and what your

21  comments were?

22         MR. SHAPIRO:  Yes, Your Honor.

23         THE COURT:  Okay.  Fair enough.  Let's see.  Next, a

24  big piece of that puzzle is Mr. Hughes.

25         Does that time frame work within Mr. Hughes'

83

1  willingness to stand down as it relates to foreclosure, as long

2  as we hit those benchmarks, Mr. Cram?

3           MR. CRAM:  Yes, Your Honor.  And I just want to add,

4  I mean, for lack of the most important benchmark, I think, you

5  know, confirmation that Prolacta actually makes the deposit of

6  the $1.65 million.  I mean, that seems to me to be the linchpin

7  of continuing this process out.  I mean, if Prolacta does not

8  do that, my client would request that the Court approve the

9  settlement.  But conditioned upon Prolacta making the deposit

10 that they represented they're going to make today, my client

11 would agree to those -- to the benchmarks that were just

12 outlined.

13          THE COURT:  All right.  That's helpful.  Thank you,

14 Mr. Cram on behalf of Mr. Hughes.  I finally got it right

15 today, Mr. Cram.

16          Ms. Guymon, workable dates?  The 9th to have the

17 hearing -- or excuse me.  The amended motion filed.  A hearing

18 on the procedures sometime during the week of the 16th, and

19 then an auction sale when I get back in the office on the 24th,

20 to run concurrently with the other matters that are pending in

21 this case?

22          MS. GUYMON:  Yes, Your Honor.  I do want to represent

23 that I, too, will be out of the office the week of the 16th,

24 but my office can still participate in the procedures hearings.

25          THE COURT:  All right.  That --

84

1          MS. GUYMON:  I will be here on the 24th.

2          THE COURT:  Okay.  Fair enough.  Okay.  That's

3    helpful.

4          Mr. Livermon, I hope you're -- you're three hours in

5    front of us anyway, so you're already -- have scheduled

6    questions usually when I do matters like this.  Are those

7    dates, the 9th for the amended motion, a hearing sometime

8    during the week of the 16th for procedures and then the actual

9    sale on the 24th, a workable time frame from the standpoint of

10   Liquid Gold?

11         MR. LIVERMON:  Yes, Your Honor, they are workable.  I

12   have a conflict with the 24th, but we will make sure that

13   Liquid Gold is adequately represented at the matter -- the

14   auction on the 24th, so do not schedule around that.

15         THE COURT:  All right.

16         MR. LIVERMON:  But thank you for asking.

17         THE COURT:  Okay.  And Mr. Driscoll, Mr. Shea, on

18   behalf of Mead Johnson, that gets the motion as amended before

19   the parties very quickly.  It gives an opportunity to look at

20   the procedures aspect of it, and weigh in at the hearing that I

21   would set sometime on the week of the 16th, and then the 24th,

22   the date for the sale.  Is that a workable time frame from the

23   standpoint of Mead Johnson?

24         MR. DRISCOLL:  Your Honor, with respect to whether we

25   can attend those?  Yes.  I'd need to consult with my client

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

85

1  about whether we're going to be able to participate in the

2  auction if we're not able to get our diligence.

3          Your Honor, if I may belabor on one point, I think

4  this is something that I did address during my colloquy, but

5  it's -- if we're going to participate in an auction, which we

6  very well may, and we very well may under these conditions.

7  I'd have to consult with my client, and those conditions -- if

8  we're competing against Prolacta's stalking horse bid, if

9  that's what it's going to be characterized as, and that bid is

10 as-is/where-is, where does that leave a debtor who buys the

11 asset?  If we are the ultimate successful purchaser, is it

12 Prolacta's position that anyone else who competes and is the

13 successful purchaser is therefore then liable under the

14 doctrines of success reliability or other theory?  That is a

15 critical point that needs to be answered before anyone can move

16 forward.  There may be other bidders other than Mead Johnson

17 out there, and this is a very critical point for us.  Thank

18 you, Your Honor.

19         THE COURT:  And of course, you can make a decision

20 whether or not to bid based on what the trustee actually says

21 the terms of the auction will be.  All right.  Thank you,

22 Mr. Driscoll.

23         Mr. Zirzow, timing, reasonable with respect to the

24 proposal as it relates to this motion and how we'll move

25 through it?

86

1          MR. ZIRZOW:  Your Honor, the dates work.  Thank you.

2          THE COURT:  All right.  Ms. McHenry, on behalf of M-2

3  Lease Fund, no ox particularly necessarily in the -- well, no

4  dog, I suppose; an ox gets gored, dogs are in fights.  I don't

5  think M-2 Lease Fund particularly has a dog in this fight, and

6  yet, you're a lessor here, and you understand the terms of the

7  proposed sale, or at least the schedule for the proposed sale.

8  Is that a workable schedule from the standpoint of M-2?

9          MS. MCHENRY:  This is Megan McHenry.  We are fine

10 with that schedule.  We just want to make sure that any sale is

11 subject to M-2 Lease Fund's purchase money security interests

12 in the equipment.

13         THE COURT:  All right.  Very well.  Thank you for

14 that.  That's helpful.  I think I've exhausted those who are

15 involved here.  I haven't heard anyone strenuously or

16 stridently objecting to that time schedule.

17         So the last question I have then, Mr. Shapiro, is the

18 idea would be to actually have a hearing on the sale procedure

19 sometime during the week of the 16th.  Any particular dates to

20 avoid?

21         MR. SHAPIRO:  Your Honor, I certainly have --

22 depending on times, I have availability that entire week.

23         THE COURT:  All right.

24         MR. SHAPIRO:  I am here.

25         THE COURT:  Then here's what I'm going to do for

87

1  purposes of the record today.  Based on the record as it's been
2  developed here, and the arguments of counsel, which were
3  appreciated and helpful to the Court, I believe that it's in
4  the estate's best interests to continue this motion to approve
5  the settlement.  I will continue it until August 24th at
6  1:30 p.m.
7          Ms. Shim?
8          With the understanding that by August 9th of 2021,
9  the trustee will file an amended motion to approve with an
10 alternative option of a sale, with the stalking horse being
11 Prolacta, the terms of which will be developed by the trustee,
12 not the Court, and that'll have to happen, obviously, in
13 communication with Ms. Guymon and Prolacta.
14          Once that's on file, we will have a hearing on the
15 motion as amended and the purpose of that hearing will be to
16 consider the sale procedures piece of that motion.  It will be
17 sometime during the week of August 16th.  I can't give you the
18 specific date on that as I'm sitting here right now.  I will
19 coordinate with the other judges here.  Someone will be
20 available to hear this matter during the week of August 16th.
21 When I have that date, Mr. Shapiro, my courtroom deputy will
22 communicate with you, so that you can incorporate that into
23 your papers.
24          The Court here today authorizes the hearing on the
25 amended motion on shortened time to avoid any questions or

88

1  concerns in that regard.  When I have that date, Mr. Shapiro,

2  you'll have it, and I'll have it to you before the end of the

3  day, assuming that I can communicate with my other judges, and

4  get a firm availability during that week of the 16th.

5          The hearing then will be on August 24th, on the

6  amended motion, and again, Mr. Shapiro, that one is a --

7  obviously, shortened time date.  If you file a motion to have

8  the amended motion heard on shortened time, you can use August

9  24th at 1:30 p.m. as the date for the hearing -- or the sale

10 hearing.

11         Questions from the standpoint of the trustee, who

12 will have to take the laboring oar in putting this process in

13 motion?

14         MR. SHAPIRO:  Brian Shapiro on behalf of the estate.

15 I don't have any questions.  Actually, let me rephrase.  I do

16 have one question, Your Honor.

17         THE COURT:  All right.

18         MR. SHAPIRO:  So yes, I'm assuming the -- I will be

19 filing a motion -- an amended motion, in a sense, to approve

20 the settlement and/or the motion to sale.  The procedures

21 aspect of that motion will be heard sometime in the 16th, and I

22 believe Your Honor is --

23         THE COURT:  The week of the 16th, and I'll get you

24 the date during --

25         MR. SHAPIRO:  Oh, the week of --

89

1          THE COURT:  Right.

2          MR. SHAPIRO:  Right, right.  The week of the 16th,

3  and Your Honor is orally granting, in essence, a shortened time

4  for that to be heard.  And then --

5          THE COURT:  I'm granting specifically orally the

6  opportunity to have that heard --

7          MR. SHAPIRO:  Thank you.

8          THE COURT:  -- on shortened time, so there's no room

9  for doubt later, should somebody else look at the transcript

10 today, Mr. Shapiro.  Go right ahead.

11         MR. SHAPIRO:  Thank you.  And then after that

12 hearing, the actual -- I guess after that, it gets approved,

13 and then subsequently, the hearing on the underlying

14 sale/settlement will be on the 24th.  Would that be --

15         THE COURT:  That's correct.  At 1:30.

16         MR. SHAPIRO:  Correct.  Okay.  All right.  The only

17 other comment I have, and it's simply a coincidence, Your

18 Honor, is for the parties to be aware, the 341 meeting for

19 Medolac is actually tomorrow -- or on Monday, I didn't realize

20 that.  It is at 11:30.  So for the parties that are in &&

21 attendance, I do intend on continuing that, so don't worry

22 about attending, because obviously, it'll lead with you, Your

23 Honor, so I will continue that matter.  I don't know the new

24 date and time but I will be continuing that matter as well.

25         THE COURT:  Okay.

90

1    MR. SHAPIRO:  I didn't realize that when you decided

2  to make the hearing on August 9th.

3    THE COURT:  Yeah.  Well, that's why I wanted to walk

4  through this all the way through with the party who's going to

5  take the laboring oar as it relates to putting the sale motion

6  in process as amended.  Mr. Shapiro, any further questions?

7    MR. SHAPIRO:  No, Your Honor.

8    THE COURT:  All right.  The Court first thanks all of

9  the parties who have appeared here today.  The record with

10  respect to this motion to approve settlement is much more fully

11  developed as a result of the hearing.  The matter was heard on

12  shortened time, and yet the parties were able to bring forward

13  substantive information that is of assistance to the Court in

14  figuring out what a reasonable way to proceed is.

15    That having been said, the dates that I've set are as

16  follows; the amended motion is to be filed by August 9th, and

17  then the hearing will be sometime during the week of the 16th.

18  Stay tuned.

19    Mr. Shapiro, as soon as I know what that date is, I

20  will let you know, and that will be today before I leave.

21    And then the sale hearing will be on August 24th at

22  1:30, if the sale procedures are approved during the hearing on

23  the week of the 16th.

24    So with that, Item Number 1, Ms. Shim, is simply

25  continued until August 24th at 1:30.

91

1          The Court will enter a short order that sets forth

2    the dates that I've set here previously.

3          Mr. Shapiro, you know when you request shortened

4    time, what dates you can use in your papers.

5          With that, Ms. Shim, what have I managed to overlook

6    on my 9:30 calendar today?

7          THE CLERK:  Nothing else, Your Honor.

8          THE COURT:  All right.  Seeing nothing further, we're

9    adjourned.  Stay safe, stay healthy, counsel, and have a good

10   weekend.

11         THE CLERK:  Thank you, Your Honor.

12         MR. SHAPIRO:  Thank you, Your Honor.

13         MR. DRISCOLL:  Thank you very much, Your Honor.

14      (Proceedings concluded at 11:58 a.m.)

15                        *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

92

1                    C E R T I F I C A T I O N
2
3          I, Lisa Luciano, court-approved transcriber, hereby
4    certify that the foregoing is a correct transcript from the
5    official electronic sound recording of the proceedings in the
6    above-entitled matter, and to the best of my ability.
7
8
9    _____
10   LISA LUCIANO, AAERT NO. 327     DATE:  August 7, 2021
11   ACCESS TRANSCRIPTS, LLC
12
13
14
15
16
17
18
19
20
21
22
23
24
25